**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: ) | |
| ) | |
| APPLICATION OF PATOKH CHODIEV AND ) | |
| INTERNATIONAL MINERAL RESOURCES, B.V. ) | |
| FOR AN ORDER TO TAKE DISCOVERY ) | 1:18-MC-00013 (EGS) |
| PURSUANT TO 28 U.S.C. § 1782, ) | |
| ) | **FILED UNDER SEAL** |
| Applicants. ) | |
| ) | |

**APPENDIX TO THE MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF RESPONDENT RINAT AKHMETSHIN'S MOTION TO QUASH**

# EXHIBIT 1

# KOBRE & KIM LLP

1919 M STREET, NW
WASHINGTON, DC 20036
WWW.KOBREKIM.COM

NEW YORK
LONDON
HONG KONG
SHANGHAI
SEOUL
WASHINGTON DC
SAN FRANCISCO
MIAMI
CAYMAN ISLANDS
BVI

TEL +1 202 664 1900

February 9, 2018

**BY HAND DELIVERY**

Rinat Akhmetshin

Re:     *In re: Application of Patokh Chodiev and International Mineral
         Resources B.V. for an Order to Take Discovery Pursuant to § 1782,
         No. 18-mc-13 (D.D.C.)*

Mr. Akhmetshin:

Enclosed please find a subpoena and order in the above-captioned matter.  As you can see, the order directs you to produce documents responsive to the subpoena by no later than February 26, 2018, and to provide deposition testimony no later than March 26, 2018.

Very truly yours,

John (Fritz) Scanlon
+1 202 664 1983

Jonathan Cogan
+1 212 488 1206

Enclosures

**FILED**

FEB - 5 2018

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE:

APPLICATION OF PATOKH CHODIEV AND
INTERNATIONAL MINERAL RESOURCES B.V.
FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782

Applicants.

[~~PROPOSED~~] ORDER

Case No. _18-mc-13_

Applicants Patokh Chodiev and International Mineral Resources B.V. ("IMR") filed this

application for an order pursuant to 28 U.S.C. § 1782 authorizing them to take discovery from Joseph

Szlavik and Rinat Akhmetshin, both found in the District of Columbia, for use in foreign

proceedings (the "Application").  For the reasons set forth in the Application, and for good cause

shown, it is hereby:

**ORDERED** that the Application is **GRANTED**; and it is further

**ORDERED** that Patokh Chodiev and IMR are authorized to serve Joseph Szlavik and

Rinat Akhmetshin with subpoenas substantially in the form as those attached to the Declaration

of John Scanlon as Exhibit A and Exhibit B; and it is further

**ORDERED** that Joseph Szlavik and Rinat Akhmetshin are directed to produce the

documents in their possession, custody, and control, as requested in the subpoenas, by no later

than February 26, 2018, and to provide the deposition testimony requested in the subpoenas on

or before March 26, 2018.

Dated: _2/2_, 2018

_____
United States District Judge

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

In re Application of Patokh Chodiev and
International Mineral Resources B.V.

District of Columbia

|  |  |
|---|---|
| _____ | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No. |
| | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                       Rinat Akhmetshin

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: | Date and Time: |
|---|---|
| Kobre & Kim LLP | |
| 1919 M Street NW, Washington, DC 20036 | 03/26/2018 9:00 am |

The deposition will be recorded by this method: _____

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

See attached Rider to Subpoena

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 2/6/2018

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Patokh Chodiev
and International Mineral Resources B.V.                                        , who issues or requests this subpoena, are:

John Scanlon, Kobre & Kim LLP, 1919 M Street NW, Washington, DC 20036

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____   on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____          _____

                                              *Server's signature*

                                    _____

                                              *Printed name and title*

                                    _____

                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

(A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

<u>**RIDER TO SUBPOENA**</u>

PLEASE TAKE NOTICE that pursuant to the attached Subpoena and Fed. R. Civ. P. 45, Rinat Akhmetshin is required to produce and permit inspections of the following documents:

## I. <u>DEFINITIONS</u>

1. "All" or "any" means each and every.

2. "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these discovery requests any information that might otherwise be construed to be outside their scope.

3. "Communication" and "communications" includes, without limitation, any oral, written, or electronic transmittal of information or request for information made from one person or entity to another, whether made in person, by telephone, electronically, or by any other means.

4. "Concerning" means relating to, referring to, describing, evidencing or constituting.

5. "Document" or "documents" means any and all handwritten, typewritten, printed or otherwise recorded matter of whatever character, or graphic material (however produced or reproduced), tapes or other voice recordings, and all other tangible objects including but not limited to booklets, procedures, pamphlets, circulars, notices, periodicals, papers, contracts, agreements, checks, bills, invoices, photographs, agendas, receipts, minutes, memoranda, written instructions, letters, expense accounts, messages, appraisals, analyses, reports, plans, evaluations, financial calculations and representations, diary entries, time sheets, calendars, telephone logs, visitor logs, telephone message slips, correspondence, e-mails, telegrams, press releases, advertisements, notes, handwritten notes, transcripts, surveys, tabulations, working papers, drawings, schedules, tabulations and projections, studies, graphs, charts, films, videotapes,

- 1 -

microfiche, printouts, all other data whether recorded by electronic or any other means, including drafts of any of the foregoing and any other data in your possession, custody, or control and including all items that are in storage anywhere, of any source of authorship.

The definition of "document" also includes information stored in or retrievable from equipment or media that includes, but is not limited to, desktop PCs or workstations, PCs, workstations, minicomputers, or mainframes used as file servers, application servers, or electronic mail servers, other minicomputers and mainframes, laptop, notebook and other portable computers, whether assigned to individuals or in pools available for shared use, home computers, backup disks and tapes, archival disks and tapes, and other forms of off-line storage, whether stored on-site with the computers used to generate them or off-site in another computer facility or by a third party, electronic mail messages, even if available only on backup or archive disks or tapes.  If a document was prepared in several copies or if additional copies were thereafter made, and if any such copies were not identical or are no longer identical by reason of subsequent notation or modification of any kind whatsoever, including, without limitations, notations on the front or back of any of the pages thereof, then each such non-identical copy is a separate document and must be produced.

6.      "IMR" means International Mineral Resources B.V., any parent, subsidiary or affiliate of International Mineral Resources B.V., any and all present and former employees, officers, directors, agents, representatives, attorneys, assignees, consultants, or successors of International Mineral Resources B.V. or their families, and any other person acting or purporting to act on International Mineral Resources B.V.'s behalf.

7.      "Patokh Chodiev or his Business Interests" means the individual Patokh Chodiev, and any and all present and former agents, representatives, attorneys, assigns, consultants,

employees, or successors, or any other person acting or purporting to act on Patokh Chodiev's behalf, whether directly or indirectly. "Patokh Chodiev or his Business Interests" means any companies or entities in which Patokh Chodiev is currently or was in the past an officer, director, shareholder, or partner or in which Patokh Chodiev currently owns or in the past owned any direct or indirect interest, and any and all present and former agents, representatives, attorneys, assigns, consultants, employees, or successors, or any other person acting or purporting to act on behalf of such companies or entities.

8.      The terms "You" and "Your" mean the individual Rinat Akhmetshin and any and all present and former agents, representatives, attorneys, assigns, consultants, employees, or successors, or any other person acting or purporting to act on Rinat Akhmetshin's behalf, whether directly or indirectly, and further includes any companies or entities in which Rinat Akhmetshin is currently or was in the past an officer, director, shareholder, or partner or in which Rinat Akhmetshin currently owns or in the past owned any interest.

## II.    **INSTRUCTIONS**

1.      The present tense shall be construed to include the past tense and the past tense shall be construed to include the present tense as necessary to bring within the scope of these requests any documents or information that might otherwise be construed to be outside their scope.

2.      The singular shall be construed to include the plural and the plural shall be construed to include the singular as necessary to bring within the scope of these requests any documents or information that might otherwise be construed to be outside their scope.

3.      If you are unable to respond fully to a request, respond to the fullest extent possible and specify the reasons for your inability to respond in full.

4.      If you withhold any documents on grounds of a claim of attorney-client privilege, the attorney work product doctrine, or any other privilege or protection, identify each such document and, with respect to each such document, state the specific basis for the claim of privilege or protection and provide the following information:

(a)      The subject matter of the document;

(b)      The title, heading, or caption of the document, if any;

(c)      The identifying number, letter, or combination thereof, if any, and the significance or meaning of such number, letter, or combination thereof;

(d)      The date appearing on the document or, if no date appears thereon, the date or approximate date on which the document was prepared;

(e)      The general nature or description of the document (*i.e.*, whether it is a letter, memorandum, minutes of a meeting, etc.) and the number of pages in the document;

(f)      The identity of the person who signed the document and, if it was not signed, the identity of each person who prepared it;

(g)      The identity of each person to whom the document was addressed and the identity of each person to whom a copy or blind copy thereof was sent; and

(h)      The identity of each person who has custody of any copy or version of the document.

5.      "Identify" or provide the "identity," with respect to a document, means to state:

(a)      The date and nature of the document (*i.e.*, whether it is a letter, memorandum, minutes of a meeting, etc.);

(b)      The title, subject, or heading of the document;

- 4 -

(c)     The identity of each author, addressee(s), copy addressee(s), blind copy

addressee(s), and every natural person or entity to whom the document was

disclosed;

(d)     A description of the document's subject matter; and

(e)     The Bates number or other identification number of the document, if any.

6.      These requests for production of documents require you to produce all responsive documents in your possession, custody, or control from all files that contain responsive documents, wherever located.  Without limitation, these requests for production require you to produce documents subject to your control even though located in the files of other persons, such as your agents, representatives, employees, and attorneys, including in other offices located outside of Washington, D.C.

7.      These document requests are not limited as to time, except as expressly set forth below.

8.      Any electronic information should be produced in searchable format.

9.      In responding to these requests:

(a)     If a document was, but no longer is, in your possession, custody, or control, state:

i.      how the document was disposed of;

ii.     the name, current address, and telephone number of the natural person or

the entity who currently has possession, custody, or control of the

document;

iii.    the date of disposition; and

iv.     the name, current address, and telephone number for each natural person

or the entity who authorized said disposition or who had knowledge of

said disposition.

(b)     If documents cannot be located, describe with particularity the efforts made to

locate the documents and the specific reason for their disappearance or

unavailability.

## III.     DOCUMENTS TO BE PRODUCED

This subpoena requires production of all documents from January 1, 2011, to the present

that are responsive to the request below and are in Your possession, custody or control:

1.      All Documents and Communications Concerning Patokh Chodiev or his Business

Interests, including but not limited to IMR.

# EXHIBIT 2

### Mutual Release and Covenant Not to Sue from Rinat Akhmetshin

This Mutual Release and Covenant Not to Sue (the "Mutual Release") is entered into on January $\underline{15}$, 2016 (the "Effective Date"), among INTERNATIONAL MINERAL RESOURCES B.V. ("IMR"), SHAFT SINKERS (PTY) LTD. ("SHAFT SINKERS PTY"), ROSSAL NO. 126 (PTY) LTD. ("ROSSAL" and, together with SHAFT SINKERS PTY, "SHAFT SINKERS"), IMR MANAGEMENT SERVICES LIMITED ("IMSL"), JAI KRISHNA SARAF, AMRE ABDELHAMID YOUNESS, (Mr. Saraf and Mr. Youness, together with IMSL, the "U.K. RESPONDENTS"), JOHANNES FREDERICK KLOPPER, LIEBENBERG DAWID RYK VAN DER MERWE, CHRISTOPHER RAYMOND REY, PETRUS STEFANUS LOUW (Messrs. Klopper, Van Der Merwe, Rey and Louw together, the "BRPs"), EUROCHEM VOLGA-KALIY LLC ("ECVK"), PATRICK SALISBURY, ("SALISBURY"), SALISBURY & RYAN LLP ("S&R") and RINAT AKHMETSHIN (each of the parties is referred to herein as a "Party" and collectively as the "Parties").

WHEREAS, IMR is engaged in the following related court proceedings (the "Actions") with Mr. Akhmetshin:

- (R) IMR has brought claims in New York State Supreme Court against Mr. Akhmetshin, EuroChem Volga-Kaliy LLC ("ECVK"), Patrick Salisbury ("Salisbury") and Salisbury & Ryan LLP ("S&R") (Index No. 161682/2015) (the "**New York Action Proceedings**");

- (S) IMR has brought an application in the U.S. District Court for the District of Columbia for an order under 28 U.S.C. § 1782 to take discovery from Mr. Akhmetshin in which ECVK has intervened (Case No. 1:14-MC-00340(GK)) (the "**Washington 1782 Proceedings**");

WHEREAS, the Parties to the Actions deny any liability arising out of, in connection with or related to the matters that are the subject of the Actions or at all;

166

WHEREAS, and notwithstanding the above, the Parties to the Actions understand that continuing the Actions would lead to protracted and costly litigation and, in order to avoid the burden and very substantial expense of continuing litigation, have agreed to terms for the settlement of all disputes arising out of, in connection with or related to the matters that are the subject of the Actions, and have entered into a Confidential Settlement Agreement, Release and Covenant Not to Sue;

NOW, THEREFORE, in connection with the settlement of the Actions and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties to this Mutual Release have agreed as follows:

**Interpretation**

1.  In this Mutual Release:

(a) With respect to any specified Party, the term **"Associated Parties"** shall include such specified Party's principals, individual and/or corporate shareholders (whether holding directly or through a holding company or companies), investors, trusts, trustees, parent undertakings, subsidiary undertakings (whether direct or indirect), wholly or partially owned investee entities (including, in the case of IMR, Cunico Resources N.V.), partners (in the case of partnership), members, joint venturers, Affiliates (as defined herein), beneficiaries, beneficial owners, officers, directors, employees, legal advisers, agents, consultants, experts, personal representatives, heirs, executors, insurers, reinsurers, predecessors, successors and assigns, authorised signatories, in each case whether past, present or future and in each case whether in their capacities as such or otherwise;

(b) The term **"Affiliate"** includes, with respect to any specified person or entity, any person or entity that directly or indirectly, including through one or more intermediaries, controls, or is controlled by, or is under common control with, such specified person or entity or any one or more partner in or principal, shareholder or parent undertaking of such specified

167

person or entity as well as, in the case of an entity, that entity's principals, individual and/or corporate shareholders (whether holding directly or through a holding company or companies), investors, trusts, trustees, parent undertakings, subsidiary undertakings (whether direct or indirect), partners (in the case of partnership), members, joint venturers, beneficiaries, beneficial owners, officers, directors, employees, legal advisers, agents, consultants, experts, personal representatives, heirs, executors, insurers, reinsurers, predecessors, successors and assigns, authorized signatories, in each case whether past, present or future and in each case whether in their capacities as such or otherwise;

(c) The term "**holding company**" shall have the meaning ascribed to it in section 1159 of the U.K. Companies Act 2006 and a company shall be treated, for the purposes only of the membership requirement contained in subsections 1159(1)(b) and (c) of the U.K. Companies Act 2006, as a member of another company even if its shares in that other company are registered in the name of (a) another person (or its nominee), whether by way of security or in connection with the taking of security, or (b) its nominee;

(d) The terms "**parent undertaking**" and "**subsidiary undertaking**" shall have the meaning ascribed to them respectively in section 1162 of the U.K. Companies Act 2006;

(e) The term "**Released Claims**" includes any and all claims described in paragraphs 2 and 3 of this Mutual Release.

**Released Claims**

2.      Save in relation to obligations arising under this Mutual Release and/or the Confidential Settlement Agreement, Release and Covenant Not to Sue, effective on the Effective Date, IMR, Shaft Sinkers Pty, Rossal, the U.K. Respondents, the BRPs, ECVK, Salisbury and S&R, and each of them, on behalf of themselves and their Associated Parties, hereby release and forever discharge and fully and finally settle any and all claims, including, without limitation, causes of action, (whether civil or criminal), suits, debts, contracts, costs, attorneys' fees, sums of money, notes, negotiable and non-negotiable instruments, bills,

specialties, covenants, controversies, agreements, promises, slanders, defamations, variances, trespasses, liabilities, torts, negligence, errors, obligations, fees, damages, judgments, awards, orders made by courts or tribunals in any jurisdiction, executions, claims, counterclaims and demands, and/or any other rights to relief of any kind whatsoever, whether in law or in equity or otherwise, direct or indirect, foreseen or unforeseen, contingent or actual, liquidated or unliquidated, past, present or future, howsoever and whensoever arising in whatever capacity or jurisdiction in the world, under any legal or factual theory, whether known or unknown, suspected or unsuspected, assigned, accrued or not accrued, whether or not in the contemplation of the Parties and/or their Associated Parties at the time of this Mutual Release, including claims which as a matter of law did not at the time of this Mutual Release exist and the existence of which cannot currently be foreseen and any claims or rights of action arising from newly discovered facts and circumstances, a subsequent change or clarification of law or regulations, or changes in the interpretation of laws, regulations, or principles of law by courts, other governmental institutions, or otherwise, and whether presently capable of being discovered or ascertained or not, that IMR, Shaft Sinkers Pty, Rossal, the U.K. Respondents, the BRPs, ECVK, Salisbury and S&R, and each of them and/or their Associated Parties, whether solely or jointly with any other person or entity, have, had, or may have against Mr. Akhmetshin and/or his respective Associated Parties arising out of, in connection with or in any way related to the matters that are the subject of the Actions.

3.       Save in relation to obligations arising under this Mutual Release and/or the Confidential Settlement Agreement, Release and Covenant Not to Sue, effective on the Effective Date, Mr. Akhmetshin, on behalf of himself and his Associated Parties, hereby release and forever discharge and fully and finally settle any and all claims, including, without limitation, causes of action, (whether civil or criminal), suits, debts, contracts, costs, attorneys' fees, sums of money, notes, negotiable and non-negotiable instruments, bills, specialties, covenants, controversies, agreements, promises, slanders, defamations, variances, trespasses, liabilities, torts, negligence, errors, obligations, fees, damages, judgments, awards, orders made by courts or tribunals in any jurisdiction, executions, claims, counterclaims and demands, and/or any other rights to relief of any kind whatsoever, whether in law or in equity or otherwise, direct or indirect, foreseen or unforeseen, contingent or actual, liquidated or unliquidated, past, present or future, howsoever and whensoever arising in whatever capacity or jurisdiction in the world, under any legal or factual theory, whether known or unknown,

169

suspected or unsuspected, assigned, accrued or not accrued, whether or not in the contemplation of the Parties and/or their Associated Parties at the time of this Mutual Release, including claims which as a matter of law did not at the time of this Mutual Release exist and the existence of which cannot currently be foreseen and any claims or rights of action arising from newly discovered facts and circumstances, a subsequent change or clarification of law or regulations, or changes in the interpretation of laws, regulations, or principles of law by courts, other governmental institutions, or otherwise, and whether presently capable of being discovered or ascertained or not, that Mr. Akhmetshin and/or his Associated Parties, whether solely or jointly with any other person or entity, have, had, or may have against IMR, Shaft Sinkers Pty, Rossal, the U.K. Respondents, the BRPs, ECVK, Salisbury and S&R and each of them and/or their Associated Parties arising out of, in connection with or in any way related to the matters that are the subject of the Actions.

**Covenant Not to Sue**

4.      Each Party agrees, on behalf of itself and on behalf of its Associated Parties not to sue, commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against any other Party or its Associated Parties any action, suit or other proceeding concerning the Released Claims, in this jurisdiction or any other.

5.      Each Party indemnifies, and shall keep indemnified, all other Parties and their Associated Parties against all costs and damages (including the entire legal expenses of the same) incurred in respect of:

> (a) any future actions, claims and proceedings related to the Released Claims, which it or any of its Associated Parties may bring against any other Party or its Associated Parties (for the avoidance of doubt, such indemnity shall apply notwithstanding that such Party may have used its best endeavours to procure that such proceedings not be brought by its Associated Parties); and

> (b) any existing actions, claims and proceedings continued or recommenced by a Party or any of its Associated Parties against any other Party or its Associated Parties in breach of this Mutual Release.

**Confidentiality**

6.     The terms of this Mutual Release, and the substance of all negotiations in connection with it, are confidential to the parties and their advisers, who shall not disclose them to, or otherwise communicate them to, any third party without the written consent of the other party (such consent not to be unreasonably withheld) other than:

> (a) to the parties' respective auditors, insurers and lawyers on terms which preserve confidentiality;
>
> (b) pursuant to an order of a court of competent jurisdiction, or pursuant to any proper order or demand made by any competent authority or body where they are under a legal or regulatory obligation to make such a disclosure; and
>
> (c) as far as necessary to implement and enforce any of the terms of this Mutual Release.

7.     For the avoidance of doubt, the Parties are entitled to disclose the fact of, but not the terms of, the Mutual Release.

8.     In the event that a Party considers itself legally compelled to disclose the terms of this Mutual Release to a third party, the disclosing Party shall give the other Parties not less than 14 days prior written notice to allow those other Parties the opportunity to challenge the proposed disclosure to the third party.

**Notices**

9.     Each of the Parties appoints the persons or companies set out below as its authorised agent for the purpose of accepting service of notices, legal process or other information for all purposes in connection with this Mutual Release.

10.     Any notice, legal process or other information in connection with this Mutual Release shall be validly served on such Party if sent both by email and in hard copy by internationally recognised courier service (such as DHL or FedEx) to such agent at the email address(es) and address(es) as set out below or as may be amended by way of notice given under this section.

171

11.     Service of documents and other notifications in connection with this Mutual Release shall be deemed to have taken place on the business day in the agent's location following the date upon which the said document or notification is sent by email.

12.     Each of the Parties undertakes not to revoke the authority of such agent, without previously having appointed another such agent for service and having given notice of the new agent (including the email and address details of that agent) to all the other Parties. Until such alternative agent for service has been appointed by a Party and notice of that appointment served on all the other Parties service on the retiring agent shall be considered valid service under this Mutual Release.

13.     The appointed agents are:

(a) For Mr. Akhmetshin:

> Kim Hoyt Sperduto
> Sperduto Thompson PLC
> 1133 Twentieth Street, N.W., 2nd Floor
> Washington, D.C.  20036
> Tel: +1 202-408-8900
> Fax: +1 202-408-8910
> ksperduto@sperdutothompson.com

(b) For IMR:

> Jonathan D. Cogan, Esq.
> Kobre & Kim LLP
> 800 Third Avenue
> New York, NY 10022
> Tel:  +1 212-488-1200
> Fax:  +1 212-488-1220
> jonathan.cogan@kobrekim.com

(c)  For Shaft Sinkers and the BRPs:

> Alex Eliott, Esq.
> Hogan Lovells (South Africa)
> 22 Fredman Drive Sandton
> P.O. Box 78333 Sandton City 2146, RSA
> Tel: +27 011 286 6900
> Fax: +27 011 286 9601
> Alex.Eliott@hoganlovells.com

(d) For IMSL and Mr. Saraf:

> Robert J. Wieder, Esq.
> Bryan Cave LLP
> 88 Wood Street
> London EC2V 7AJ UK
> Tel:  +44 (0) 20 3207 1263
> Fax:  +44 (0) 20 3207 1613
> rjw@bryancave.com

(e) For Mr. Youness:

> Joe Hage
> Joseph Hage Aaronson LLP
> 280 High Holborn
> London WC1V 7EE UK
> Tel: +44 (0) 20 7851 8888
> Fax: +44 (0) 20 7117 1838
> jhage@jha.com

(f) For ECVK

> Andrew Lankler, Esq.
> Baker Botts LLP
> 30 Rockefeller Plaza
> New York, NY 10112
> Tel: +1 (212) 408-2516
> Fax:  +1 (212) 212-259-2516
> andrew.lankler@bakerbotts.com

(g) For Mr. Salisbury and S&R

> Patrick Salisbury, Esq.
> Salisbury & Ryan LLP
> 1325 Avenue of the Americas
> New York, NY 10019
> Tel:  (212) 977-4660
> Fax:  (212 977-4668
> ps@salisburyryan.com

**Miscellaneous**

14.     The execution of this Mutual Release and the performance of its terms shall not be construed to be an admission of any liability whatsoever on the part of any of the Parties or their Associated Parties and shall not be admissible as evidence against any such

173

persons in any proceeding, whether judicial, administrative or otherwise in relation to the Released Claims.

15.     The settlements, releases and/or discharges set out above are without prejudice to any claim that any of the Parties and/or their Associated Parties may have against any other Party to this Mutual Release and/or its Associated Parties in relation to a breach or breaches of this Mutual Release.

16.     Other than their respective Associated Parties, the Parties do not intend by virtue of this Mutual Release to confer any rights on any third party as third party beneficiaries; any of the Parties and/or their Associated Parties may enforce the terms of this Mutual Release as it relates to such party or such Associated Party.

17.     Each of the Parties represents and warrants that it has full authority to enter into this Mutual Release on behalf of itself and its Associated Parties.

18.     Subject to clause 19 below, the Parties acknowledge that, damages not being an adequate remedy for any breach of any obligation under the terms of this Mutual Release, relief by way of injunction and/or specific performance shall be available to any Party or any Party's Associated Parties which is or may be affected by any such breach or contemplated breach and the Parties irrevocably waive the right to object to such remedies on the basis that damages are an adequate remedy for breach of obligations under the terms of this Mutual Release.

19.     This Mutual Release and any dispute or claim arising out of it or in connection with it or its subject matter, existence, negotiation, validity, termination or enforceability (including non-contractual disputes or claims) shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice-of-law rules thereof which may permit or require the application of the laws of another jurisdiction. The Parties hereby irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York, or, in the event that court lacks subject matter jurisdiction, to the exclusive jurisdiction of the New York Supreme Court for New York County (and to the full extent permitted by that Court shall cooperate to have any dispute heard by the Commercial Division thereof), to determine any dispute arising under or related to this Mutual Release and hereby waive, to the fullest extent permitted by law, any objection that they may now or hereafter have to the laying of jurisdiction and venue

for any such action or proceeding in such court. The Parties agree to accept service of process by means of the notice provision set forth above.

20. **THE PARTIES WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY DISPUTE BASED ON OR ARISING FROM THIS MUTUAL RELEASE.**

21. This Mutual Release represents the entire understanding and constitutes the whole agreement of the Parties in relation to the subject matter hereof and supersedes any previous agreement among the Parties with respect thereto. For the avoidance of doubt, nothing contained in this Mutual Release shall in any way affect, amend, modify, release or waive any of the respective rights, contractual or otherwise, or obligations among ECVK, EuroChem Group AG, S&R, Mr. Salisbury and their Associated Parties.

22. IMR, Shaft Sinkers, the U.K. Respondents and the BRPs on the one hand, and Mr. Akhmetshin on the other, each confirm that in entering into this Mutual Release:

> (a) Neither has relied on any representation, warranty, assurance, covenant, indemnity, undertaking or commitment from the other which is not expressly set out in this Mutual Release; and

> (b) In any event, without prejudice to any liability for fraudulent misrepresentation or fraudulent misstatement, the only rights or remedies either shall have against the other in relation to any representation, warranty, assurance, covenant, indemnity, undertaking or commitment given or action taken in connection with this Mutual Release are pursuant to this Mutual Release, and for the avoidance of doubt and without limitation, neither have any other right or remedy (whether by way of a claim for contribution or otherwise) in tort (including negligence) or for misrepresentation (whether negligent or otherwise, and whether made prior to, or in, this Mutual Release) against the other.

23. If any provision or part of this Mutual Release is found to be void or unenforceable, it shall be deemed to be deleted and the remaining provisions of this Mutual Release shall continue in full force and effect and the Parties shall use their respective best endeavours to agree a valid and enforceable provision in place of the provision deemed to be deleted which will as nearly as possible give effect to the substance of the provision deemed to be deleted.

24. Each Party covenants and agrees that it will execute, acknowledge and deliver or will cause to be done, executed, acknowledged and delivered any further acts, documents, or instruments as may reasonably be required by any other Party in order to carry out fully and effectuate the promises and covenants herein provided.

25. Each Party agrees that this Mutual Release shall be binding upon and inure for the benefit of all successors in title and assigns of each Party including successors to all or any part of the assets or business of any of the Parties. Each of the Parties undertakes to use its best endeavours to procure that this Mutual Release is and remains so binding.

26. This Mutual Release may be executed in any number of counterparts and by the Parties to it on separate counterparts, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

27. No variation of this Mutual Release shall be effective unless it is executed and delivered as an agreement by each of the Parties concerned.

28. No Party shall be able to assign any of its rights or transfer any of its rights and/or obligations under or in connection to this Mutual Release without prior written consent of each other Party.

**IN WITNESS** whereof this Mutual Release has been executed by the Parties hereto and is intended to be and is hereby delivered on the date first above written.

_____
On behalf of International Mineral
Resources B.V.

_____
On behalf of Shaft Sinkers (Pty) Ltd.

_____
On behalf of Rossal No. 126 (Pty) Ltd.

_____
On behalf of Petrus Stefanus Louw

_____
On behalf of IMR Management
Services Limited

_____
On behalf of Jai Krishna Saraf

_____
On behalf of Amre Abdelhamid
Youness

_____
On behalf of Johannes Frederick Klopper

_____
On behalf of Liebenberg Dawid Ryk
Van Der Merwe

_____
On behalf of Christopher Raymond Rey

24.      Each Party covenants and agrees that it will execute, acknowledge and deliver or will cause to be done, executed, acknowledged and delivered any further acts, documents, or instruments as may reasonably be required by any other Party in order to carry out fully and effectuate the promises and covenants herein provided.

25.      Each Party agrees that this Mutual Release shall be binding upon and inure for the benefit of all successors in title and assigns of each Party including successors to all or any part of the assets or business of any of the Parties. Each of the Parties undertakes to use its best endeavours to procure that this Mutual Release is and remains so binding.

26.      This Mutual Release may be executed in any number of counterparts and by the Parties to it on separate counterparts, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

27.      No variation of this Mutual Release shall be effective unless it is executed and delivered as an agreement by each of the Parties concerned.

28.      No Party shall be able to assign any of its rights or transfer any of its rights and/or obligations under or in connection to this Mutual Release without prior written consent of each other Party.

**IN WITNESS** whereof this Mutual Release has been executed by the Parties hereto and is intended to be and is hereby delivered on the date first above written.

On behalf of International Mineral Resources B.V.

On behalf of Shaft Sinkers (Pty) Ltd.

On behalf of Rossal No. 126 (Pty) Ltd.

On behalf of Petrus Stefanus Louw

On behalf of IMR Management Services Limited

On behalf of Jai Krishna Saraf

On behalf of Amre Abdelhamid Youness

On behalf of Johannes Frederick Klopper

On behalf of Liebenberg Dawid Ryk Van Der Merwe

On behalf of Christopher Raymond Rey

176

24.      Each Party covenants and agrees that it will execute, acknowledge and deliver or will cause to be done, executed, acknowledged and delivered any further acts, documents, or instruments as may reasonably be required by any other Party in order to carry out fully and effectuate the promises and covenants herein provided.

25.      Each Party agrees that this Mutual Release shall be binding upon and inure for the benefit of all successors in title and assigns of each Party including successors to all or any part of the assets or business of any of the Parties.  Each of the Parties undertakes to use its best endeavours to procure that this Mutual Release is and remains so binding.

26.      This Mutual Release may be executed in any number of counterparts and by the Parties to it on separate counterparts, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

27.      No variation of this Mutual Release shall be effective unless it is executed and delivered as an agreement by each of the Parties concerned.

28.      No Party shall be able to assign any of its rights or transfer any of its rights and/or obligations under or in connection to this Mutual Release without prior written consent of each other Party.

**IN WITNESS** whereof this Mutual Release has been executed by the Parties hereto and is intended to be and is hereby delivered on the date first above written.

On behalf of International Mineral Resources B.V.

On behalf of Shaft Sinkers (Pty) Ltd.

On behalf of Rossal No. 126 (Pty) Ltd.

On behalf of Petrus Stefanus Louw

On behalf of IMR Management Services Limited

On behalf of Jai Krishna Saraf

On behalf of Amre Abdelhamid Youness

On behalf of Johannes Frederick Klopper

On behalf of Liebenberg Dawid Ryk Van Der Merwe

On behalf of Christopher Raymond Rey

176

24.     Each Party covenants and agrees that it will execute, acknowledge and deliver or will cause to be done, executed, acknowledged and delivered any further acts, documents, or instruments as may reasonably be required by any other Party in order to carry out fully and effectuate the promises and covenants herein provided.

25.     Each Party agrees that this Mutual Release shall be binding upon and inure for the benefit of all successors in title and assigns of each Party including successors to all or any part of the assets or business of any of the Parties.  Each of the Parties undertakes to use its best endeavours to procure that this Mutual Release is and remains so binding.

26.     This Mutual Release may be executed in any number of counterparts and by the Parties to it on separate counterparts, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

27.     No variation of this Mutual Release shall be effective unless it is executed and delivered as an agreement by each of the Parties concerned.

28.     No Party shall be able to assign any of its rights or transfer any of its rights and/or obligations under or in connection to this Mutual Release without prior written consent of each other Party.

**IN WITNESS** whereof this Mutual Release has been executed by the Parties hereto and is intended to be and is hereby delivered on the date first above written.

On behalf of International Mineral
Resources B.V.

On behalf of Shaft Sinkers (Pty) Ltd.

On behalf of Rossal No. 126 (Pty) Ltd.

On behalf of Petrus Stefanus Louw

On behalf of IMR Management
Services Limited

On behalf of Jai Krishna Saraf

On behalf of Amre Abdelhamid
Youness

On behalf of Johannes Frederick Klopper

On behalf of Liebenberg Dawid Ryk
Van Der Merwe

On behalf of Christopher Raymond Rey

176

24.     Each Party covenants and agrees that it will execute, acknowledge and deliver or will cause to be done, executed, acknowledged and delivered any further acts, documents, or instruments as may reasonably be required by any other Party in order to carry out fully and effectuate the promises and covenants herein provided.

25.     Each Party agrees that this Mutual Release shall be binding upon and inure for the benefit of all successors in title and assigns of each Party including successors to all or any part of the assets or business of any of the Parties. Each of the Parties undertakes to use its best endeavours to procure that this Mutual Release is and remains so binding.

26.     This Mutual Release may be executed in any number of counterparts and by the Parties to it on separate counterparts, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

27.     No variation of this Mutual Release shall be effective unless it is executed and delivered as an agreement by each of the Parties concerned.

28.     No Party shall be able to assign any of its rights or transfer any of its rights and/or obligations under or in connection to this Mutual Release without prior written consent of each other Party.

**IN WITNESS** whereof this Mutual Release has been executed by the Parties hereto and is intended to be and is hereby delivered on the date first above written.

On behalf of International Mineral
Resources B.V.

On behalf of Shaft Sinkers (Pty) Ltd.

On behalf of Rossal No. 126 (Pty) Ltd.

On behalf of Petrus Stefanus Louw

On behalf of IMR Management
Services Limited

On behalf of Jai Krishna Saraf

On behalf of Amre Abdelhamid
Youness

On behalf of Johannes Frederick Klopper

On behalf of Liebenberg Dawid Ryk
Van Der Merwe

On behalf of Christopher Raymond Rey

176



24.     Each Party covenants and agrees that it will execute, acknowledge and deliver or will cause to be done, executed, acknowledged and delivered any further acts, documents, or instruments as may reasonably be required by any other Party in order to carry out fully and effectuate the promises and covenants herein provided.

25.     Each Party agrees that this Mutual Release shall be binding upon and inure for the benefit of all successors in title and assigns of each Party including successors to all or any part of the assets or business of any of the Parties. Each of the Parties undertakes to use its best endeavours to procure that this Mutual Release is and remains so binding.

26.     This Mutual Release may be executed in any number of counterparts and by the Parties to it on separate counterparts, each of which when so executed and delivered shall be an original, but all the counterparts shall together constitute one and the same instrument.

27.     No variation of this Mutual Release shall be effective unless it is executed and delivered as an agreement by each of the Parties concerned.

28.     No Party shall be able to assign any of its rights or transfer any of its rights and/or obligations under or in connection to this Mutual Release without prior written consent of each other Party.

**IN WITNESS** whereof this Mutual Release has been executed by the Parties hereto and is intended to be and is hereby delivered on the date first above written.

On behalf of International Mineral
Resources B.V.

On behalf of Shaft Sinkers (Pty) Ltd.

On behalf of Rossal No. 126 (Pty) Ltd.

On behalf of Petrus Stefanus Louw

On behalf of IMR Management
Services Limited

On behalf of Jai Krishna Saraf

On behalf of Amre Abdelhamid
Youness

On behalf of Johannes Frederick Klopper

On behalf of Liebenberg Dawid Ryk
Van Der Merwe

On behalf of Christopher Raymond Rey

176



On behalf of EuroChem Volga-Kaliy LLC

On behalf of Patrick Salisbury

On behalf of Salisbury & Ryan LLP

On behalf of Rinat Akhmetshin

_____   _____
On behalf of EuroChem Volga-Kaliy     On behalf of Patrick Salisbury
LLC

_____   _____
On behalf of Salisbury & Ryan LLP     On behalf of Rinat Akhmetshin

177

<br>

_____
On behalf of EuroChem Volga-Kaliy
LLC

_____
On behalf of Patrick Salisbury


_____
On behalf of Salisbury & Ryan LLP

_____
On behalf of Rinat Akhmetshin

# EXHIBIT 3

AO88 (Rev. 12/06) Subpoena in a Civil Case

### Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

In Re Application of International Mineral Resources

V.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]   1:14-mc-00340-GK

TO:  Rinat Akhmetshin
1529 Vermont Avenue NW
Washington, DC 20005

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Kobre & Kim LLP, 1919 M St NW, Washington, DC 20036 | DATE AND TIME<br>02/27/2015 |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See attached Rider

| PLACE   Kobre & Kim LLP, 1919 M St NW, Washington, DC 20036 | DATE AND TIME<br>02/20/2015 |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)   *Attorney for Plaintiff* | DATE<br>2/5/2015 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

S. Nathan Park, Kobre & Kim LLP, 1919 M St NW, Washington, DC 20036 (202) 664-1900

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev.  12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## RIDER TO SUBPOENA

PLEASE TAKE NOTICE that pursuant to the attached Subpoena and Fed. R. Civ. P. 45, Rinat Akhmetshin is required to produce and permit inspections of the following documents:

**I.   DEFINITIONS**

1.      "All" or "any" means each and every.

2.      "And" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these discovery requests any information that might otherwise be construed to be outside their scope.

3.      "Communication" and "communications" includes, without limitation, any oral, written, or electronic transmittal of information or request for information made from one person or entity to another, whether made in person, by telephone, electronically, or by any other means.

4.      "Concerning" means relating to, referring to, describing, evidencing or constituting.

5.      "Document" or "documents" means any and all handwritten, typewritten, printed or otherwise recorded matter of whatever character, or graphic material (however produced or reproduced), tapes or other voice recordings, and all other tangible objects including but not limited to booklets, procedures, pamphlets, circulars, notices, periodicals, papers, contracts, agreements, checks, bills, invoices, photographs, agendas, receipts, minutes, memoranda, written instructions, letters, expense accounts, messages, appraisals, analyses, reports, plans, evaluations, financial calculations and representations, diary entries, time sheets, calendars, telephone logs, visitor logs, telephone message slips, correspondence, e-mails, telegrams, press releases, advertisements, notes, handwritten notes, transcripts, surveys, tabulations, working papers, drawings, schedules, tabulations and projections, studies, graphs, charts, films, videotapes,

- 1 -

microfiche, printouts, all other data whether recorded by electronic or any other means, including drafts of any of the foregoing and any other data in your possession, custody, or control and including all items that are in storage anywhere, of any source of authorship.

The definition of "document" also includes information stored in or retrievable from equipment or media that includes, but is not limited to, desktop PCs or workstations, PCs, workstations, minicomputers, or mainframes used as file servers, application servers, or electronic mail servers, other minicomputers and mainframes, laptop, notebook and other portable computers, whether assigned to individuals or in pools available for shared use, home computers, backup disks and tapes, archival disks and tapes, and other forms of off-line storage, whether stored on-site with the computers used to generate them or off-site in another computer facility or by a third party, electronic mail messages, even if available only on backup or archive disks or tapes. If a document was prepared in several copies or if additional copies were thereafter made, and if any such copies were not identical or are no longer identical by reason of subsequent notation or modification of any kind whatsoever, including, without limitations, notations on the front or back of any of the pages thereof, then each such non-identical copy is a separate document and must be produced.

6. "ECVK" means EuroChem Volga-Kaliy LLC, any parent, subsidiary, or affiliate of EuroChem Volga-Kaliy LLC, any and all present and former employees, officers, directors, agents, representatives, attorneys, assignees, consultants, or successors of EuroChem Volga-Kaliy LLC or their families, and any other person acting or purporting to act on EuroChem Volga-Kaliy LLC's behalf.

7. "ENRC" means Eurasian Natural Resources Corporation PLC, any parent, subsidiary, or affiliate of Eurasian Natural Resources Corporation PLC, any and all present and

former employees, officers, directors, agents, representatives, attorneys, assignees, consultants, or successors of Eurasian Natural Resources Corporation PLC or their families, and any other person acting or purporting to act on Eurasian Natural Resources Corporation PLC's behalf.

8.　　"EuroChem" means EuroChem, any parent, subsidiary, or affiliate of EuroChem, any and all present and former employees, officers, directors, agents, representatives, attorneys, assignees, consultants, or successors of EuroChem or their families, and any other person acting or purporting to act on EuroChem's behalf.

9.　　"IMR" means International Mineral Resources B.V., any parent, subsidiary or affiliate of International Mineral Resources B.V., any and all present and former employees, officers, directors, agents, representatives, attorneys, assignees, consultants, or successors of International Mineral Resources B.V. or their families, and any other person acting or purporting to act on International Mineral Resources B.V.'s behalf.

10.　　The word "person" or "persons" means all individuals and entities including, but not limited to, natural persons, trusts and estates, legal or investment advisors, auditors, directors, employees, trustees, fiduciaries, representatives, delegates, consultants, attorneys, agents, functionaries, or otherwise affiliated individuals, whether serving full-time or part-time, whether paid or unpaid, whether regular or alternate, including any individuals having possession, custody, or control of documents or information relating to the present application.

11.　　"Salisbury & Ryan" means Salisbury & Ryan, LLP, Patrick Salisbury, Andrew Ryan, or any other attorney, employee, or agent of Salisbury & Ryan, LLP.

12.　　"Shaft Sinkers" means Shaft Sinkers (Pty) Ltd, any parent, subsidiary, or affiliate of Shaft Sinkers (Pty) Ltd, any and all present and former employees, officers, directors, agents,

representatives, attorneys, assignees, consultants, or successors of Shaft Sinkers (Pty) Ltd or their families, and any other person acting or purporting to act on Shaft Sinkers (Pty) Ltd's behalf.

13.     The terms "You," "Your," or "Rinat Akhmetshin" includes any and all present and former agents, representatives, attorneys, assigns, consultants, employees, or successors, or any other person acting or purporting to act on Rinat Akhmetshin's behalf, whether directly or indirectly, and further includes any companies or entities in which Rinat Akhmetshin is currently or was in the past an officer, director, shareholder, or partner or in which Rinat Akhmetshin currently owns or in the past owned any interest.

## II.     **INSTRUCTIONS**

1.     The present tense shall be construed to include the past tense and the past tense shall be construed to include the present tense as necessary to bring within the scope of these requests any documents or information that might otherwise be construed to be outside their scope.

2.     The singular shall be construed to include the plural and the plural shall be construed to include the singular as necessary to bring within the scope of these requests any documents or information that might otherwise be construed to be outside their scope.

3.     If you are unable to respond fully to a request, respond to the fullest extent possible and specify the reasons for your inability to respond in full.

4.     If you withhold any documents on grounds of a claim of attorney-client privilege, the attorney work product doctrine, or any other privilege or protection, identify each such document and, with respect to each such document, state the specific basis for the claim of privilege or protection and provide the following information:

(a)     The subject matter of the document;

- 4 -

(b)     The title, heading, or caption of the document, if any;

(c)     The identifying number, letter, or combination thereof, if any, and the significance or meaning of such number, letter, or combination thereof;

(d)     The date appearing on the document or, if no date appears thereon, the date or approximate date on which the document was prepared;

(e)     The general nature or description of the document (*i.e.*, whether it is a letter, memorandum, minutes of a meeting, etc.) and the number of pages in the document;

(f)     The identity of the person who signed the document and, if it was not signed, the identity of each person who prepared it;

(g)     The identity of each person to whom the document was addressed and the identity of each person to whom a copy or blind copy thereof was sent; and

(h)     The identity of each person who has custody of any copy or version of the document.

5.     "Identify" or provide the "identity," with respect to a document, means to state:

(a)     The date and nature of the document (*i.e.*, whether it is a letter, memorandum, minutes of a meeting, etc.);

(b)     The title, subject, or heading of the document;

(c)     The identity of each author, addressee(s), copy addressee(s), blind copy addressee(s), and every natural person or entity to whom the document was disclosed;

(d)     A description of the document's subject matter; and

(e)     The Bates number or other identification number of the document, if any.

- 5 -

6.      These requests for production of documents require you to produce all responsive documents in your possession, custody, or control from all files that contain responsive documents, wherever located.  Without limitation, these requests for production require you to produce documents subject to your control even though located in the files of other persons, such as your agents, representatives, employees, and attorneys, including in other offices located outside of Washington, D.C.

7.      These document requests are not limited as to time, except as expressly set forth below.

8.      Any electronic information should be produced in searchable format.

9.      In responding to these requests:

(a)     If a document was, but no longer is, in your possession, custody, or control, state:

  i.      how the document was disposed of;

  ii.     the name, current address, and telephone number of the natural person or the entity who currently has possession, custody, or control of the document;

  iii.    the date of disposition; and

  iv.     the name, current address, and telephone number for each natural person or the entity who authorized said disposition or who had knowledge of said disposition.

(b)     If documents cannot be located, describe with particularity the efforts made to locate the documents and the specific reason for their disappearance or unavailability.

- 6 -

III.    **DOCUMENTS TO BE PRODUCED**

This subpoena requires production of all documents from January 1, 2011, to the present that are responsive to the request below and are in your possession, custody or control:

1.    All documents and communications concerning IMR, Shaft Sinkers, ENRC, EuroChem, ECVK, and/or Salisbury & Ryan.

# EXHIBIT 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------- x
                                                        :
INTERNATIONAL MINERAL RESOURCES B.V.,   :    Index No. _____
                                                        :
                              Plaintiff,                :    Date Purchased: November 12, 2015
                                                        :
v.                                                      :    **SUMMONS**
                                                        :
RINAT AKHMETSHIN, PATRICK P.            :
SALISBURY, SALISBURY & RYAN LLP,        :
EUROCHEM VOLGA-KALIY LLC,               :
                                                        :
                              Defendants.               :
                                                        x
--------------------------------------------------------------- 

**TO THE ABOVE NAMED DEFENDANTS:**        **Rinat Akhmetshin**
                                          1529 Vermont Avenue NW
                                          Washington, D.C. 20005

                                          **Patrick P. Salisbury**
                                          1325 Avenue of the Americas
                                          New York, New York 10019

                                          **Salisbury & Ryan LLP**
                                          1325 Avenue of the Americas
                                          New York, New York 10019

                                          **EuroChem Volga-Kaliy LLC**
                                          7 Lenin Street
                                          Kotelnikovo 404350, Russia

        You are hereby summoned to answer the complaint in this action and to serve a copy of
your answer on the Plaintiff's attorney within 20 days after the service of this summons,
exclusive of the day of service (or within 30 days after the service is complete if this summons is
not personally delivered to you within the State of New York); and in case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Plaintiff designates New York County as the place of trial. The basis of venue is Defendant SALISBURY & RYAN LLP's principal office address, which is 1325 Avenue of the Americas, New York, New York 10019.  *See* CPLR § 503(d)

Dated: New York, New York                               KOBRE & KIM LLP
   November 12, 2015

          By:           

           Jonathan D. Cogan (NY Bar No. 4167276)
           Jonathan.Cogan@kobrekim.com
           Steven W. Perlstein (NY Bar No. 2982478)
           Steven.Perlstein@kobrekim.com
           Rebecca G. Mangold (NY Bar No. 4741021)
           Rebecca.Mangold@kobrekim.com
           KOBRE & KIM LLP
           800 Third Avenue
           New York, New York 10022
           Tel: 212.488.1200
           Fax: 212.488.1220

           John (Fritz) Scanlon (NY Bar No. 4538781)
           Fritz.Scanlon@kobrekim.com
           KOBRE & KIM LLP
           1919 M Street, NW
           Washington, DC 20036
           Tel: 202.664.1900
           Fax: 202.664.1920

           *Counsel for Plaintiff International Mineral
           Resources B.V.*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

INTERNATIONAL MINERAL RESOURCES B.V.,

                     Plaintiff,

v.

RINAT AKHMETSHIN, PATRICK P.
SALISBURY, SALISBURY & RYAN LLP,
EUROCHEM VOLGA-KALIY LLC,

                     Defendants.

-----------------------------------------------------------------x

Index No. _____

**COMPLAINT**

Plaintiff International Mineral Resources B.V. ("IMR") for its Complaint against Rinat Akhmetshin ("Akhmetshin"), Patrick P. Salisbury ("Salisbury"), Salisbury & Ryan LLP ("S&R"), and EuroChem Volga-Kaliy LLC ("ECVK") alleges:

## INTRODUCTION

1.    This lawsuit concerns Defendants' unlawful scheme to hack highly confidential and/or commercially sensitive communications and other private information from IMR's computer systems.

2.    The scheme — which, upon information and belief, was conceived of and has been largely executed in the United States — has been carried out at the direction of a New York lawyer (Salisbury) and his New York City law firm (S&R).  Salisbury and S&R are U.S. counsel to Russian potassium-mining company ECVK in a $1 billion litigation against IMR that is currently pending in the Netherlands (the "Dutch Action").

3.    In connection with the Dutch Action, Salisbury, S&R, and ECVK hired Akhmetshin, a former Soviet military counterintelligence officer.  Upon being retained, Mr. Akhmetshin hacked into

IMR's computer systems and stole IMR's sensitive and confidential materials.  Defendants then sought to inflict maximum damage on IMR, including by using the fruits of this hacking to assist ECVK in the Dutch litigation.

4.      In addition, Defendants disseminated the stolen materials and other negative information to journalists and other third parties as part of a smear campaign against IMR designed to harm IMR's business reputation.

5.      ECVK then made applications in the Dutch Action that relied on negative press articles authored by individuals to whom Defendants have disseminated IMR's stolen electronic information.

6.      That Defendants would resort to such underhanded tactics comes as no surprise. The primary ultimate beneficiary and owner of ECVK is Andrey Melnichenko, who has personally, and through companies he owns, been associated with a number of allegedly improper and illegal activities throughout the world, as described further below.

7.      Defendants' unlawful actions in hacking IMR's computer systems and disseminating its confidential information have caused IMR significant damage by, among other things, (1) causing IMR to incur substantial expenses in investigating and responding to the hacking of and theft from its computer systems, (2) causing IMR to incur substantial additional expenses in the Dutch Action (as described in more detail below), and (3) causing serious injury to IMR's business reputation.

8.      Defendants' conduct constitutes common law trespass to chattels and civil conspiracy.   As a result, Defendants' misconduct entitles IMR to, among other relief, (a) injunctive relief precluding Defendants from further retaining, using or disseminating IMR's stolen electronic information in any way, (b) compensatory, consequential, statutory and/or

punitive damages resulting from Defendants' malicious hacking of IMR's computer systems and subsequent use and dissemination of IMR's stolen electronic information, and (c) the fees and costs associated with bringing this action.

## PARTIES

9.      Plaintiff IMR is a private limited liability company organized under the laws of the Netherlands.  IMR regularly invests in the mining and metal industries.

10.     Upon information and belief, Defendant Akhmetshin is an individual residing in Washington, D.C.

11.     Upon information and belief, Defendant ECVK is a private limited liability company organized under the laws of Russia that engages in the mining of potassium.  ECVK is a wholly-owned subsidiary of EuroChem MCC, an open joint-stock company organized under the laws of Russia (together with ECVK, "EuroChem").

12.     Upon information and belief, Defendant S&R is a limited liability partnership organized under the laws of New York with its principal office in New York, New York.

13.     Upon information and belief, Defendant Salisbury is an individual residing in the State of New York.  Salisbury is one of the founding partners of S&R.  S&R and Salisbury were retained by ECVK in connection with foreign proceedings, including the Dutch Action.

## RELEVANT NON-PARTIES

14.     Shaft Sinkers (Proprietary) Limited ("Shaft Sinkers") is a shaft-sinking company in which IMR held an indirect ownership interest.

15.     Eurasian Natural Resources Corporation PLC ("ENRC") was a publicly listed diversified natural resources company.  Some shareholders of the former ENRC, and its successor entity, Eurasian Resources Group, hold a beneficial ownership in IMR.  These

3

shareholders include three Eastern European industrialists named Patokh Chodiev, Alexander Machkevitch, and Alijan Ibragimov.   The business holdings of these three industrialists, including ENRC, were the subject of Akhmetshin's negative media campaign aimed at harming IMR.

16.   EuroChem MCC, ECVK's 100% shareholder, claims to be Russia's largest producer of mineral fertilizers.  The primary ultimate beneficiary and owner of EuroChem MCC is Andrey Melnichenko.  Melnichenko has an estimated net worth of approximately $8 billion, making him one of the wealthiest men in the world and one of the top 15 wealthiest people in Russia, according to Forbes.

**JURISDICTION AND VENUE**

17.   This court has jurisdiction pursuant to CPLR §§ 301 and 302.  Venue is proper pursuant to CPLR § 503(d) because Defendant S&R is a partnership with its principal office in New York County.

**BACKGROUND**

**I.     Akhmetshin's Background in Counterintelligence and Negative Public Relations Campaigns**

18.   Akhmetshin is a former Soviet military counterintelligence officer who moved to Washington, D.C. to become a lobbyist.

19.   While working in Washington, D.C., Akhmetshin developed a special expertise in running negative public relations campaigns.

20.   In connection with these negative public relations campaigns, Akhmetshin conducted media and legislative outreach, encouraged journalists to write negative articles in connection with his client matters, and developed close relationships with reporters in New York, Washington, D.C., and elsewhere.

21.     Akhmetshin has been linked to numerous journalists, including a former editor of *Harper's*, a publisher of *Main Justice* and writer for the *Wall Street Journal*, and an investigative reporter who contributes to *The Nation* and *The Huffington Post*.

22.     Akhmetshin has gained notoriety for his work, and his negative public relations campaigns were even discussed in Steve LeVine's 2007 book *The Oil and the Glory*.

23.     The attorneys at S&R, including Salisbury, were among the people who were familiar with Akhmetshin's work.

24.     S&R previously represented an individual named Peter Zalmayev in *Egiazaryan v. Zalmayev*, No. 11-2670 (S.D.N.Y.).  In that case, the plaintiff alleged that Akhmetshin worked with Mr. Zalmayev to orchestrate a "black (*i.e.*, negative) public relations campaign" that was "designed to discredit" the plaintiff in order to benefit the plaintiff's "litigation foes" (among others).

25.     The plaintiff in that case specifically alleged that Akhmetshin strategically planted negative articles about the plaintiff in various publications, and encouraged non-profit organizations to write letters to Congress about the plaintiff that they later had to retract when they realized that they had been "misled."

**II.     Andrey Melnichenko, EuroChem, and Patrick Salisbury**

26.     The fact that ECVK would hire someone like Akhmetshin is not surprising in light of widespread reports concerning improper and illegal activities regularly undertaken by EuroChem, its owner, Andrey Melnichenko, and/or those associated with them.

27.     As noted above, Melnichenko is a Russian billionaire who has been linked to improper acts throughout the world.[1]

28.     Those close to Melnichenko have been at the center of high profile scandals that have been reported in the press.  For example, Melnichenko served on the Board of Directors of Greencorp SA with Daniel Clauw and Kendrick Wallace, former officers of chemical producer Yara International.   Yara International became the subject of Norway's largest corporate corruption case and, earlier this year, both Clauw and Wallace were reportedly found guilty of paying bribes to officials in Libya and/or India and sentenced to prison.

29.      Like Melnichenko and his associates, Melnichenko's companies are the frequent subject of investigations and scandals.

30.     For example, MDM Bank, founded by Melnichenko, was reportedly approached by U.S. authorities after employees of Bank of New York were accused of aiding Russian oligarchs launder billions of dollars through a Moscow-based bank that MDM controlled.

31.     Melnichenko is also the co-founder of coal producer Siberian Coal Energy Company (SUEK), which was the subject of a series of scandals and allegations.  In 2002, SUEK was reportedly the subject of a criminal investigation by The Russian Ministry of Internal Affairs for tax evasion allegedly totaling over 1 billion rubles in connection with the purchase of shares in three surface coal mines from its subsidiary, Krasnoyarsk Coal Company (KCC).  Officers of SUEK and one of its subsidiaries are reportedly under criminal investigation for unlicensed coal mining in the Chita region of Russia.

---

[1] Melnichenko is most well-known for owning a lavish 394-foot, $300 million motor yacht named "A," which reportedly includes six guest suites featuring furniture made with crystal and crocodile skin, bomb-proof glass windows, three swimming pools (one of them glass-bottomed), three motor boats valued at $1 million each, and an escape pod.  Melnichenko's recent work on building the world's largest sailing yacht, a 480-foot ship that reportedly cost approximately $450 million, has also attracted attention.  His new sailing yacht is reported to have eight floors, three 300-foot masts, an underwater observation room, and a touch-and-go helicopter pad.

32.    EuroChem MCC, despite being one of the most profitable mineral fertilizer producers in the world, has also been the subject of a number of allegations, and its business practices have been repeatedly called into question.

33.    For example, EuroChem MCC has been accused of environmental violations and was the target of protests on at least two occasions.  In 2010, an alleged fertilizer spill at its Tuapse shipping terminal on the coast of the Black Sea is said to have caused illnesses among residents and killed marine life.  Similarly, in 2012, Ville Niinistö, Finland's Minister for Environmental Affairs, reportedly accused EuroChem MCC of contaminating the Baltic Sea with phosphoric waste from its fertilizer plant in the Leningrad Region.

34.    EuroChem MCC has also been accused of questionable dealings with its subsidiaries and business partners.  For instance, minority shareholders of Nevinnomyssky Azot, the largest producer of nitrogen fertilizers in Russia and a subsidiary of EuroChem MCC, reportedly accused the parent company of orchestrating an illegal takeover in 2008, under the guise of a set of mandatory buyouts from the minority shareholders.  Similarly, in February 2015, EuroChem MCC allegedly purchased shares in Astrakhan Oil & Gas Company OJSC from the Astrakhan Regional Administration at a price well below market value.

35.    Melnichenko and EuroChem MCC's business interests outside Russia have also been called into question.  Kazakh citizens reportedly sent a public letter to President Nursultan Nazarbaev expressing concern over Melnichenko's plans to develop Kazakh phosphorus deposits while receiving preferential prices for gas without paying taxes to the Kazakh government.

36.    Eurochem MCC's long-time business partner, Togliatti Azot (ToAz), has reportedly been accused of evading tax payments to the Russian government by engaging in offshore transfer-pricing schemes.  Melnichenko's connection to ToAz may go beyond their

business relations, however.  Amicorp Group is a company that is located at the same address as Melnichenko's private family office in Monaco and has been linked to numerous Melnichenko business interests, including Melnichenko-controlled entities in the United Kingdom and Switzerland.  Upon information and belief, some time ago, Amicorp  effectively acquired control over ToAz by taking control of four offshore companies who are shareholders of ToAz (Bairiki, Inc.; Kamara Ltd; Instantania Holdings Ltd.; and Trafalgar Developments Ltd.).  ToAz, like Eurochem, produces urea.

37.     Salisbury and his law firm, S&R, have a long-standing relationship with Melnichenko and his companies.

38.     Over the years, Salisbury has performed all manner of legal work for Melnichenko and the entities under Melnichenko's control, including representing Melnichenko-controlled entities in disputes over an allegedly defective paint job of "A" (Melnichenko's yacht) and an allegedly undersized sculpture purchased by Melnichenko.

39.     Thus, it should come as no surprise that Melnichenko turned to Salisbury and his law firm to represent ECVK in its legal dispute with IMR.  It should also come as no surprise that this group engaged in the wrongful hacking of IMR's computer systems to gain an unfair advantage in those legal proceedings and cause IMR harm.

**III.     ECVK Hires S&R in Connection with Potential Foreign Legal Disputes**

40.     In 2007, ECVK engaged Shaft Sinkers to design and construct a mine shaft for one of its mining projects near the Russian town of Kotelnikovo (the "Kotelnikovo Mining Project").

41.     In 2012, the business relationship between Shaft Sinkers and ECVK broke down, and in March 2012, ECVK retained Salisbury and his New York law firm, S&R, to investigate potential legal claims that it sought to assert in connection with the Kotelnikovo Mining Project.

42.     When S&R was retained, ECVK and S&R did not have specific information about Shaft Sinkers's organizational structure or its relationship to other corporate entities.  S&R was retained, among other things, to investigate these issues and determine whether ECVK could initiate legal actions against any corporate entities in addition to Shaft Sinkers.

43.     At all relevant times, S&R and Salisbury acted as ECVK's agents and acted at ECVK's direction.  In fact, S&R and Salisbury reported directly to EuroChem's Chairman, Melnichenko, EuroChem's CEO, Dmitry Strezhnev, and EuroChem's General Counsel, Valery Sidnev, who was responsible for retaining and instructing outside litigation counsel for EuroChem and its subsidiaries, including ECVK.

44.     Upon information and belief, S&R and Salisbury directed and coordinated their work for ECVK from S&R's offices in New York.

45.     ECVK gave S&R and Salisbury full authority to hire people and conduct background research in connection with the potential legal proceedings.

**IV.    ECVK, S&R, and Salisbury Approach Akhmetshin**

46.     In early 2012, S&R and Salisbury reached out to Akhmetshin to discuss his potential engagement in connection with the ECVK matter.

47.     When S&R and Salisbury reached out to Akhmetshin, they were familiar with his counterintelligence background and his experience in running negative public relations campaigns. As discussed above, S&R previously worked with Akhmetshin on a case where Akhmetshin was alleged to have orchestrated a "black public relations campaign" that was "designed to discredit"

the plaintiff in order to benefit the plaintiff's "litigation foes."  S&R and Salisbury also reached out to Akhmetshin specifically because they understood that Akhmetshin could gain access to private sources of information concerning IMR.

48.     In response to S&R's interest in his work, Akhmetshin proposed developing a "strategic communication" campaign for ECVK.  Akhmetshin has stated that his strategic communications campaigns simply involve "encouraging journalists to look into [his] client['s] matters" and "get[ting] the [client's] story out" in media and legislative forums.  In reality, however, Akhmetshin's practice is to forward derogatory information to his network of media contacts in the hopes that negative stories will be written about the campaign's target.

**V.     Akhmetshin Hacks into IMR's Computers and Steals Confidential Information at the Direction of Salisbury, S&R, and ECVK**

49.     IMR and its executives, employees, and administrative staff lawfully possessed files and other electronic information that were stored on computers, computer systems, and computer servers.

50.     Upon information and belief, before Akhmetshin even signed a formal engagement agreement with Salisbury, S&R, and ECVK, Akhmetshin began organizing the hacking of IMR's computer systems and searching for specific information at Salisbury, S&R, and ECVK's direction.

51.     Upon information and belief, Salisbury and S&R directed and coordinated the scheme on ECVK's behalf from S&R's offices in New York.  Throughout the relevant time period, Akhmetshin had multiple meetings in furtherance of the scheme with Salisbury and S&R at S&R's offices in New York.

52.     In a July 13, 2012 email, Akhmetshin informed Salisbury that "the project is already up and running and it is churning up the info."   Upon information and belief, "the project" referred to the hacking project.

53.     Upon information and belief, in this time period, Salisbury, S&R, and ECVK intentionally directed Akhmetshin to work with his collaborators to repeatedly access, use, and physically interfere with IMR's computers and computer servers to collect and copy confidential files and other electronic information without IMR's knowledge or authorization.   Upon information and belief, Akhmetshin did just that.

54.     Akhmetshin and his collaborators collected files from multiple individuals at IMR, including executives and administrative staff who were likely to have access to important documents.

55.     The files that Akhmetshin and his collaborators stole included confidential and commercially sensitive information, such as passport information, emails, and personal contact lists for executives within IMR; IMR bank account information; loan agreements; business strategy documents; board meeting minutes; board and governance documents; drafts of market-sensitive documents; and financial forecasts and projections.

56.     Upon information and belief, after collecting the files, Akhmetshin indexed them for use by Salisbury, S&R, and ECVK.

57.     On July 23, 2012, Akhmetshin e-mailed Salisbury to tell him that "the indexing is done" and to ask Salisbury to send him "a list of terms/names for a scan" of the information.

## VI.     Salisbury, S&R, and ECVK Formally Retain Akhmetshin

58.     On July 26, 2012, Salisbury and Akhmetshin finalized an engagement letter covering Akhmetshin's "research" work.   Upon information and belief, both Salisbury and Akhmetshin signed the engagement letter while in S&R's offices in New York.

59.     The engagement letter provided that "Salisbury & Ryan LLP, as attorney agent for its client and not in its individual capacity (the 'Client'), has engaged you to provide the services described below."

60.     Under the heading "Services," the engagement letter stated, "you will provide the Client with assistance in the Client's investigation of claims it may have against companies relating to a mining project being built by the Client in Russia which has encountered delays. You will assist in such endeavors by researching and providing information concerning the relevant parties and other requested information."

61.     Under the heading "Compensation," the engagement letter stated, "[w]e shall transfer to you on behalf of the Client an initial payment of $45,000 and you will bill as discussed as the work progresses.  The Client will reimburse you for all pre-approved travel and related expenses incurred by you on the Client's behalf.  The Client shall be solely responsible for payment of your fees and expenses."

62.     Finally, the engagement letter stated that it "shall be governed by and construed in accordance with New York law."

63.     On the following day, July 27, 2012, Salisbury and S&R transferred $45,000 to Akhmetshin on behalf of ECVK, to compensate Akhmetshin for his work on the hacking and smear campaign.

**VII.    Akhmetshin Continues the Hacking and Smear Campaign at the Direction of ECVK, S&R, and Salisbury**

64.     After Akhmetshin was formally retained, he continued to intentionally access, use, and physically interfere with IMR's computers and computer servers to collect and copy confidential IMR files and other electronic information at the direction of ECVK, S&R, and Salisbury.

12

65.     On August 30, 2012, Akhmetshin informed Salisbury that "the work is finally completed."

66.     Upon information and belief, Akhmetshin then arranged to pick up the fruits of the hacking, which were saved to a storage device that Akhmetshin referred to  as "the thing." For example, in an email dated September 1, 2012, Akhmetshin informed Salisbury that he "plan[ned] to get that thing in London tomorrow, can take it anywhere, pls advise where I should go."

67.     Upon information and belief, Akhmetshin then turned over the fruits of the hacking to Salisbury, S&R, and ECVK.

68.     A few days later, Salisbury put Akhmetshin directly in touch with a EuroChem executive so that Akhmetshin and ECVK could coordinate on the smear campaign.  In his e-mail to the EuroChem executive, Salisbury stated, "Rinat is advising on the international PR campaign we have been discussing. . . . He has thoughts as to how we should proceed and can help your PR and IR people."

69.     Upon information and belief, Akhmetshin thereafter worked with his collaborators to access, use, and physically interfere with IMR's computers and computer servers to collect and copy additional confidential IMR files and other electronic information requested by Salisbury, S&R, and ECVK, which Akhmetshin then delivered to Salisbury, S&R, and ECVK.

70.     On November 19, 2012, Akhmetshin emailed Salisbury, informing him that he "just spoke with the guy — he said they pulled everything there was available.  Need to go collect it some time after the holidays."  A week later, Akhmetshin notified Salisbury that he would be heading to London to pick up a storage device with the fruits of the hacking, again

referred to as "the thing," and could deliver the materials to Salisbury approximately two weeks later:  "[I] plan to collect the thing in [L]ondon [W]ed[nesday] this week and [will] be traveling to msk after that . . . . can drop the thing with you afternoon [D]ec. 10."

**VIII.   ECVK, S&R, and Salisbury Initiate the Dutch Action and Other Foreign Proceedings**

71.     In late 2012, ECVK filed two arbitration proceedings against Shaft Sinkers (the "Arbitration Proceedings").  In the Arbitration Proceedings, ECVK alleged, among other things, that Shaft Sinkers committed misconduct in connection with the Kotelnikovo Mining Project.

72.     In addition, S&R and Salisbury concluded that ECVK should assert claims against IMR in the Netherlands.  Upon information and belief, S&R and Salisbury came to this conclusion based, at least in part, on the hacked information that Akhmetshin provided.

73.     In March 2013, ECVK commenced the Dutch Action alleging, among other things, that IMR should be held liable for any judgment entered against Shaft Sinkers in the Arbitration Proceedings.

74.     In June 2013, ECVK filed an application in the Dutch Action seeking a pre-judgment attachment of approximately €886,000,000 — or USD $1.2 billion — of IMR's assets pending a final judgment in the case (the "Freezing Application").  The Dutch court granted the application in July 2013.

**IX.     Akhmetshin Distributes IMR's Stolen, Confidential Material to Third Parties and Conducts a Smear Campaign against IMR at the Direction of Salisbury, S&R, and ECVK**

75.     In late 2012 through May 2013, consistent with Akhmetshin's strategic communication proposal, Akhmetshin disseminated negative information about IMR and associated companies such as Shaft Sinkers and ENRC to his contacts in the media, and urged his contacts to publish negative articles.

76.     Throughout this period, Salisbury and S&R intentionally directed Akhmetshin's activities in order to further ECVK's strategy in the Dutch Action and Arbitration Proceedings and harm IMR's business reputation.

77.     Upon information and belief, Akhmetshin carried out the publicity work, at least in part, in coordination with employees and officers at EuroChem.

78.     At the direction of Salisbury, S&R, and ECVK, Akhmetshin also disseminated to certain of his media contacts the confidential, commercially sensitive information that was stolen from IMR.

79.     Ultimately, numerous publications that Akhmetshin reached out to ran negative press articles about IMR and other associated companies.

80.     In addition, negative press articles written and published by individuals and entities with whom Akhmetshin has ties also served as part of the basis for actions taken by ECVK against IMR in the Dutch Action.

81.     For example, ECVK's Freezing Application contains disparaging allegations about IMR, certain entities associated with IMR, and their ultimate beneficial shareholders — certain of which are based on negative press articles about IMR written by individuals and entities with whom Akhmetshin has ties.

82.     On July 1, 2013, Salisbury and S&R transferred $100,000 to Akhmetshin on behalf of ECVK to compensate Akhmetshin for his work on the hacking and smear campaign.

**X.     Akhmetshin Continues to Distribute IMR's Stolen, Confidential Material to Third Parties**

83.     In the following months, Akhmetshin continued to distribute IMR's stolen, confidential information.

84.     For example, on January 30, 2014, Akhmetshin met with a client at the Café Royal Coffee Shop on Regent Street in central London and gave him a copy of the stolen IMR materials.

85.     Specifically, at approximately 11:25 a.m., Akhmetshin met his client at the coffee shop and handed him an external hard drive, explaining that the drive contained numerous folders of documents that included memoranda, emails, and financial information.

86.     Akhmetshin described his process for obtaining the documents, stating that he had a team that hacked materials from IMR senior executives and from individuals in key administrative positions whose computers were likely to contain important internal documents.

87.     Akhmetshin said that his team had collected approximately 50 gigabytes worth of material.  The businessman commented on the volume of material, and Akhmetshin responded, "there is a lot of the stuff, so — but that's why you are paying money."

88.     Akhmetshin stated that he had met with lawyers for Melnichenko, the owner of EuroChem, in New York.

89.     Akhmetshin identified one of these lawyers as Salisbury, and said that Salisbury was representing EuroChem in the Arbitration Proceedings and Dutch Action.

90.     Akhmetshin added that he was hired because there were certain things that the law firm could not do.  Upon information and belief, Akhmetshin's reference to "certain things that the law firm could not do" was a reference to the unlawful hacking of IMR's computer systems.

### XI.     IMR Wins the Dutch Action

91.     On June 25, 2014, the court in the Dutch Action rejected ECVK's theories of liability, found that ECVK's factual assertions were unsubstantiated, and entered a judgment in favor of IMR.

92.     ECVK filed a formal notice of appeal on September 18, 2014, and that appeal is still pending.  The Freezing Application is still in place pending appeal.

### XII.    IMR Suffered Significant Harm as a Result of Defendants' Hacking and Dissemination of Confidential Information

93.     As a direct result of the hacking of IMR's computer systems, IMR has been forced to expend significant amounts of money to investigate and otherwise respond to Defendants' unlawful conduct.

94.     For example, IMR was forced to incur substantial expenses to replace certain servers, whose integrity and security were impaired due to the hacking that was organized by Akhmetshin.

95.     IMR incurred other substantial expenses in connection with its response to the hacking, including investigative and remedial costs.

96.     In addition, IMR has suffered significant harm in connection with the Dutch Action.

97.     Upon information and belief, but for the hacked information provided by Akhmetshin, ECVK would not have initiated the meritless Dutch litigation against IMR.

98.     The confidential information stolen from IMR's computer systems included documents that are relevant to the substance of the Dutch Action.  IMR has therefore suffered, and continues to suffer, harm arising from its litigation adversary's access to and, upon

information and belief, review of information relevant to the foreign legal proceedings themselves.

99.     In addition, IMR has incurred substantial additional expenses defending against applications in the Dutch Action that are premised, in part, on negative articles published by media outlets and individuals to whom Akhmetshin has, upon information and belief, disseminated some or all of the hacked documents.  As explained above, ECVK's Freezing Application contains numerous allegations based on negative press articles about IMR and certain associated entities, including ENRC, published by such entities and individuals.

100.    IMR has also suffered significant harm to its business reputation as a result of the negative articles appearing in the press that, upon information and belief, are based in whole or in part on information that Defendants hacked from its computer systems.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Trespass to Chattels)

101.    IMR realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

102.    As described above, Defendants have intentionally, unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to maliciously harm IMR through the unauthorized hacking of IMR's computer systems and subsequent use of the hacked material to damage IMR's business reputation and cause it pecuniary and non-pecuniary harm.

103.    Defendants thus intentionally and maliciously interfered with IMR's lawful possession of its computer system and electronic information and inflicted substantial damage on

IMR, including the cost of replacing a portion of the computer system, the cost of investigating and responding to the hacking, and the costs associated with the harm to IMR's business reputation that resulted from the hacking and dissemination of IMR's sensitive, confidential information.

104.    Defendants maliciously sought to inflict the maximum amount of harm possible through their intentional interference with IMR's lawful possession of its computer system and electronic information, and through the dissemination of IMR's confidential information to third parties.

105.    IMR is entitled to recover the damages it sustained as a result of Defendants' malevolent conduct in hacking IMR's computer systems, stealing IMR's confidential information, and then disseminating that information to third parties.

**COUNT TWO**
**(Civil Conspiracy)**

106.    IMR realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

107.    As set forth above, Defendants have committed torts against IMR, including acts that constitute common law trespass to chattels.

108.    Defendants agreed to participate in a common scheme against IMR.  Defendants intentionally participated in the furtherance of a plan for the purpose of obtaining property from IMR and using that property to harm IMR.  In furtherance of this plan or purpose, Defendants committed overt and unlawful acts alleged herein.

109.    As a direct and proximate result of Defendants' conspiracy, the overt acts committed in furtherance of that conspiracy, and the torts committed against IMR, IMR has been damaged in its business and property.

110.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, IMR is entitled to, and should be awarded, punitive damages against each of the Defendants.

111.    IMR is further entitled to, and should be awarded, an injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them from (i) engaging in any further unauthorized accessing of IMR's computer systems and (ii) using or distributing IMR's stolen confidential information in any way.

## **PRAYER FOR RELIEFF**

WHEREFORE, IMR respectfully requests the following relief:

A.     An order requiring Defendants to relinquish all of the stolen materials in their possession, custody, or control and return the same to IMR and to immediately refrain from using them for any purpose;

B.     An order enjoining Defendants, their assignees, and anyone else acting in concert with them from (i) engaging in any further unauthorized accessing of IMR's computer systems, and (ii) using or distributing IMR's stolen confidential information in any way; and

C.     An award against Defendants for:

    a.   Compensatory damages in an amount to be determined at trial for losses incurred by IMR;

    b.   Punitive damages in an amount to be determined at trial for losses incurred by IMR;

    c.   Consequential damages in an amount to be determined at trial for losses incurred by IMR;

    d.   Interest;

    e.   Reasonable attorneys' fees and costs of bringing this suit; and

    f.   Such other relief as is just, fair and equitable.

## **JURY DEMAND**

IMR demands a trial by jury on all issues so triable in this action.

Dated: 11/12/2015
New York, New York

Respectfully submitted,

Jonathan D. Cogan (NY Bar No. 4167276)
Jonathan.Cogan@kobrekim.com
Steven W. Perlstein (NY Bar No. 2982478)
Steven.Perlstein@kobrekim.com
Rebecca G. Mangold (NY Bar No. 4741021)
Rebecca.Mangold@kobrekim.com
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220

John (Fritz) Scanlon (NY Bar No. 4538781)
Fritz.Scanlon@kobrekim.com
KOBRE & KIM LLP
1919 M Street, NW
Washington, DC 20036
Tel: 202.664.1900
Fax: 202.664.1920

*Counsel for Plaintiff International Mineral
Resources B.V.*

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN RE:

APPLICATION OF INTERNATIONAL MINERAL
RESOURCES B.V. FOR AN ORDER TO TAKE
DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Case No. 1:14-MC-00340 (GK)

Applicant.

## JOINT STIPULATION OF DISMISSAL WITH PREJUDICE

IT IS HEREBY STIPULATED AND AGREED, by and between the parties, that
(i) International Mineral Resources B.V. ("IMR") withdraws all allegations made in its 28
U.S.C. § 1782 Application (the "Application"), including allegations therein that Mr.
Akhmetshin, EuroChem Volga-Kaliy LLC ("ECVK") or their counsel engaged in any
unlawful or improper acts against IMR, including but not limited to hacking any information
from IMR's computer systems, or disseminating any information as part of a smear campaign
against IMR, (ii) Mr. Akhmetshin and ECVK withdraw all allegations made in their briefing
in this matter, including allegations therein that IMR or its representatives engaged in any
unlawful or improper acts against Mr. Akhmetshin, ECVK, or any other person, and (iii) this
action and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of
Civil Procedure 41(a)(1)(A)(ii), with each party to bear its own costs and fees.  IMR
accordingly stipulates and agrees not to seek any costs and fees related to this action from
Rinat Akhmetshin or ECVK, and Mr. Akhmetshin stipulates and agrees not to seek any costs
and fees related to this action from IMR, including those costs and fees he may otherwise
have been entitled to recover under the Court's Memorandum Order dated November 18,
2015, (Dkt. No. 60), Order dated December 21, 2015, (Dkt. No. 74), or any other Orders or
motions entered or filed in this action.  All fees currently on deposit with the clerk of this

Court shall be remitted to IMR as specified in the Parties' Joint Stipulation and Proposed

Order to Disburse Funds.

Dated: *January 15, 2016*

FOR APPLICANT INTERNATIONAL
MINERAL RESOURCES B.V.

John ("Fritz") Scanlon (Bar ID: 983169)
KOBRE & KIM LLP
1919 M Street NW
Washington, D.C. 20036
Tel: +1 202 664 1900
Fax: +1 202 664 1920
fritz.scanlon@kobrekim.com

Jonathan D. Cogan (admitted *pro hac vice*)
Rebecca G. Mangold (admitted *pro hac vice*)
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: +1 212 488 1200
Fax: +1 212 488 1220
jonathan.cogan@kobrekim.com
rebecca.mangold@kobrekim.com

*Attorneys for International Mineral Resources B.V.*

FOR RESPONDENT RINAT
AKHMETSHIN

Kim Hoyt Sperduto (BAR ID: 416127)
Sperduto Thompson PLC
1133 20th Street NW, 2nd Floor
Washington, DC 20036
Tel: (202) 408-8900
Fax: (202) 408-8910
ksperduto@sperdutothompson.com

*Attorney for Rinat Akhmetshin*

FOR INTERVENOR EUROCHEM
VOLGA-KALIY LLC

Bridget Moore (Bar ID: 484862)
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 639-7740
Fax: (202) 585-4090
bridget.moore@bakerbotts.com

Patrick P. Salisbury
SALISBURY & RYAN LLP
1325 Avenue of the Americas
New York, NY 10019
Tel: (212) 977-4660
Fax: (212) 977-4668
PS@salisburyryan.com

*Attorneys for EuroChem Volga-Kaliy LLC*

Court shall be remitted to IMR as specified in the Parties' Joint Stipulation and Proposed

Order to Disburse Funds.

Dated: Jan. 15, 2016

FOR APPLICANT INTERNATIONAL
MINERAL RESOURCES B.V.

_____
John ("Fritz") Scanlon (Bar ID: 983169)
KOBRE & KIM LLP
1919 M Street NW
Washington, D.C. 20036
Tel: +1 202 664 1900
Fax: +1 202 664 1920
fritz.scanlon@kobrekim.com


Jonathan D. Cogan (admitted *pro hac vice*)
Rebecca G. Mangold (admitted *pro hac
vice*)
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: +1 212 488 1200
Fax: +1 212 488 1220
jonathan.cogan@kobrekim.com
rebecca.mangold@kobrekim.com

*Attorneys for International Mineral
Resources B.V.*

FOR RESPONDENT RINAT
AKHMETSHIN

_____
Kim Hoyt Sperduto (BAR ID: 416127)
Sperduto Thompson PLC
1133 20th Street NW, 2nd Floor
Washington, DC 20036
Tel: (202) 408-8900
Fax: (202) 408-8910
ksperduto@sperdutothompson.com

*Attorney for Rinat Akhmetshin*

FOR INTERVENOR EUROCHEM
VOLGA-KALIY LLC

_____
Bridget Moore (Bar ID: 484862)
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 639-7740
Fax: (202) 585-4090
bridget.moore@bakerbotts.com

Patrick P. Salisbury
SALISBURY & RYAN LLP
1325 Avenue of the Americas
New York, NY 10019
Tel: (212) 977-4660
Fax: (212) 977-4668
PS@salisburyryan.com

*Attorneys for EuroChem Volga-Kaliy LLC*

68

# EXHIBIT 6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------x

INTERNATIONAL MINERAL RESOURCES B.V., :   Index No. 161682/2015
                                             :

                     Plaintiff,      :

                                   :

v.                                :    **STIPULATION OF**

                                :    **DISCONTINUANCE**

RINAT AKHMETSHIN, PATRICK P.      :    **WITH PREJUDICE**

SALISBURY, SALISBURY & RYAN LLP,    :

EUROCHEM VOLGA-KALIY LLC,       :

                                   :

                    Defendants.    x

-----------------------------------------------------------------

      IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned,

that (i) International Mineral Resources B.V. ("IMR") withdraws all allegations made by it

against Defendants in the Complaint filed with this Court on November 12, 2015, including

allegations therein that Defendants, or any of them, have engaged in any unlawful or

improper acts against IMR, including but not limited to hacking any information from IMR's

computer systems, disseminating any information as part of a smear campaign against IMR,

trespass to chattel or conspiracy; and (ii) this action and all claims therein shall be voluntarily

discontinued with prejudice pursuant to CPLR 3217(a)(2), with each party to bear its own

costs and fees.  This stipulation may be filed without further notice with the Clerk of the

Court.

Dated: 1/15/16
New York, New York

FOR PLAINTIFF INTERNATIONAL
MINERAL RESOURCES B.V.

_____
Jonathan D. Cogan (NY Bar No. 4167276)
Jonathan.Cogan@kobrekim.com
Steven W. Perlstein (NY Bar No. 2982478)
Steven.Perlstein@kobrekim.com
Rebecca G. Mangold (NY Bar No.
4741021)
Rebecca.Mangold@kobrekim.com
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220

John (Fritz) Scanlon (NY Bar No. 4538781)
Fritz.Scanlon@kobrekim.com
KOBRE & KIM LLP
1919 M Street, NW
Washington, DC 20036
Tel: 202.664.1900
Fax: 202.664.1920

*Attorneys for International Mineral
Resources B.V.*

FOR DEFENDANT RINAT
AKHMETSHIN

_____
Kim Hoyt Sperduto (D.C. BAR ID:
416127)
Sperduto Thompson PLC
1133 20th Street NW, 2nd Floor
Washington, DC 20036
Tel: (202) 408-8900
Fax: (202) 408-8910
ksperduto@sperdutothompson.com

*Attorneys for Rinat Akhmetshin*

FOR DEFENDANT EUROCHEM
VOLGA-KALIY LLC

_____
Andrew Lankler, Esq.
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-2516
Fax: (212) 212-259-2516
andrew.lankler@bakerbotts.com

*Attorneys for EuroChem Volga-Kaliy LLC*

FOR DEFENDANTS PATRICK P.
SALISBURY AND SALISBURY &
RYAN LLP

_____
Robert F. Serio, Esq.
Avi Weitzman, Esq.
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166
Tel: 212-351-4000
Fax: 212-351-4035

*Attorneys for Patrick P. Salisbury and
Salisbury & Ryan LLP*

Dated: 1/15/16

New York, New York

FOR PLAINTIFF INTERNATIONAL
MINERAL RESOURCES B.V.

_____
Jonathan D. Cogan (NY Bar No. 4167276)
Jonathan.Cogan@kobrekim.com
Steven W. Perlstein (NY Bar No. 2982478)
Steven.Perlstein@kobrekim.com
Rebecca G. Mangold (NY Bar No.
4741021)
Rebecca.Mangold@kobrekim.com
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220

John (Fritz) Scanlon (NY Bar No. 4538781)
Fritz.Scanlon@kobrekim.com
KOBRE & KIM LLP
1919 M Street, NW
Washington, DC 20036
Tel: 202.664.1900
Fax: 202.664.1920

*Attorneys for International Mineral
Resources B.V.*

FOR DEFENDANT RINAT
AKHMETSHIN

_____
Kim Hoyt Sperduto (D.C. BAR ID:
416127)
Sperduto Thompson PLC
1133 20th Street NW, 2nd Floor
Washington, DC 20036
Tel: (202) 408-8900
Fax: (202) 408-8910
ksperduto@sperdutothompson.com

*Attorneys for Rinat Akhmetshin*

FOR DEFENDANT EUROCHEM
VOLGA-KALIY LLC

_____
Andrew Lankler, Esq.
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-2516
Fax: (212) 212-259-2516
andrew.lankler@bakerbotts.com

*Attorneys for EuroChem Volga-Kaliy LLC*

FOR DEFENDANTS PATRICK P.
SALISBURY AND SALISBURY &
RYAN LLP

_____
Robert F. Serio, Esq.
Avi Weitzman, Esq.
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166
Tel: 212-351-4000
Fax: 212-351-4035

*Attorneys for Patrick P. Salisbury and
Salisbury & Ryan LLP*

65

Dated: 1/15/16
New York, New York

FOR PLAINTIFF INTERNATIONAL
MINERAL RESOURCES B.V.

Jonathan D. Cogan (NY Bar No. 4167276)
Jonathan.Cogan@kobrekim.com
Steven W. Perlstein (NY Bar No. 2982478)
Steven.Perlstein@kobrekim.com
Rebecca G. Mangold (NY Bar No.
4741021)
Rebecca.Mangold@kobrekim.com
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220

John (Fritz) Scanlon (NY Bar No. 4538781)
Fritz.Scanlon@kobrekim.com
KOBRE & KIM LLP
1919 M Street, NW
Washington, DC 20036
Tel: 202.664.1900
Fax: 202.664.1920

*Attorneys for International Mineral
Resources B.V.*

FOR DEFENDANT RINAT
AKHMETSHIN

Kim Hoyt Sperduto (D.C. BAR ID:
416127)
Sperduto Thompson PLC
1133 20th Street NW, 2nd Floor
Washington, DC 20036
Tel: (202) 408-8900
Fax: (202) 408-8910
ksperduto@sperdutothompson.com

*Attorneys for Rinat Akhmetshin*

FOR DEFENDANT EUROCHEM
VOLGA-KALIY LLC

Andrew Lankler, Esq.
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-2516
Fax: (212) 212-259-2516
andrew.lankler@bakerbotts.com

*Attorneys for EuroChem Volga-Kaliy LLC*

FOR DEFENDANTS PATRICK P.
SALISBURY AND SALISBURY &
RYAN LLP

Robert F. Serio, Esq.
Avi Weitzman, Esq.
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, NY 10166
Tel: 212-351-4000
Fax: 212-351-4035

*Attorneys for Patrick P. Salisbury and
Salisbury & Ryan LLP*

65

# EXHIBIT 7

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE:<br><br>APPLICATION OF PATOKH CHODIEV AND<br>INTERNATIONAL MINERAL RESOURCES, B.V.<br>FOR AN ORDER TO TAKE DISCOVERY<br>PURSUANT TO 28 U.S.C. § 1782,<br><br>Applicant. | ) ) ) ) ) ) ) ) ) ) | 1:18-MC-00013 (EGS) |

## PRELIMINARY OBJECTIONS BY RINAT AKHMETSHIN
## TO SUBPOENA PURSUANT TO FED. R. CIV. P. 45(d)(2)(B)

Pursuant to Fed. R. Civ. P. 45(d)(2)(B), Rinat Akhmetshin objects to the

subpoena of Patokh Chodiev and International Mineral Resources, B.V. ("IMR") dated February

6, 2018 ("Subpoena") for the following reasons:

### GENERAL OBJECTIONS.

1.       Mr. Akhmetshin objects to the Subpoena on the basis of fundamental

fairness. Mr. Chodiev and IMR have denied Mr. Akhmetshin simple fairness by refusing to

provide the underlying 28 U.S.C. § 1782 Application in this proceeding, which was filed under

seal. Since the Court's Order filed February 5, 2018, Mr. Chodiev and IMR have refused to

provide Mr. Akhmetshin a copy of the *ex parte* Application, without any explanation. Without

knowing what Mr. Chodiev and IMR have represented to the Court, Mr. Akhmetshin is

incapable of fully assessing his legal rights and obligations pursuant to § 1782 and the Federal

Rules of Civil Procedure, or fully responding to the Subpoena. Indeed, if Mr. Akhmetshin were

required to respond to the Subpoena without ever seeing the § 1782 Application, such a

proceeding could rise to the level of a denial of due process. Accordingly, Mr. Akhmetshin

**CONFIDENTIAL**

reserves the right (i) to supplement his objections and (ii) to raise new arguments in support of a motion to quash or in defense of a motion to compel, based upon any new information he obtains once he is provided the § 1782 Application.

        2.     That secrecy is particularly perplexing given the fact that this is the Applicants' second § 1782 application against Mr. Akhmetshin in recent years.  IMR obtained discovery from Mr. Akhmetshin in 2015 pursuant to a 28 U.S.C. § 1782 application that it filed in this Court, *In re Application of International Mineral Resources, B.V. for an Order To Take Discovery Pursuant To 28 U.S.C. §1782*, Case No. 1:14-mc-00340 (GK) ("2014 IMR § 1782 Application").  Mr. Akhmetshin appeared for two days of depositions and produced nearly 2000 pages of documents to IMR in response to the resulting subpoena dated February 5, 2015 ("2015 Subpoena").  On or about January 15, 2016, IMR and Mr. Akhmetshin executed a "Mutual Release And Covenant Not To Sue" (the "Mutual Release").  Under the Mutual Release, IMR and its "Associated Parties," which by definition includes Mr. Chodiev, agreed to release and forever discharge and fully and finally settle any and all "past, present, or future" claims, including "any other rights to relief of any kind whatsoever," that it had or may have had against Mr. Akhmetshin relating to the matters that were the subject of "Actions," which included the 2014 IMR § 1782 Application.  Mr. Chodiev and IMR have released Mr. Akhmetshin from his obligation to comply.  Accordingly, Mr. Akhmetshin objects to the Subpoena on the ground that Mr. Chodiev and IMR have released any right they had to subpoena documents and testimony from Mr. Akhmetshin.  The prior § 1782 proceeding was dismissed with prejudice by "Joint Stipulation of Dismissal With Prejudice" filed January 19, 2016 (Dkt. 78).

        3.     Mr. Akhmetshin objects to the Subpoena on the ground that instigation of this miscellaneous proceeding and issuance of the Subpoena constitute a breach of the Mutual

**CONFIDENTIAL**

Release's covenant not to sue.   Mr. Akhmetshin and IMR (and Mr. Chodiev) agreed "not to sue, commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against any other Party or its Associated Parties *any action*, suit or *other proceeding* concerning the Released Claims . . . ."  (Emphasis added.)   Pursuant to the Mutual Release, IMR is obligated to indemnify Mr. Akhmetshin in this proceeding against all costs and damages (including full legal expenses) incurred.

4.      Mr. Akhmetshin objects to the Subpoena on the grounds that it is overly broad and unduly burdensome, particularly in light of the extensive document production Mr. Akhmetshin made in 2015 in response to the 2015 Subpoena.  Mr. Akhmetshin further objects to the extent the Subpoena is not reasonably calculated to lead to the discovery of admissible evidence.

5.      Mr. Akhmetshin objects to the Subpoena to the extent that it seeks to impose burdens beyond the scope of the Federal Rules of Civil Procedure 26 and 45.

6.      Mr. Akhmetshin objects to the Subpoena to the extent that it seeks documents that are unreasonably cumulative or duplicative, were already produced in response to the 2015 Subpoena, or are obtainable from some other source that is more convenient, less burdensome, or less expensive for Mr. Chodiev and IMR.

7.      Mr. Akhmetshin objects to the Subpoena to the extent that it seeks privileged documents, including documents protected by the attorney-client privilege, the work product doctrine, the consulting expert privilege, the joint-defense privilege, or any other applicable privilege.  In the event that Mr. Akhmetshin makes any production pursuant to the Subpoena, such privileged documents will not be produced.  Any inadvertent disclosure or production of any privileged documents by Mr. Akhmetshin shall not constitute a waiver of any

3

**CONFIDENTIAL**

privilege.  Any disclosure or production of any privileged documents by Mr. Akhmetshin shall not constitute a waiver of any privilege with respect to any information or documents not disclosed by Mr. Akhmetshin.

8.      Mr. Akhmetshin objects to the Subpoena to the extent that it seeks documents containing trade secrets or other confidential research, development, proprietary, or commercial information.  In the event that Mr. Akhmetshin makes any production pursuant to the Subpoena, Mr. Akhmetshin will first attempt either to negotiate in good faith an amicable resolution for satisfactory protection of such confidential information with Mr. Chodiev and IMR, or, if necessary, move for a protective order.

9.      Mr. Akhmetshin objects to the Subpoena to the extent that it seeks electronic documents that are not reasonably accessible to him because of the undue burden or costs required to access and produce them.  The Subpoena seeks ESI dating back more than seven years, some of which may no longer exist and some of which may not be readily accessible.

10.     Mr. Akhmetshin objects to the Subpoena to the extent that it seeks electronic documents, such as "legacy data," ordinarily maintained in forms that are not reasonably usable by any party.  As noted above, the Subpoena seeks ESI dating back more than seven years, some of which may no longer exist and some of which may not be readily accessible.

11.     Mr. Akhmetshin objects to Definition 6, "IMR" to the extent that it is vague, ambiguous, and overbroad.  Mr. Akhmetshin does not know, and is incapable of discovering, the identities of "any parent, subsidiary or affiliate of International Mineral Resources B.V., any and all present and former employees, officers, directors, agents,

4

**CONFIDENTIAL**

representatives, attorneys, assignees, consultants, or successors of International Mineral Resources B.V. or their families, and any other person acting or purporting to act on International Mineral Resources B.V.'s behalf."  Accordingly, to the extent Mr. Akhmetshin makes any production pursuant to the Subpoena, he will construe "IMR" to mean and include International Mineral Resources B.V., Eurasian Natural Resources Corporation Plc ("ENRC"), Shaft Sinkers (Pty) Ltd. ("Shaft Sinkers"), Alijan Imbramovich, Alexander Mashkevitch, and Mr. Chodiev, individually.

        12.     Mr. Akhmetshin objects to Definition 7, "Patokh Chodiev or his Business Interests," to the extent that it is vague, ambiguous, and overbroad.  Mr. Akhmetshin does not know, and is incapable of discovering, the identities of "any and all present and former agents, representatives, attorneys, assigns, consultants, employees, or successors, or any other person acting or purporting to act on Patokh Chodiev's behalf, whether directly or indirectly" and "any companies or entities in which Patokh Chodiev is currently or was in the past an officer, director, shareholder, or partner or in which Patokh Chodiev currently owns or in the past owned any indirect or indirect interest, and any and all present and former agents, representatives, attorneys, assigns, consultants, employees, or successors, or any other person acting or purporting to act on behalf of such companies or entities."  In October 2016, Forbes estimated that Mr. Chodiev had a net worth of $1.8 billion.[1]  Mr. Akhmetshin's does not know, and is incapable of discovering, the identities of the countless individuals and entities that comprise Mr. Chodiev's $1.8 billion enterprise.  Accordingly, to the extent Mr. Akhmetshin makes any production pursuant to the Subpoena, he will construe "Patokh Chodiev or his Business Interests" to mean Mr. Chodiev, individually, International Mineral Resources B.V., ENRC, and Shaft Sinkers.

---

[1]  *See* https://www.forbes.com/sites/richardbehar/2016/10/03/trump-and-the-oligarch-trio/#63749c845314.

**CONFIDENTIAL**

13.     Mr. Akhmetshin objects to Instruction 4 to the extent that it seeks to impose burdens beyond the scope of Rule 45(e).  In the event that Mr. Akhmetshin makes any production pursuant to the Subpoena, he will provide a description of documents withheld on the basis of privilege in a manner consistent with Rule 45.

14.     Mr. Akhmetshin objects to Instruction 9 on the ground that it would impose undue burden and expense on him and because it seeks to impose obligations beyond those required by the Federal Rules of Civil Procedure.  Mr. Akhmetshin further objects to the extent that he does not know, and is incapable of discovering, all documents that were, but no longer are, in his "possession, custody, or control."  For example, Mr. Akhmetshin's computer was stolen from him at the Berlin airport over five years ago, on or about February 17, 2013.  Mr. Akhmetshin cannot be reasonably expected to "know" all documents that may have been stored on that stolen computer.

15.     Mr. Akhmetshin objects to the Subpoena on the grounds that it will impose a significant expense on him in order to comply.  On its face, the Subpoena seeks over seven years of documents and implicates at least four distinct legal privileges.  Arguably, every single document in Mr. Akhmetshin's counsel's possession relating the 2014 IMR § 1782 Application and the related proceedings is responsive to the current Subpoena.  Gathering, reviewing, analyzing, defending, and ultimately producing documents responsive to this Subpoena may present a significant expense to Mr. Akhmetshin, as would attending and testifying at deposition.  Mr. Akhmetshin requests that Mr. Chodiev and IMR pay all reasonable costs and expenses permitted by Rule 45, including attorneys' fees, and will move this Court accordingly.

CONFIDENTIAL

16.     Mr. Akhmetshin objects to the Subpoena to the extent that it seeks documents subject to a Protective Order issued in any other litigation.

17.     Mr. Akhmetshin objects to the Subpoena on the ground that it fails to comply with the requirements of Fed. R. Civ. P. 45(a)(1)(B).  The Subpoena does not state the method of recordation for Mr. Akhmetshin's deposition.

18.     Mr. Akhmetshin objects to the Subpoena on the ground that it constitutes an undue burden to be compelled by IMR to sit for a third day of depositions in the last three years about what he can only assume (absent possession of the current § 1782 Application) will be the same issues and topics as the first two days of depositions.

## SPECIFIC OBJECTIONS

1.     Mr. Akhmetshin objects to Subpoena Document Request No. 1 for each of the following reasons:

a.     Mr. Akhmetshin object to Document Request No. 1 on the grounds that it constitutes an undue burden and expense for him to produce documents to IMR (and Mr. Chodiev) less that two and a half years after he last produced similar documents to IMR.  The overwhelming majority, if not all, of the documents responsive to the Subpoena were responsive to and produced pursuant to the 2015 Subpoena.  Just as in the 2015 Subpoena, the Subpoena seeks documents dating back to January 1, 2011.  The Subpoena covers a substantial number of documents produced by Mr. Akhmetshin in 2015.  In 2015, IMR sought production of "all documents and communications concerning IMR, Shaft Sinkers, [and] ENRC."  Since IMR was defined to include Mr. Chodiev, documents concerning Mr. Chodiev were produced.  The current Subpoena presents the other side of the same circle.  The Subpoena demands "All Documents and Communications concerning Patokh Chodiev or his Business Interests, including

7

**CONFIDENTIAL**

but not limited to IMR," and then defines those terms in the manner encompasses IMR, Shaft

Sinkers, and ENRC, among other entities and individuals unknown and unknowable to Mr.

Akhmetshin.

        b.   Mr. Akhmetshin objects to Document Request No. 1 to the extent that the

designated timeframe (January 1, 2011 to present) is overbroad and encompasses documents

which are neither relevant nor reasonably calculated to lead to the discovery of admissible

evidence.  To the extent that events giving rise to the Subpoena are the same as those that gave

rise to the 2014 IMR § 1782 Application proceedings (which Mr. Akhmetshin cannot confirm

without access to the current § 1782 Application), Judge Kessler previously ruled that documents

post-dating August 25, 2013 are neither relevant nor reasonably calculated to lead to the

discovery of admissible evidence.  *See* July 28, 2015 Order and Opinion (Dkt. 47, 48).

        c.   Mr. Akhmetshin objects to the extent that Document Request No. 1, read

literally, seeks documents that were filed with the Court or served on IMR in the course of the

2014 IMR §1782 Application proceeding.  In the event that Mr. Akhmetshin makes any

production pursuant to the Subpoena, Mr. Akhmetshin will not be producing such documents as

they are already in the possession, custody, or control of Mr. Chodiev and IMR.

        d.   Consistent with General Objection No. 6, Mr. Akhmetshin objects to the

extent that Request No. 1 seeks documents covered by the attorney-client privilege, the work

product doctrine, the consulting expert privilege, the joint-defense privilege, or any other

applicable privilege.  In this case, the attorney-client privilege applies to both: (i)

communications between Mr. Akhmetshin and his attorneys; and (ii) communications between

Salisbury & Ryan, on behalf of ECVK, and Mr. Akhmetshin.  ECVK has previously stated

unequivocally through Mr. Salisbury that it has not and will not waive its attorney-client

8

**CONFIDENTIAL**

privilege.  (Engagement Agmt. dated July 26, 2012 ¶ 4; Salisbury Decl. dated May 15, 2014 ¶

20).  The work product doctrine (Fed. R. Civ. P. 26(b)(3)(A)) and consulting expert privilege

(Fed. R. Civ. P. 26(b)(4)(D)) (and their common law counterparts) both cover work performed

by Mr. Akhmetshin at the request and direction of Salisbury & Ryan in anticipation of litigation.

The work product doctrine also protects work performed by Sperduto Thompson in the course of

the 2014 IMR §1782 Application proceeding and this proceeding.  The joint-defense privilege

covers communications between Mr. Akhmetshin or his attorneys and Salisbury & Ryan or its

attorneys.  In the event that Mr. Akhmetshin makes any production pursuant to the Subpoena,

such privileged documents are not being produced.

     Mr. Akhmetshin reserves the right to supplement these objections, particularly

after he is given access to the *ex parte* Application.  *See In re Merck & Co*., 197 F.R.D. 267, 270

(M.D.N.C. 2000) ("*Ex parte* Section 1782 discovery orders can result in unfairness.").


Dated: Washington, D.C.
       February 26, 2018

                                 Kim Hoyt Sperduto
                                 DC Bar No. 416127
                                 Joshua S. Kauke
                                 DC Bar No. 999296

                                 SPERDUTO THOMPSON PLC
                                 1133 Twentieth St. NW
                                 Second Floor
                                 Washington, D.C.  20036
                                 (202) 408-8900
                                 (202) 408-8910 (fax)
                                 ksperduto@sperdutothompson.com

**CONFIDENTIAL**

## Certificate of Service

I hereby certify that on this 26th day of February 2018 copies of the foregoing Preliminary Objections By Rinat Akhmetshin To Subpoena Pursuant To Fed. R. Civ. P. 45(d)(2)(B) were served via email and first-class mail, postage pre-paid, on:

John Scanlon, Esq.
Kobre & Kim LLP
1919 M St. NW
Washington, D.C. 20036

with copy via email to Jonathan D. Cogan, Esq.

Joshua S. Kauke

10

**CONFIDENTIAL**

# EXHIBIT 8

**Joshua S. Kauke**

| | |
|---|---|
| **From:** | Fritz.Scanlon@kobrekim.com |
| **Sent:** | Monday, April 30, 2018 6:18 PM |
| **To:** | Kim Sperduto; Joshua S. Kauke |
| **Cc:** | Jonathan.Cogan@kobrekim.com |
| **Subject:** | 1782 |

Kim and Josh,

As we mentioned after our meeting on Friday, we have reason to believe that Mr. Akhmetshin was not forthright with us.  After conferring with our clients, we have concluded that – absent additional information from your client – we should proceed to a formal production of documents and deposition pursuant to the subpoena served on Mr. Akhmetshin on February 14.  Below is a written version of the proposal we described for you previously regarding a reduced scope of the subpoena, as well as proposed timing for compliance:

Scope:  in an effort to reduce the burden on Mr. Akhmetshin and to clarify that the subpoena in no way seeks documents and/or information that are duplicative of what was sought in the previous Section 1782 application filed by IMR, we propose narrowing the subpoena's document request in the following manner:  First, the date range would be narrowed to September 1, 2014-present.  September 2014 is when we understand articles about Kazakhgate 2.0 began appearing in the Belgian press.  Second, the scope of the subpoena would be narrowed to all documents concerning Patokh Chodiev, IMR or its subsidiaries and affiliates, the Belgian Parliamentary Inquiry Commission, Mr. Chodiev's Belgian complaints, and the media/public relations campaign defined in the Section 1782 Application as Kazakhgate 2.0, including all communications between (i) Mr. Akhmetshin and (ii) Joseph Szlavik**,** Bulat Utemuratov, any journalists, public relations professionals or anyone else that Mr. Akhmetshin knows or believes are in any way related to Kazakhgate 2.0.  To be clear, we are not seeking reproduction of any documents Mr. Akhmetshin previously produced to IMR in the prior 1782 or any documents or information concerning Eurochem or the work Mr. Akhmetshin did for Eurochem.

Timing:  We propose that responsive documents – or confirmation that Mr. Akhmetshin has none – should be provided by May 7, 2018, and Mr. Akhmetshin sit for a deposition by June 8, 2018 at a mutually agreeable time and place.  As we mentioned at our meeting, we will work with you to make the timing of a deposition work based on your office move.

Please let us know whether this proposal is agreeable to Mr. Akhmetshin, or whether he intends to move to quash the subpoena.

Regards,
Fritz


Fritz Scanlon
+1 202 664 1983
**KOBRE & KIM LLP**
www.kobrekim.com

New York | London | Hong Kong | Shanghai | Seoul | Washington DC | San Francisco | Miami | Cayman Islands | BVI

This e-mail message is from Kobre & Kim LLP, a law firm, and may contain legally privileged and/or confidential information. If the reader of this message is not the intended recipient(s), or the employee or agent responsible for delivering the message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please notify the sender immediately and delete this e-mail message and any attachments from your computer without retaining a copy.