# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE:

APPLICATION OF PATOKH CHODIEV AND
INTERNATIONAL MINERAL RESOURCES B.V.
FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782

        Applicants.

Case No. 1:18-mc-00013-EGS

**FILED UNDER SEAL**

---

## PATOKH CHODIEV AND INTERNATIONAL MINERAL RESOURCES B.V.'S
## OPPOSITION TO RINAT AKHMETSHIN'S MOTION TO QUASH

KOBRE & KIM LLP
1919 M Street NW
Washington, D.C. 20036
Tel:  +1 202 664 1900
Fax: +1 202 664 1920
fritz.scanlon@kobrekim.com

800 Third Avenue
New York, New York 10022
Tel:  +1 212 488 1200
Fax: +1 212 488 1220
jonathan.cogan @kobrekim.com

*Attorneys for Applicants Patokh Chodiev*
*and International Mineral Resources B.V.*

# TABLE OF CONTENTS

**Page(s)**

**TABLE OF AUTHORITIES** ................................................................................... ii

**PRELIMINARY STATEMENT** ..............................................................................1

**ARGUMENT** ..............................................................................................................3

I.      The Prior Release Does Not Preclude the Present Section 1782 Application or
        Entitle Mr. Akhmetshin to Indemnification.........................................................3

        A.      The Prior Release Does Not Apply Because the Present Section 1782
                Application Is Not Related to the Prior Actions. ......................................4

        B.      The Prior Release Does Not Apply Because New York Law Prohibits
                Parties from Releasing Claims Involving Future Intentional Misconduct..............8

        C.      Any Disputes Regarding the Application and Effect of the Prior Release
                Must Be Brought and Heard in New York Courts...................................9

II.     The Discovery Sought in the Application is "For Use" in the Belgian Proceedings
        and Contemplated Belgian Proceedings. ...........................................................10

        A.      The Belgian Proceedings Are Adjudicative in Nature...........................11

        B.      Applicants Showed that they Seek Evidence "For Use" in the Belgian
                Proceedings and that Mr. Akhmetshin May Be in Possession of It.....................12

        C.      Mr. Akhmetshin's Submission of a Self-Serving Declaration Asserting
                Lack of Knowledge Does Not Warrant Quashing of the Subpoena. ..................13

III.    The Section 1782 Application Was Brought in Good Faith and Satisfies the Four
        Discretionary *Intel* Factors..............................................................................14

        A.      Applicants Disclosed All Relevant Information in their Ex Parte
                Application.........................................................................................14

        B.      The Subpoena Does not Seek Information that Is Duplicative of What Was
                Produced in Response to IMR's Prior Actions. .....................................15

        C.      The Subpoena Is Not Overbroad or Unduly Burdensome. ...................16

IV.     Mr. Akhmetshin's Request for Reimbursement and Interim Relief Related to His
        Expenses in Responding to the Subpoena Is Premature. ....................................18

        **CONCLUSION** ...............................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alexander v. FBI*,
    186 F.R.D. 71 (D.D.C. 1998).............................................................. 17

*Arista Records LLC v. Does 1-27*,
    584 F. Supp. 2d 240 (D. Me. 2008) ................................................ 13

*Call of the Wild Movie, LLC v. Does 1-1,062*,
    770 F. Supp. 2d 332 (D.D.C. 2011) ................................................ 17

*Egiazaryan v. Zalmayev*,
    No. 11-CIV-2670 (PKC), 2011 WL 6097136 (S.D.N.Y. Apr. 19, 2011)...................................... 2

*Gwynn v. Rabco Leasing, Inc.*,
    2010 WL 11507684 (M.D. Fla. Jan. 21, 2010) ................................. 8

*In re Am. Hous. Found.*,
    2013 WL 2422706 (Bankr. N.D. Tex. June 4, 2013)........................ 18

*In re Auto–Guadeloupe Investissement S.A.*,
    2012 WL 4841945 (S.D.N.Y. Oct.10, 2012) .................................... 13

*In re Stati*,
    2018 WL 474999 (D. Mass. Jan. 18, 2018) ...................................... 11

*In re Veiga*,
    746 F. Supp. 2d 8 (D.D.C. 2010) ............................................ 10, 13

*Jankovic v. Int'l Crisis Grp.*,
    494 F.3d 1080 (D.C. Cir. 2007).................................................... 11

*Kalisch-Jarcho, Inc. v. New York*,
    448 N.E.2d 413 (N.Y. 1983)............................................................ 8

*Lago v. Krollage*,
    575 N.E.2d 107 (N.Y. 1991)............................................................ 8

*Linder v. Calero-Portocarrero*,
    183 F.R.D. 314 (D.D.C. 1998)...................................................... 19

*Lombardozzi v. Debroux*,
    1992 WL 246872 (S.D.N.Y. Sept. 23, 1992)................................... 9

*London-Sire Records, Inc. v. Doe 1*,
   542 F. Supp. 2d 153 (D. Mass. 2008) ................................................................. 17

*Mano Enters., Inc. v Metropolitan Life Ins. Co.*,
   2017 N.Y. Misc. LEXIS 2136 (N.Y. Sup. Ct. May 31, 2017) ................................. 13

*Mata v. Anderson*,
   685 F. Supp. 2d 1223, 1258 (D.N.M. 2010) *aff'd*, 635 F.3d 1250 (10th Cir. 2011) .............. 8, 9

*Modern Settings, Inc. v. Am. Dist. Telegraph Co.*,
   121 A.D.2d 266 (N.Y. App. Div. 1st Dep't 1989) ..................................................... 8

*Northrop Corp. v. McDonnell Douglas Corp.*,
   751 F.2d 395 (D.C. Cir. 1984) ......................................................................... 17

*ODW Logistics, Inc. v. Karmaloop, Inc.*,
   2014 WL 293816 (S.D. Ohio Jan. 27, 2014) ........................................................ 8

*PhotoMedex, Inc. v. St. Paul Fire & Marine Ins. Co.*,
   2009 WL 2326750 (E.D. Pa. July 28, 2009) ..................................................... 9, 10

*United States Trust Co. v. Lewis*,
   1992 WL 18327 (S.D.N.Y. Jan. 28, 1992) ........................................................... 13

*Vita-Herb Nutriceutricals, Inc. v. Probiohealth*,
   2012 WL 3903454 (C.D. Cal. Sept. 6, 2012) ......................................................... 8

**Statutes**

28 U.S.C. § 1782 ................................................................................... *passim*

**Rules**

Federal Rules of Civil Procedure Rule 26 ................................................................. 12

Federal Rules of Civil Procedure Rule 45 .............................................................. 12, 17

Applicants Patokh Chodiev and International Mineral Resources B.V. ("IMR") respectfully submit this opposition to Rinat Akhmetshin's Motion to Quash (the "Motion") the subpoena that this Court authorized Applicants to issue pursuant to 28 U.S.C. § 1782 (the "Subpoena").

## PRELIMINARY STATEMENT

Mr. Akhmetshin's Motion rests primarily on the fiction that the present Section 1782 Application is duplicative of and/or related to a previous Section 1782 application and complaint filed by IMR against Mr. Akhmetshin (the "Prior Actions"), and therefore that the Application is barred by a release and covenant not to sue that resolved those earlier actions (the "Prior Release"). That assertion is not accurate. IMR's Prior Actions concerned Mr. Akhmetshin's role in a wholly different smear campaign that he conducted on behalf of a different entity (Eurochem), during a different time period (prior to August 31, 2013), and that involved different facts. Indeed, Applicants have repeatedly explained to Mr. Akhmetshin, including in an email attached to Mr. Akhmetshin's own Motion, that "the [S]ubpoena in no way seeks documents and/or information that are duplicative of what was sought in the previous section 1782 Application filed by IMR," and Applicants "are not seeking reproduction of any documents Mr. Akhmetshin previously produced to IMR in the prior 1782 or any documents or information concerning Eurochem or the work Mr. Akhmetshin did for Eurochem." (Mot. to Quash Ex. 8.)

Contrary to Mr. Akhmetshin's assertions, the discussion of IMR's Prior Actions in the present Section 1782 Application does not show that the matters are related such that the discovery now sought should be barred by the Prior Release. Rather, it illustrates Mr. Akhmetshin's *modus operandi*. Mr. Akhmetshin's profession appears to involve running and participating in smear campaigns. Prior to the Eurochem campaign that was the subject of IMR's Prior Actions, Mr. Akhmetshin is alleged to have orchestrated a different "black (*i.e.*,

1

negative) public relations campaign" that was "designed to discredit" a Russian banker and former elected official name Ashot Egiazaryan, who was forced to flee Russia after he became embroiled in a dispute with a close ally of Vladimir Putin.[1]  More recently, Mr. Akhmetshin has been the subject of intense scrutiny concerning his participation in the highly publicized June 2016 Trump Tower meeting that was purportedly convened by Trump campaign aides to gather damaging material about Hillary Clinton.[2]  As Senator Grassley has commented, Mr. Akhmetshin "allegedly specializes in 'active measures campaigns,' *i.e.*, subversive political influence operations often involving disinformation and propaganda."[3]

The Court should reject Mr. Akhmetshin's primary argument that the Prior Release precludes this Section 1782 Application or entitles him to indemnification because (a) the two sets of actions are not related, and thus the Prior Release does not apply; (b) even if they were related, the Prior Release still would not apply because the Application seeks information about Mr. Akhmetshin's post-release willful misconduct, and release agreements cannot apply to future acts of willful misconduct; and (c) regardless, Mr. Akhmetshin has failed to raise his arguments concerning the Prior Release in the proper forum because the Prior Release contains a forum-selection clause that explicitly confers exclusive jurisdiction on the courts of New York for all disputes related to it.  (See Mot. to Quash Ex. 2 ¶ 19.)

Mr. Akhmetshin's other arguments are equally unavailing.

---

[1] *See* Compl. ¶¶ 1-22 (ECF No. 1), *Egiazaryan v. Zalmayev*, No. 11-2670 (S.D.N.Y. Apr. 19, 2011); Am. Compl. ¶¶ 9, 32-76, 95-106, 115, 121 (ECF No. 110), *Egiazaryan*, No. 11-2670 (S.D.N.Y. Feb. 29, 2012).

[2] *See, e.g.,* Sharon LaFraniere et al., *Lobbyist at Trump Campaign Meeting Has a Web of Russian Connections*, N.Y. Times, Aug. 21, 2017, available at https://www.nytimes.com/2017/08/21/us/rinat-akhmetshin-russia-trump-meeting.html.

[3] Ex. 1 at 4.

*First*, Mr. Akhmetshin's argument that the Subpoena should be quashed because the Section 1782 Application does not seek evidence "for use" in the Belgian Proceedings and Contemplated Belgian Proceedings fails because (i) the Belgian Proceedings are adjudicative in nature, (ii) Applicants have submitted detailed declarations explaining the basis for the Application and how the materials may be used, and (iii) Mr. Akhmetshin's self-serving declaration purporting to disclaim knowledge of the Belgian smear campaign is insufficient to excuse him from his discovery obligations.

*Second*, Mr. Akhmetshin's arguments that the Section 1782 Application was brought in bad faith or that Applicants failed to satisfy the discretionary *Intel* factors is without merit because (i) there was no reason for Applicants to present irrelevant details about IMR's Prior Actions in their *ex parte* filing; (ii) notwithstanding Mr. Akhmetshin's suggestions to the contrary, Applicants are not seeking information that is duplicative of what was produced in the Prior Actions; and (iii) the Subpoena, as narrowed, is not overbroad.

*Third*, and finally, Mr. Akhmetshin's request for interim relief in the form of advancement of $50,000 is premature and unsubstantiated.  Mr. Akhmetshin has not submitted any legal invoices, nor has he described in any detail what efforts have been undertaken or what efforts will need to be undertaken in the future.  Granting interim relief in the form of a $50,000 advancement now would be inappropriate given the barren record before the Court.

## ARGUMENT

## I.   The Prior Release Does Not Preclude the Present Section 1782 Application or Entitle Mr. Akhmetshin to Indemnification.

Mr. Akhmetshin argues (at 13-18, 31-32) that the Prior Release precludes this Section 1782 Application and entitles him to indemnification for defending against it.  He is wrong for three reasons.  First, the present Section 1782 Application is not related to the Prior Actions, and

thus the Prior Release has no effect on the present Application.  Second, even if the Court were to find that the Application and Prior Actions are related, the Prior Release would be unenforceable under New York law, which prohibits the release of future intentional misconduct. Third, any dispute over the application and effect of the Prior Release must be heard in New York state or federal court pursuant to a forum-selection clause contained in the Prior Release.

### A.    The Prior Release Does Not Apply Because the Present Section 1782 Application Is Not Related to the Prior Actions.

The Prior Release applies to all claims that are "related to the matters that are the subject of the Actions"; and the Prior Release defines the "Actions" as a Section 1782 application brought by IMR against Mr. Akhmetshin in this District (Case No. 1:14-MC-00340(GK)) and a civil complaint filed by IMR against Mr. Akhmetshin and others in New York State Supreme Court (Index No. 161682/2015) (*i.e.*, the Prior Actions).  (Mot. to Quash Ex. 2 at 166-70.)  The Prior Release also contains a covenant not to commence any proceedings "concerning" the claims released (i.e. claims related to the Prior Actions), as well as an indemnification clause for all proceedings "related to" the claims released.  (*Id.* at 170.)

The Prior Actions that are subject to the Prior Release alleged that Mr. Akhmetshin coordinated a scheme to hack IMR's computers, steal IMR's confidential information, and disseminate that information in an attempt to confer an unfair advantage on his ultimate client in that matter, Eurochem, a Russian fertilizer company that, several years ago, was in a billion-dollar dispute with IMR in the Netherlands.[4]  The basis of the Dutch action was a failed mining project in Russia.[5]  Mr. Akhmetshin's work on the Eurochem campaign is alleged to have

---

[4] *See* Dkt. No. 1 at 8-9; *In re: App. of Int'l Mineral Res. B.V. for an Order to Take Discovery Pursuant to 28 U.S.C. § 1782,* No. 14-mc-00340 (D.D.C.), Dkt. No. 1 at 1-8; Mot. to Quash Ex. 4 at 1-3.

[5] *In re: App. of IMR,* No. 14-mc-00340 (D.D.C.), Dkt. No. 1 at 2-3; Mot. to Quash Ex. 4 at 1-3.

included providing the hacked information to Eurochem and the media.[6]  Eurochem was alleged

to have used the hacked information to make certain strategic decisions in the Dutch action, and

Eurochem made at least one filing that cited media articles containing disparaging allegations

about IMR written by individuals and entities with whom Mr. Akhmetshin had ties.[7]  Mr.

Akhmetshin asserted to the Court in the earlier Section 1782 proceeding that his work on behalf

of Eurochem ceased in June 2013, and, on the basis of that assertion, that Court limited IMR's

discovery to information predating August 31, 2013.[8]

The present Section 1782 Application, in contrast, seeks no information whatsoever

concerning the work Mr. Akhmetshin did for Eurochem.  Indeed, Applicants have repeatedly

explained this fact to Mr. Akhmetshin orally and in writing, including in an email attached to his

Motion. (Mot. to Quash Ex. 8.)  Instead, this present Application "seek[s] discovery into . . . Mr.

Akhmetshin's involvement in disseminating information to the Belgian Parliamentary Inquiry

Commission and/or the Belgian press in connection with the smear campaign" described in the

Application as "Kazakhgate 2.0."   (Dkt. No. 1 at 2.)   As explained in the Application,

Applicants have gathered information showing that Mr. Akhmetshin and others have been

working to influence the Belgian Parliamentary Inquiry Commission.  (*Id.* at 9.)  In addition,

Applicants' investigation has uncovered evidence showing that Mr. Akhmetshin has recently

been attempting to sell material that he states was hacked from IMR's computer servers, and that

apparently hacked materials are being used to damage Mr. Chodiev in the Belgian Parliamentary

investigation.  (*Id.*)  The timeframe during which Applicants seek discovery is from September 1,

2014 to the present because, as Applicants have explained to Mr. Akhmetshin on several

---

[6] *In re: App. of IMR,* No. 14-mc-00340 (D.D.C.), Dkt. No. 1 at 4-8; Mot. to Quash Ex. 4 at 10-16.

[7] Mot. to Quash Ex. 4 at 14-15.

[8] *In re: App. of IMR,* No. 14-mc-00340 (D.D.C.), Dkt. No. 48 at 20-21.

occasions including in the email attached to Mr. Akhmetshin's Motion, the earliest articles regarding Kazakhgate 2.0 began appearing in the Belgian press in September 2014. (*See* Mot. to Quash Ex. 8.)

Thus, Mr. Akhmetshin's argument that the Prior Actions and the present Application are related – and thus precluded by the Prior Release – is not correct. As explained above and illustrated in the chart below, the present Section 1782 Application seeks information about Mr. Akhmetshin's role in a completely different smear campaign whose object is to influence proceedings in a different country (Belgium v. the Netherlands), and that concerns different facts (alleged inappropriate political influence in Belgium and France v. a mining project in Russia) on behalf of a different ultimate client (a rival of Mr. Chodiev[9] v. Eurochem), and that occurred during a different timeframe (September 2014 to present v. before September 2013).

---

[9] The rival is not related to Eurochem.

| 2014 Actions | 2018 Application |
|---|---|
| ***Object of Akhmetshin's Campaign***:  Confer unfair advantage on Eurochem in proceedings in the Netherlands | ***Object of Akhmetshin's Campaign***:  Devalue Mr. Chodiev's business interests so that they may be purchased by rivals at depressed prices |
| ***Proponent of Akhmetshin's Campaign***: Eurochem | ***Proponent of Akhmetshin's Campaign***:  Mr. Chodiev's rival who is not related to Eurochem |
| ***Underlying Dispute***:  Failed mining venture in Russia between Eurochem and IMR | ***Underlying Dispute***:  Belgian Parliamentary Inquiry Proceedings regarding Mr. Chodiev |
| ***Foreign Proceedings***:  Billion-dollar action brought by Eurochem against IMR in the Netherlands | ***Foreign Proceedings***:  Pending and Contemplated Proceedings in Belgium |
| ***Information Sought by IMR***:  Information regarding Mr. Akhmetshin's scheme to hack IMR's computers, steal confidential information, and disseminate such information to Eurochem and the media | ***Information Sought by Applicants***:  Information regarding Mr. Akhmetshin's involvement in disseminating information to the Belgian Parliamentary Inquiry Commission and/or Belgian press in connection with Kazakhgate 2.0 |
| ***Timeframe***:  Before August 31, 2013 | ***Timeframe***:  After September 1, 2014 |

To be sure, the Application does include a discussion of the hacking and smear campaign allegations in the Prior Actions.  But the purpose of providing that information to the Court here is to show Mr. Akhmetshin's *modus operandi*.  As described in the Prior Actions and elsewhere, Mr. Akhmetshin's profession appears to involve running smear campaigns, at least one of which (the Eurochem campaign) allegedly involved the hacking of IMR's computer systems.

Even if the hacked materials that Mr. Akhmetshin is alleged to be marketing now are the same as the materials that were previously alleged in the Eurochem case, it does not follow that the present Application is related to the Prior Actions.  In such a scenario, the present Application would simply involve similar parties and Mr. Akhmetshin's recent misuse of materials he previously misused in a wholly different context.  In any event, Applicants do not know whether the purportedly hacked materials are the same, similar or unrelated.

**B.      The Prior Release Does Not Apply Because New York Law Prohibits Parties from Releasing Claims Involving Future Intentional Misconduct.**

Even if the Court were to determine that the present Application describes conduct that is related to the Prior Actions, the Prior Release would not preclude the Application or entitle Mr. Akhmetshin to indemnification because contract provisions that purport to indemnify against or release future intentional misconduct are not enforceable.  *See, e.g.*, *Lago v. Krollage*, 575 N.E.2d 107, 110 (N.Y. 1991) ("Such an agreement will be viewed as wholly void, however, where it purports to grant exemption from liability for willful or grossly negligent acts."); *Kalisch-Jarcho, Inc. v. New York*, 448 N.E.2d 413, 416 (1983) ("[A]n exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing.  This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith"); *Modern Settings, Inc. v. Am. Dist. Telegraph Co.*, 121 A.D.2d 266, 269 (N.Y. App. Div. 1st Dep't 1989) ("Agreements exempting one from liability for willful or grossly negligent conduct are void."); *Vita-Herb Nutriceuticals, Inc. v. Probiohealth LLC*, 2012 WL 3903454, at *6 (C.D. Cal. Sept. 6, 2012) ("[R]eleases that waive liability for future intentional torts are generally void as a matter of public policy"); *ODW Logistics, Inc. v. Karmaloop, Inc.*, 2014 WL 293816, at *6 (S.D. Ohio Jan. 27, 2014) ("A release of a future intentional tort is void as against public policy."); *Gwynn v. Rabco Leasing, Inc.*, 2010 WL 11507684, at *2 (M.D. Fla. Jan. 21, 2010) ("[T]he release cannot discharge the defendants from liability for future, intentional conduct."); *Mata v. Anderson*, 685 F. Supp. 2d 1223, 1258 (D.N.M. 2010) *aff'd,* 635 F.3d 1250 (10th Cir. 2011) ("The Court finds, however, that New Mexico law would not allow J. Mata to release future intentional conduct by a police department.").

The present Application seeks information about Mr. Akhmetshin's involvement with the Belgian Parliamentary Inquiry Commission and Belgian media campaign, including Mr. Akhmetshin's apparent marketing of materials stolen from IMR's computer systems through hacking.  Hacking and trafficking in stolen property constitute willful misconduct, and therefore, proceedings based on such allegations – including the present Application – fall into the willful-misconduct exception to the enforceability of releases.  The Prior Release accordingly cannot be applied to preclude the present Section 1782 Application or confer any right of indemnification on Mr. Akhmetshin.

### C.    Any Disputes Regarding the Application and Effect of the Prior Release Must Be Brought and Heard in New York Courts.

Even assuming that the Prior Release was potentially applicable in the present situation and could be enforced in this context, any dispute over whether the Prior Release precludes the present Application or entitles Mr. Akhmetshin to indemnification must be heard by a federal or state Court in Manhattan.  Thus, Mr. Akhmetshin has raised his arguments in the incorrect forum.

The Prior Release explicitly states that the "Parties hereby irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York, or . . . the New York Supreme Court for New York County . . . to determine any dispute arising under or related to this Mutual Release . . . ."  (Mot. to Quash Ex. 2 ¶ 19.)  Such forum-selection clauses are enforceable, and therefore this Court should not deny the present Section 1782 Application based on the application of the Prior Release.  *See, e.g.*, *Lombardozzi v. Debroux*, 1992 WL 246872, at *4 (S.D.N.Y. Sept. 23, 1992) (enforcing forum selection clause in a settlement agreement); *see also PhotoMedex, Inc. v. St. Paul Fire & Marine Ins. Co.*, 2009 WL 2326750, at *5 (E.D. Pa. July 28, 2009) ("[B]ecause of the forum selection clause in the

Settlement Agreement, I am unable to address the threshold issue of whether the Settlement Agreement precludes PhotoMedex's *RA Medical II* claim.").

## II.     The Discovery Sought in the Application is "For Use" in the Belgian Proceedings and Contemplated Belgian Proceedings.

As Mr. Akhmetshin admits in his Motion and as explained in the Application, the "for use" requirement imposes a "de minimus" burden to show that the requested discovery has some relevance to the foreign proceeding.  Mot. to Quash at 24; *In re Veiga,* 746 F. Supp. 2d 8, 17-18 (D.D.C. 2010).   Relevance is "broadly construed" and, when in doubt, the court should be permissive.  *Id.* at 19.

Applicants satisfied this burden by submitting several declarations providing the factual basis for their Section 1782 Application, as well as an explanation of how the evidence sought could be used in the Belgian Proceedings and Contemplated Belgian Proceedings.  (*See* Dkt. No. 1 at 11-13.)  The Court evidently accepted this showing when it issued an Order on February 2, 2018 granting the Application "[f]or the reasons set forth in the Application, and for good cause shown."  (Dkt.  No. 4.)

In response, Mr. Akhmetshin makes three arguments as to why the discovery sought in the Section 1782 Application is not "for use" in the Belgian Proceedings, none of which has merit.  First, Mr. Akhmetshin is incorrect in arguing (at 23, 28-29) that there is no adjudicative proceeding in Belgium; the three Belgian Proceedings are all pending in adjudicative tribunals. Second, Mr. Akhmetshin is wrong in arguing (at 24-26) that Applicants have failed to demonstrate that the evidence sought may be relevant to the Belgian Proceedings and/or that Mr. Akhmetshin is actually in possession of such evidence; Applicants have submitted declarations explaining the basis for the Application and how the materials may be used.  And finally, Mr. Akhmetshin is incorrect in arguing (at 26-27) that a self-serving declaration disclaiming any

10

involvement in the Belgian smear campaign justifies quashing the Subpoena; a subpoena target cannot avoid his obligations simply by submitting a declaration purporting to disclaim knowledge of what he thinks he will be asked about.

### A.    The Belgian Proceedings Are Adjudicative in Nature.

As explained in the Declaration of Beat Ehrensberger, the Belgian Proceedings consist of three lawsuits that Mr. Chodiev has filed seeking damages from the Belgian State and two members of the Belgian Parliamentary Inquiry Commission.   The lawsuits are clearly adjudicative in nature.  To dispel any doubts about this issue, Mr. Ehrensberger has submitted an additional declaration that attaches the summons from each lawsuit and confirms that the courts in which the suits were filed are judicial tribunals that preside over civil and criminal disputes. (*See* Decl. of Beat Ehrensberger ¶¶ 1, 14 15; Second Decl. of Beat Ehrensberger ¶¶ 7-10.)

Mr. Akhmetshin is therefore wrong in arguing (at 23) that the evidence sought in the Application is not "for use" in the Belgian Proceedings because the Proceedings are legislative, not adjudicative in nature.  Mr. Akhmetshin is equally incorrect when he repeats this argument in connection with his discussion of the second discretionary *Intel* factor regarding the nature of the foreign tribunal.   (*See* Mot. to Quash at 28-29).   Indeed, one of the Belgian Proceedings is pending in the very same adjudicative tribunal that Mr. Akhmetshin acknowledges was previously accepted by a court in this District as a basis for a Section 1782 Application:  the Court of First Instance of Brussels, Belgium.  *See* Second Ehrensberger Decl. ¶¶ 6-10; Mot. to Quash at 28-29; *Jankovic v. Int'l Crisis Grp.,* 494 F.3d 1080, 1085 (D.C. Cir. 2007).   Other courts have likewise acknowledged that the Belgian Courts of First Instance are "foreign tribunals" for purposes of Section 1782.  *See, e.g.*, *In re Stati*, 2018 WL 474999, at *2, *4 (D. Mass. Jan. 18, 2018).

**B.     Applicants Showed that they Seek Evidence "For Use" in the Belgian Proceedings and that Mr. Akhmetshin May Be in Possession of It.**

Mr. Akhmetshin is incorrect in arguing (at 24) that Applicants have failed to present a plausible connection between Mr. Akhmetshin and the Belgian proceedings.  As explained in the Application and the supporting declarations of Mssrs. Hutman and Ehrensberger, Applicants have gathered information indicating that Mr. Akhmetshin is (i) involved in the Belgian smear campaign, (ii) a long-time friend and former colleague of Joseph Szlavik, an individual that Applicants have presented evidence showing is also involved in the campaign, (iii) attempting to influence the Belgian Parliamentary Inquiry Commission, and (iv) marketing material that Mr. Akhmetshin states was hacked from IMR's servers.  (Dkt. No. 1 at 6-9.)  In addition, Applicants have gathered evidence showing that materials that appear to have been hacked from IMR's computer systems are being used to damage Mr. Chodiev in the Belgian investigation.  (*Id.* at 9.)  With regard to the use of the material sought from Mr. Akhmetshin, Mr. Ehrensberger has explained that it can be used in a variety of ways in the Belgian Proceedings, including to show that members of the Commission or Belgian press are acting improperly.  (Ehrensberger Decl. ¶¶ 17-20.)

Mr. Akhmetshin's argument (at 24-26) that the Application's supporting materials are insufficient because they rely on confidential sources and hearsay[10] must be rejected because he is attempting to engraft trial-like evidentiary standards onto this discovery proceeding where no such standards exist.  Section 1782 does not contain any threshold evidentiary standard that an applicant must fulfill with regard to whether the respondent actually has some or all the information sought. The requirements for a Section 1782 application instead focus on the

---

[10] Applicants have not identified all their sources because, as described in the Declaration of William Hutman (at ¶ 3), those sources have requested confidentiality due to concerns for their safety.

location of the respondent, the nature of the information sought, and the foreign proceedings for which the information is sought. *See Veiga*, 746 F. Supp. 2d at 17 (setting forth the statutory and discretionary factors for Section 1782 applications). Moreover, "[a] court considering a request for discovery under § 1782 must also be mindful of U.S. federal discovery procedures under Rules 26 and 45 of the Federal Rules of Civil Procedure." *In re Auto–Guadeloupe Investissement S.A.,* 2012 WL 4841945, at *4 (S.D.N.Y. Oct.10, 2012). Neither Rule 26 nor Rule 45 contains any requirement that a discovery proponent prove what information a discovery target has before discovery can be taken. And finally, the Federal Rules of Evidence generally do not apply to discovery and other non-trial matters other than summary judgment motions. *See, e.g.*, *Arista Records LLC v. Does 1-27*, 584 F. Supp. 2d 240, 252-56 (D. Me. 2008) (holding that "the rules of evidence do not apply" to "a garden variety discovery motion" such as "a motion for leave to take an immediate deposition and a responsive motion to quash or modify").

###### C.     Mr. Akhmetshin's Submission of a Self-Serving Declaration Asserting Lack of Knowledge Does Not Warrant Quashing of the Subpoena.

Subpoena targets cannot avoid their obligations simply by submitting declarations or affidavits stating that they do not have relevant knowledge. *See, e.g.*, *United States Trust Co. v. Lewis*, 1992 WL 18327, at *2 (S.D.N.Y. Jan. 28, 1992); *see also Mano Enters., Inc. v Metropolitan Life Ins. Co.*, 2017 N.Y. Misc. LEXIS 2136, at *5-6 (N.Y. Sup. Ct. May 31, 2017) (holding that the subpoena target's "bald assertion" of lack of knowledge was insufficient to quash a subpoena under New York's analogue to Rule 26). Accordingly, Mr. Akhmethsin's submission of a self-serving declaration disclaiming knowledge of the "Belgian smear campaign" does not warrant quashing of the Subpoena.

*          *          *          *          *

In sum, the Court need not make factual determinations about what Mr. Akhmetshin did or did not do in order to grant this Application.  Indeed, the entire point of the 1782 process is to allow foreign litigants to gather information.  Applicants have submitted a detailed Application demonstrating that they have a reasonable basis for their discovery requests and have satisfied the statutory and discretionary factors for obtaining that discovery.  That is all that is required.

## III. The Section 1782 Application Was Brought in Good Faith and Satisfies the Four Discretionary *Intel* Factors.

Mr. Akhmetshin makes a three-part argument as to why the present Section 1782 Application was brought in bad faith and then repackages his arguments several times with regard to the four discretionary *Intel* factors.  For efficiency purposes, Applicants will address each of Mr. Akhmetshin's arguments only once.  First, Mr. Akhmetshin incorrectly asserts (at 19-20, 29) that Applicants acted in bad faith by failing to disclose certain details of the Prior Actions by IMR against Mr. Akhmetshin; those Prior Actions are unrelated to the present Application and thus the details are irrelevant.  Second, Mr. Akhmetshin is incorrect in arguing (at 20-22, 28) that Applicants acted in bad faith because the Subpoena seeks material that is duplicative of that which was previously produced; Applicants have repeatedly explained to Mr. Akhmetshin that they are not seeking any duplicative material.  Third, Mr. Akhmetshin is wrong in arguing (at 22-23, 29-30) that Applicants acted in bad faith because the Subpoena is overbroad or unduly burdensome; as narrowed, the Subpoena seeks information on discrete topics at the heart of the Belgian smear campaign and communications with specific individuals involved in the campaign.

### A. Applicants Disclosed All Relevant Information in their Ex Parte Application.

The notion that Applicants somehow acted in bad faith by failing to disclose certain details about the Prior Actions such as the nature and volume of discovery taken and the

14

existence of the Prior Release is premised on the same fiction that underpins several of Mr. Akhmetshin's arguments – the assertion that the present Application is related to the Prior Actions. As explained at length above, that assertion is incorrect. Applicants did not include every detail of the Prior Actions in the present Application because such details are irrelevant. Accordingly, Mr. Akhmetshin's argument (at 19-20) that Applicants acted in bad faith by failing to disclose details of the prior actions in their *ex parte* filing should be rejected. Mr. Akhmetshin's similar argument (at 29) – that the third discretionary *Intel* factor weighs against granting the Application because it offends U.S. policy favoring enforcement of settlement agreements – must likewise be rejected. For the reasons set forth above, the Prior Release does not apply to the present Application.

**B.      The Subpoena Does not Seek Information that Is Duplicative of What Was Produced in Response to IMR's Prior Actions.**

Mr. Akhmetshin's claim (at 20-22) that the Section 1782 Application was brought in bad faith because the Subpoena seeks material that is duplicative or cumulative of what was sought and collected in the Prior Actions should be rejected because it is belied by the facts. As Applicants have explained to Mr. Akhmetshin several times, including in the email attached to his own Motion, Applicants have narrowed the Subpoena to make clear that it "in no way seeks documents and/or information that are duplicative of what was sought in the previous section 1782 Application filed by IMR," and Applicants "are not seeking reproduction of any documents Mr. Akhmetshin previously produced to IMR in the prior 1782 or any documents or information concerning Eurochem or the work Mr. Akhmetshin did for Eurochem." (Mot. to Quash Ex. 8.)

Mr. Akhmetshin's related argument (at 28) that the first *Intel* discretionary factor is neutral because Applicants already have the discovery sought in this Application by virtue of productions in the Prior Actions must likewise be rejected.

### C.      The Subpoena Is Not Overbroad or Unduly Burdensome.

Mr. Akhmetshin's final bad-faith argument (at 22-23) alleges that the Subpoena is impermissibly overbroad and therefore the Application was brought in bad faith.   Mr. Akhmetshin repeats this argument (at 29-30) contending that the fourth discretionary *Intel* factor weighs against granting the Application because the Subpoena is overly intrusive.   These arguments fail because they are not accurate and because Mr. Akhmetshin has not demonstrated that compliance would impose any burden on him, let alone an undue burden.   In arguing that the Subpoena is overbroad, Mr. Akhmetshin incorrectly contends that Applicants' narrowing of the Subpoena somehow had the opposite effect of broadening it because the narrowed Subpoena now seeks "all documents relating to Joseph Szlavik, Bulat Utemuratov, and Kazakhgate 2.0." (Mot. to Quash at 23.)   That assertion is false.   The narrowed Subpoena does not seek all documents concerning Mssrs. Szlavik and Utemuratov.   Under Applicants' proposal, which was made in writing on April 30, 2018, Mr. Akhmetshin would be required to produce documents and information post-dating September 1, 2014 and concerning topics at the heart of the Belgian Proceedings:

> [A]ll documents concerning Patokh Chodiev, IMR or its subsidiaries and affiliates, the Belgian Parliamentary Inquiry Commission, Mr. Chodiev's Belgian complaints, and the media/public relations campaign defined in the Section 1782 Application as Kazakhgate 2.0, including all communications between (i) Mr. Akhmetshin and (ii) Joseph Szlavik, Bulat Utemuratov, any journalists, public relations professionals or anyone else that Mr. Akhmetshin knows or believes are in any way related to Kazakhgate 2.0.

(Mot. to Quash Ex. 8.)   This request for information sets forth discrete topics and seeks communications with specific individuals involved in the Kazakhgate 2.0 affair.   It is not overbroad.

16

In addition, Applicants have consistently tried to work with Mr. Akhmetshin to reduce any burden that responding to the Subpoena would place on him. Not only have Applicants narrowed the Subpoena as described above, they have also offered to narrow the Subpoena even more if Mr. Akhmetshin believed that it was still unduly broad, overly burdensome or otherwise objectionable. For example, on May 3, 2018, in an effort to avoid the need for court intervention, Applicants asked Mr. Akhmetshin to let them know if he "believes that the reduced scope is still unduly broad, overly burdensome or otherwise objectionable"; if so, Applicants offered to "consider what, if any, further narrowing [Mr. Akhmetshin] propose[s]." (*See* Ex. 2.) Notably, Mr. Akhmetshin ignored these offers, choosing instead to make this motion.

Finally, Mr. Akhmetshin's argument that the Subpoena is overbroad or unduly burdensome should be rejected because Mr. Akhmetshin has submitted no evidence that he would suffer any burden, let alone an undue burden, in responding to it. Where a party seeks to quash a subpoena on the grounds that it is overbroad and unduly burdensome, the party bears the burden of demonstrating why. *See Alexander v. FBI*, 186 F.R.D. 71, 75 (D.D.C. 1998) (noting that party seeking protection from discovery must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for protection); *see also London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 162 (D. Mass. 2008) ("The party requesting that the subpoena be quashed must show good cause for protection by specifically demonstrating that disclosure will cause a clearly defined and serious harm."). This is a "heavy burden." *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984); *see also Call of the Wild Movie, LLC v. Does 1-1,062*, 770 F. Supp. 2d 332, 354 (D.D.C. 2011) ("Quashing subpoenas goes against courts' general preference for a broad scope of discovery.").

Mr. Akhmetshin's four-page declaration submitted in support of his Motion to Quash is silent on the issue of burden, and his Motion itself makes no such argument.  (*See generally* Mot. to Quash; Decl. of Rinat Akhmetshin.)  To the contrary, Mr. Akhmetshin's declaration disclaims any participation in the Belgian smear campaign.  (*Id.*)  If this statement is accurate, then Mr. Akhmetshin should be able to comply with the narrowed Subpoena quite easily.

## IV.   Mr. Akhmetshin's Request for Reimbursement and Interim Relief Related to His Expenses in Responding to the Subpoena Is Premature.

Mr. Akhmetshin's requests (at 33-35) that the Court fully compensate him for the expenses he has incurred and order Applicants to pay $50,000 into the Court registry are premature and unwarranted on the present record, which is barren of details regarding the expenses for which Mr. Akhmetshin seeks reimbursement.  They should therefore be denied.

Rule 45(d)(2)(B)(ii) "'does not establish a blanket requirement that all of a nonparty's legal fees are reimbursable so long as they are somehow related to its efforts in responding to a subpoena.  Reimbursable fees are those that are necessary to the third party's compliance and thus benefit the requesting party or are of assistance to the court.'"  Mem. Order at 6, *In re: App. of IMR,* No. 14-mc-00340 (D.D.C.) (Dkt. No. 60) (quoting *In re Am. Hous. Found.*, 2013 WL 2422706, at *2 (Bankr. N.D. Tex. June 4, 2013)).  In addition, requested expenses must be reasonable.  *See, e.g.*, *id.* (cutting in half the number of hours Mr. Akhmetshin requested reimbursement for in the prior Section 1782 application).

Mr. Akhmetshin has provided no legal invoices or otherwise described in any detail the work he or his attorneys have done or will do on this matter.  Thus, Applicants and the Court are unable to determine which expenses that Mr. Akhmetshin has incurred may be subject to reimbursement.  The Court should accordingly deny Mr. Akhmetshin's requests for a blanket

reimbursement of all prior expenses and an order directing Applicants to pay $50,000 into the Court's registry.

To be sure, Applicants will comply with their reimbursement obligations under Rule 45. But the scope of those obligations, if any, should be determined on a more complete record.

Finally, Mr. Akhmetshin's argument (at 35) that he should be awarded interim relief in the form of a $50,000 advancement because Applicants are foreign should be rejected out of hand. Mr. Akhmetshin has provided no evidence that Applicants would refuse to pay or otherwise comply with any Court order. Moreover, Mr. Akhmetshin's characterization of the sole case he cites in support of his request – *Linder v. Calero-Portocarrero*, 183 F.R.D. 314 (D.D.C. 1998) – is highly misleading. Mr. Akhmetshin states that "Judge Harris conditioned the subpoenaed federal agencies' compliance on 'plaintiffs' payments' of costs in advance." (Mot. to Quash at 35). What Judge Harris actually ordered was that plaintiffs cover only *half* of the agencies' costs, and only after the agencies provide plaintiffs "with a detailed estimate of the cost of complying," and plaintiffs had an opportunity to "file objections to the cost estimates." *Linder*, 183 F.R.D. at 323.

Mr. Akhmetshin's requests for reimbursement and advancement should be denied.

## CONCLUSION

For the reasons set forth above, the Court should deny Mr. Akhmetshin's Motion to Quash in its entirety.

Dated:        Washington, D.C.
              May 29, 2018

Respectfully submitted,

KOBRE & KIM LLP
1919 M Street NW
Washington, D.C. 20036
Tel:  +1 202 664 1900
Fax: +1 202 664 1920
fritz.scanlon@kobrekim.com

800 Third Avenue
New York, New York 10022
Tel:  +1 212 488 1200
Fax: +1 212 488 1220
jonathan.cogan @kobrekim.com

*Attorneys for Applicants Patokh Chodiev*
*and International Mineral Resources B.V.*

## CERTIFICATE OF SERVICE

I certify that on May 29, 2018, I served this Motion by filing a true and correct copy through the Court's electronic filing system, which will send notification of the filing to all counsel of record in this matter via email through CM/ECF.  I further certify that I caused copies this Motion, as well as Applicants' Opposition to Mr. Akhmetshin's Motion to Quash and its supporting documents, to be served electronically on Mr. Akhmetshin's counsel of record in this matter at the following email addresses:  ksperduto@sperdutothompson.com; jkauke@sperdutothompson.com.

Respectfully submitted,

/s/ John Scanlon
John ("Fritz") Scanlon (Bar ID 983169)
KOBRE & KIM LLP
1919 M Street NW
Washington, D.C. 20036
Tel:  +1 202 664 1900
Fax: +1 202 664 1920
fritz.scanlon@kobrekim.com

Jonathan D. Cogan (admitted pro hac vice)
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel:  +1 212 488 1200
Fax: +1 212 488 1220
jonathan.cogan @kobrekim.com

*Attorneys for Applicants Patokh Chodiev
and International Mineral Resources B.V.*

# EXHIBIT 1

CHARLES E. GRASSLEY, IOWA, CHAIRMAN

ORRIN G. HATCH, UTAH
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
BEN SASSE, NEBRASKA
JEFF FLAKE, ARIZONA
MIKE CRAPO, IDAHO
THOM TILLIS, NORTH CAROLINA
JOHN KENNEDY, LOUISIANA

DIANNE FEINSTEIN, CALIFORNIA
PATRICK J. LEAHY, VERMONT
RICHARD J. DURBIN, ILLINOIS
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
AL FRANKEN, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE K. HIRONO, HAWAII

KOLAN L. DAVIS, Chief Counsel and Staff Director
JENNIFER DUCK, Democratic Staff Director

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

March 31, 2017

**VIA ELECTRONIC TRANSMISSION**

The Honorable Dana Boente
Acting Deputy Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Mr. Boente:

Over the past few years, the Committee has repeatedly contacted the Department of Justice to raise concerns about the Department's lack of enforcement of the Foreign Agents Registration Act ("FARA"). I write regarding the Department's response to the alleged failure of pro-Russia lobbyists to register under FARA. In July of 2016, Mr. William Browder filed a formal FARA complaint with the Justice Department regarding Fusion GPS, Rinat Akhmetshin, and their associates.[1] His complaint alleged that lobbyists working for Russian interests in a campaign to oppose the pending Global Magnitsky Act failed to register under FARA and the Lobbying Disclosure Act of 1995. The Committee needs to understand what actions the Justice Department has taken in response to the information in Mr. Browder's complaint. The issue is of particular concern to the Committee given that when Fusion GPS reportedly was acting as an unregistered agent of Russian interests, it appears to have been simultaneously overseeing the creation of the unsubstantiated dossier of allegations of a conspiracy between the Trump campaign and the Russians.

Mr. Browder is the CEO of Hermitage Capital Management ("Hermitage"), an investment firm that at one time was the largest foreign portfolio investor in Russia. According to the Justice Department, in 2007, Russian government officials and members of organized crime engaged in corporate identity theft, stealing the corporate identities of three Hermitage companies and using them to fraudulently obtain $230 million.[2] The $230 million was then extensively laundered into accounts outside of Russia. When Hermitage learned of the situation, its attorneys, including Mr. Sergei Magnitsky, investigated. In December of 2007, Hermitage filed criminal complaints with law enforcement agencies in Russia, complaints which identified the Russian government officials who had been involved. In response, the Russian government

---

[1] *Complaint Regarding the Violation of US Lobbying Laws by the Human Rights Accountability Global Initiative Foundation and Others*, Hermitage Capital Management (July 15, 2016) ("Browder Complaint") (attached).
[2] Second Amended Verified Complaint, *U.S. v. Prevezon Holdings Ltd., et al.*, No. 13-cv-6326, ECF 381 (SDNY) ("DOJ Complaint") (attached).

assigned the case to the very officials involved in the crime, who then arrested Mr. Magnitsky and kept him in pretrial detention for nearly a year, until he died under highly suspicious circumstances after being beaten by guards and denied medical treatment.

In response to this brazen violation of human rights, Congress passed the bipartisan Sergei Magnitsky Rule of Law Accountability Act of 2012 ("Magnitsky Act"), which was signed into law by President Obama.  The law authorized sanctions against those who the President determined were responsible for Mr. Magnitsky's detention and death, those who financially benefitted from it, and those involved in the criminal conspiracy he had uncovered.  The law also authorized sanctions against those the President determined were responsible for other extrajudicial killings, torture, or human rights violations committed against individuals seeking to promote human rights or expose illegal activity carried out by Russian government officials.  The sanctions involved banning the identified individuals from the U.S. and authorizing the President to use the International Emergency Economic Powers Act to freeze their property, provided that the property is in the United States.  President Obama initially identified 18 such individuals, and subsequently added others.

The Russian government responded to the Magnitsky Act by prohibiting all adoptions of Russian children by United States citizens.  It similarly put out a list of 18 U.S. government officials banned from Russia.

In 2013, the Department of Justice initiated a civil asset forfeiture case against Prevezon Holdings, a company owned by Russian Denis Katsyv, the son of a former Russian government minister.[3]  The Justice Department argued that his company had received millions of the laundered $230 million from the conspiracy Mr. Magnitsky discovered, and had used it to purchase real estate in New York.[4]  Additionally, in 2015, Senators Cardin and McCain introduced the Global Magnitsky Act, which would extend the Magnitsky sanctions framework to human rights violators across the globe.

As detailed in press accounts and in Mr. Browder's FARA complaint, in response to these actions, Prevezon Holdings and the Russian government began a lobbying campaign purportedly designed to try to: repeal the Magnitsky Act; remove the name "Magnitsky" from the Global Magnitsky Act and delay its progress; and cast doubt on the Justice Department's version of events regarding the corporate identity theft of Hermitage's companies, the fraudulently obtained $230 million, and the death of Mr. Magnitsky.[5]

---

[3] *U.S. v. Prevezon Holdings Ltd., et al.*, No. 13-cv-6326 (SDNY).

[4] DOJ Complaint, *supra* note 2.

[5] Browder Complaint, *supra* note 1; *see* Isaac Arnsdorf, *FARA Complaint Alleges Pro-Russian Lobbying*, POLITICO (Dec. 8, 2016); Michael Weiss, *Putin's Dirty Game in the U.S. Congress*, THE DAILY BEAST (May 18, 2016); Mike Eckel, *Russian 'Gun-For-Hire' Lurks in Shadows of Washington's Lobbying World*, RADIO FREE EUROPE/RADIO LIBERTY (July 17, 2016); Isaac Arnsdorf, *From Russia, With Love?*, POLITICO (Aug. 17, 2016); Chuck Ross, *Oppo Researcher Behind Trump Dossier Is Linked to Pro-Kremlin Lobbying Effort*, THE DAILY CALLER (Jan. 13, 2017); Isaac Arnsdorf and Benjamin Oreskes, *Putin's Favorite Congressman*, POLITICO (Nov. 23, 2016).

Prevezon's lobbying efforts were reportedly commissioned by Mr. Katsyv, who organized them through a Delaware non-profit he formed and through the law firm then representing Prevezon in the asset forfeiture case, Baker Hostetler.[6]  Among others, the efforts involved lobbyist Rinat Akhmetshin and Fusion GPS, a political research firm led by Glenn Simpson.[7]  According to press reports, Baker Hostetler partner Mark Cymrot briefed congressional staff on the asset forfeiture case, attempting to discredit the Justice Department's version of events and instead push the Russian government's account.[8]  Rinat Akhmetshin, along with former Congressman Ron Dellums, reportedly lobbied the House Foreign Affairs Committee, telling staffers "they were lobbying on behalf of a Russian company called Prevezon and ask[ing] [the Committee] to delay the Global Magnitsky Act or at least remove Magnitsky from the name," as well as telling the staffers "it was a shame that this bill has made it so Russian orphans cannot be adopted by Americans."[9]  Mr. Akhmetshin was also involved in the screening, targeting Congressional staffers and State Department officials, of an anti-Magnitsky propaganda film.[10]  For its part, Fusion GPS reportedly "dug up dirt" on Mr. Browder's property and finances, and attempted to generate negative stories about Mr. Browder and Hermitage in the media, shopping stories to a number of reporters.[11]

According to press reports, the Russian government also directly delivered a letter on the issue to a Congressional delegation visiting the country, which similarly sought to undermine the Justice Department's account of events by accusing Mr. Browder and Mr. Magnitsky of a variety of crimes.[12]  The letter from the Russian government also stated:

> Changing attitudes to the Magnitsky story in Congress, obtaining reliable knowledge about real events and personal motives of those behind the lobbying of this destructive Act, taking into account the pre-election political situation may change the current climate in interstate relations.  Such a situation could have a very favorable response from the Russian side on many key controversial issues and disagreements with the United States, including matters concerning the adoption procedures.[13]

---

[6] Browder Complaint, *supra* note 2; Isaac Arnsdorf, *FARA Complaint Alleges Pro-Russian Lobbying*, POLITICO (Dec. 8, 2016).

[7] *Id.*; Chuck Ross, *Oppo Researcher Behind Trump Dossier Is Linked to Pro-Kremlin Lobbying Effort*, THE DAILY CALLER (Jan. 13, 2017).

[8] Isaac Arnsdorf, *FARA Complaint Alleges Pro-Russian Lobbying*, Politico (Dec. 8, 2016).

[9] Michael Weiss, *Putin's Dirty Game in the U.S. Congress*, THE DAILY BEAST (May 18, 2016); *see* Isaac Arnsdorf, *From Russia, With Love?*, POLITICO (Aug. 17, 2016).

[10] Mike Eckel, *Russian 'Gun-For-Hire' Lurks in Shadows of Washington's Lobbying World*, RADIO FREE EUROPE/ RADIO LIBERTY (July 17, 2016).

[11] Isaac Arnsdorf, *FARA Complaint Alleges Pro-Russian Lobbying*, Politico (Dec. 8, 2016); Chuck Ross, *Oppo Researcher Behind Trump Dossier Is Linked to Pro-Kremlin Lobbying Effort*, THE DAILY CALLER (Jan. 13, 2017).

[12] Michael Weiss, *Putin's Dirty Game in the U.S. Congress*, THE DAILY BEAST (May 18, 2016).

[13] *Id.*

It is particularly disturbing that Mr. Akhmetshin and Fusion GPS were working together on this pro-Russia lobbying effort in 2016 in light of Mr. Akhmetshin's history and reputation. Mr. Akhmetshin is a Russian immigrant to the U.S. who has admitted having been a "Soviet counterintelligence officer."[14]  In fact, it has been reported that he worked for the GRU and allegedly specializes in "active measures campaigns," *i.e.*, subversive political influence operations often involving disinformation and propaganda.[15]  According to press accounts, Mr. Akhmetshin "is known in foreign policy circles as a key pro-Russian operator,"[16] and Radio Free Europe described him as a "Russian 'gun-for-hire' [who] lurks in the shadows of Washington's lobbying world."[17]  He was even accused in a lawsuit of organizing a scheme to hack the computers of one his client's adversaries.[18]

As you know, Fusion GPS is the company behind the creation of the unsubstantiated dossier alleging a conspiracy between President Trump and Russia.  It is highly troubling that Fusion GPS appears to have been working with someone with ties to Russian intelligence –let alone someone alleged to have conducted political disinformation campaigns– as part of a pro-Russia lobbying effort while also simultaneously overseeing the creation of the Trump/Russia dossier.  The relationship casts further doubt on an already highly dubious dossier.

The actions of Mr. Akhmetshin, Fusion GPS, and the others described in Mr. Browder's complaint appear to show that they acted on behalf of a foreign principal.  This is exactly the type of activity Congress intended to reach with FARA.  When properly enforced, FARA provides important transparency.  However, in this case, because none of the parties involved in the anti-Magnitsky lobbying had properly registered under FARA, these suspicious connections were not appropriately documented and brought to public light.  In fact, it is unclear whether the FBI was or is aware of Fusion GPS's pro-Russia lobbying and connection to Mr. Akhmetshin, or that these efforts coincided with the creation of the dossier.  Presumably, such awareness would have informed the FBI's evaluation of the dossier's credibility.  This is why it is important for the Department of Justice to actually enforce FARA's disclosure requirements.

---

[14] Isaac Arnsdorf, *FARA Complaint Alleges Pro-Russian Lobbying*, POLITICO (Dec. 8, 2016).

[15] *Id.* ("Akhmetshin used to spy for the Soviets and 'specializes in active measures campaigns' … Akhmetshin acknowledged having been a Soviet counterintelligence officer"); Chuck Ross, *Oppo Researcher Behind Trump Dossier Is Linked to Pro-Kremlin Lobbying Effort*, THE DAILY CALLER (Jan. 13, 2017) (Akhmetshin "was affiliated with GRU, Russia's main intelligence directorate"); STEVE LEVINE, THE OIL AND THE GLORY: THE PURSUIT OF EMPIRE AND FORTUNE ON THE CASPIAN SEA 366 (2007) (describing how a former KGB officer turned businessman turned Kazahk politician "hired a lobbyist, and English-speaking former Soviet Army counter-intelligence officer named Rinat Akhmetshin [and] the skilled Akhmetshin burrowed in with Washington reporters, think tank experts, administration bureaucrats, and key political figures"); Plaintiff's Complaint, *International Mineral Resources B.V. v. Rinat Akhmetshin, et al.*, No. 161682/2015, 2015 WL 7180277 (N.Y. Sup.) ("Akhmetshin is a former Soviet military counterintelligence officer who moved to Washington, D.C. to become a lobbyist.").

[16] Isaac Arnsdorf, *From Russia, With Love?*, POLITICO (Aug. 17, 2016).

[17] Mike Eckel, *Russian 'Gun-For-Hire' Lurks in Shadows of Washington's Lobbying World*, RADIO FREE EUROPE/RADIO LIBERTY (July 17, 2016).

[18] *Id.*; Plaintiff's Complaint, *International Mineral Resources B.V. v. Rinat Akhmetshin, et al.*, No. 161682/2015, 2015 WL 7180277 (N.Y. Sup. Ct.).

In order for the Committee to evaluate the situation, please respond to the following by no later than April 14, 2017:

1. What actions, if any, has the Department of Justice taken to enforce FARA's requirements regarding the parties identified in Mr. Browder's July 16, 2016 complaint?

2. None of the parties involved appear to have registered these activities pursuant to FARA. Why has the Justice Department not required them to register under FARA?

3. Has the Justice Department sent letters of inquiry to any of the parties identified in the complaint?

4. If so, please provide copies. If not, why not?

5. Under 28 C.F.R. § 5.2, any present or prospective agent of a foreign entity may request an advisory opinion from the Justice Department regarding the need to register. Have any of the parties identified in the complaint ever requested an advisory opinion in relation to the pro-Russia work described in this letter? If so, please provide a copy of the request and the opinion.

I anticipate that your written response and the responsive documents will be unclassified. Please send all unclassified material directly to the Committee. In keeping with the requirements of Executive Order 13526, if any of the responsive documents do contain classified information, please segregate all unclassified material within the classified documents, provide all unclassified information directly to the Committee, and provide a classified addendum to the Office of Senate Security. The Committee complies with all laws and regulations governing the handling of classified information. The Committee is not bound, absent its prior agreement, by any handling restrictions or instructions on unclassified information unilaterally asserted by the Executive Branch.

Thank you for your prompt attention to this important matter. If you have any questions, please contact Patrick Davis of my Committee staff at (202) 224-5225.

Sincerely,

Charles E. Grassley
Chairman
Committee on the Judiciary

cc:    The Honorable Dianne Feinstein
Ranking Member
Senate Committee on the Judiciary

The Honorable James Comey
Director
Federal Bureau of Investigation

The Honorable Ben Cardin
United States Senate

The Honorable John McCain
United States Senate

House Committee on Foreign Affairs

# EXHIBIT 2

| From: | Fritz Scanlon |
|---|---|
| Sent: | Thursday, May 03, 2018 4:42 PM |
| To: | Kim Sperduto; Joshua S. Kauke |
| Cc: | Jonathan D. Cogan |
| Subject: | RE: 1782 |

Kim and Josh – I wanted to follow up on my voicemail from yesterday.  As I mentioned, I was calling to see whether your client is agreeable to our proposed reduced scope of the subpoena or wished to discuss further.  If your client believes that the reduced scope is still unduly broad, overly burdensome or otherwise objectionable, please let us know.  We will consider what, if any, further narrowing you propose.

Regards,
Fritz

Fritz Scanlon
+1 202 664 1983

**KOBRE & KIM LLP**
www.kobrekim.com

New York  |  London  |  Hong Kong  |  Shanghai  |  Seoul  |  Washington DC  |  San Francisco  |  Miami  |  Cayman Islands  |  BVI

**From:** Fritz Scanlon
**Sent:** Monday, April 30, 2018 6:18 PM
**To:** 'Kim Sperduto' <ksperduto@sperdutothompson.com>; 'Joshua S. Kauke' <jkauke@sperdutothompson.com>
**Cc:** Jonathan D. Cogan <Jonathan.Cogan@kobrekim.com>
**Subject:** 1782

Kim and Josh,

As we mentioned after our meeting on Friday, we have reason to believe that Mr. Akhmetshin was not forthright with us.  After conferring with our clients, we have concluded that – absent additional information from your client – we should proceed to a formal production of documents and deposition pursuant to the subpoena served on Mr. Akhmetshin on February 14.  Below is a written version of the proposal we described for you previously regarding a reduced scope of the subpoena, as well as proposed timing for compliance:

Scope:  in an effort to reduce the burden on Mr. Akhmetshin and to clarify that the subpoena in no way seeks documents and/or information that are duplicative of what was sought in the previous Section 1782 application filed by IMR, we propose narrowing the subpoena's document request in the following manner:  First, the date range would be narrowed to September 1, 2014-present.  September 2014 is when we understand articles about Kazakhgate 2.0 began appearing in the Belgian press.  Second, the scope of the subpoena would be narrowed to all documents concerning Patokh Chodiev, IMR or its subsidiaries and affiliates, the Belgian Parliamentary Inquiry Commission, Mr. Chodiev's Belgian complaints, and the media/public relations campaign defined in

the Section 1782 Application as Kazakhgate 2.0, including all communications between (i) Mr. Akhmetshin and (ii) Joseph Szlavik, Bulat Utemuratov, any journalists, public relations professionals or anyone else that Mr. Akhmetshin knows or believes are in any way related to Kazakhgate 2.0.  To be clear, we are not seeking reproduction of any documents Mr. Akhmetshin previously produced to IMR in the prior 1782 or any documents or information concerning Eurochem or the work Mr. Akhmetshin did for Eurochem.

Timing:  We propose that responsive documents – or confirmation that Mr. Akhmetshin has none – should be provided by May 7, 2018, and Mr. Akhmetshin sit for a deposition by June 8, 2018 at a mutually agreeable time and place.  As we mentioned at our meeting, we will work with you to make the timing of a deposition work based on your office move.

Please let us know whether this proposal is agreeable to Mr. Akhmetshin, or whether he intends to move to quash the subpoena.

Regards,
Fritz

Fritz Scanlon
+1 202 664 1983

**KOBRE & KIM LLP**
www.kobrekim.com

New York | London | Hong Kong | Shanghai | Seoul | Washington DC | San Francisco | Miami | Cayman Islands | BVI

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE:

APPLICATION OF PATOKH CHODIEV AND
INTERNATIONAL MINERAL RESOURCES B.V.
FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782

    Case No. 1:18-mc-00013-EGS

Applicants.

## SECOND DECLARATION OF BEAT EHRENSBERGER

Pursuant to 28 U.S.C. § 1746, I, Beat Ehrensberger, declare under penalty of perjury as follows:

1.    I am a Swiss qualified lawyer and the founder of BE LAW AG, a Zurich-based law firm. I am counsel to Patokh Chodiev and advise him on a number of matters, including the provision of strategic litigation advice. Since 2004, I have been working from time to time with Christiaan Barbier, an attorney licensed to practice law in Belgium, on matters for Mr. Chodiev and others. I advise Mr. Chodiev in relation to the current smear campaign in Belgium and France targeting his assets and reputation. I also advise Mr. Chodiev in relation to the pending Belgian proceedings discussed below.

2.    I submit this Declaration in support of Mr. Chodiev and International Mineral Resources B.V.'s Opposition to Rinat Akhmetshin's Motion to Quash.

3.    I am familiar with the facts set forth in this Declaration, either from personal knowledge or on the basis of documents that have been provided to me. Insofar as they are within my own knowledge, the facts and matters testified to are true to the best of my own knowledge and belief. Because this Declaration is being submitted for a specific legal purpose, the

information provided in the Declaration does not include every single fact that I know that may be pertinent to this subject matter.

4.      Insofar as this Declaration provides a discussion of Belgian law or the Belgian legal system, I have relied on the information provided by Mr. Barbier.  Mr. Barbier represents Mr. Chodiev in three lawsuits currently pending in Belgium.  One is against the Belgian State for the improper functioning of a Parliamentary Inquiry Commission (the "Commission").  One is against the president of the Commission, Dirk Van der Maelen, for his improper behavior.  And one is against a member of the Commission, Georges Gilkinet, for his improper behavior.  These lawsuits are referred to herein collectively as the "Belgian Proceedings."

5.      Mr. Barbier is not submitting his own declaration because Mr. Barbier was advised that Brussels Dutch bar rules prevent him from submitting a sworn statement in proceedings that are related to any proceedings in which he is acting as counsel.

6.      I understand that Mr. Akhmetshin has suggested in his Motion to Quash that the Belgian Proceedings are not before any tribunal in Belgium.  That suggestion is incorrect.

7.      Mr. Chodiev's action against the Belgian State was filed and is pending in the Court of First Instance, Brussels, Belgium.  A copy of the summons in that action is attached hereto as Exhibit A.  An English translation of the summons can be provided upon request.

8.      Mr. Chodiev's action against Georges Gilkinet was filed and is pending in the Court of First Instance, Namur, Belgium.  A copy of the summons in that action is attached hereto as Exhibit B.  An English translation of the summons can be provided upon request.

9.      Mr. Chodiev's action against Dirk Van der Maelen was filed and is pending in the Court of First Instance, Oudenaarde, Belgium.  A copy of the summons in that action is attached hereto as Exhibit C.  An English translation of the summons can be provided upon request.

10.     The Courts of First Instance in Belgium are judicial tribunals that preside over civil and criminal disputes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in _____, on May 28, 2018.

_____
Beat Ehrensberger

3

# EXHIBIT A

**Koen CUYVERS – Hugo CLEOPATER**
*huissiersdejustice@cuyverscleopater.be*
**Avenue de Roodebeek, 275 – 1030 SCHAERBEEK**
TVA BE 0851.392.457
--------------

Tel. : 02/735.83.43 Fax : 02/734.14.28            Bureau ouvert de 9h. à 12h30
Compte : 210-0313312-54            Swift : BIC GEBABEBB / IBAN BE42 2100 3133 1254

Ref.:A244-17

---

| CITATION |
|---|

## TABLE DES MATIERES

I.      **Exposé des faits**

   A. Qui est Monsieur Patokh CHODIEV ?

   B. La création d'une Commission d'enquête parlementaire

   C. La Commission d'enquête parlementaire


II.     **L'objet de la présente action judiciaire**

   A. Le comportement fautif de la Commission d'enquête et le dommage causé à Monsieur Patokh CHODIEV

   B. Les fondements de la responsabilité de l'Etat

   C. Les faits et comportements reprochés à l'Etat

      1. La période qui précède la constitution de la Commission d'enquête
      2. La constitution de la Commission
      3. Le fonctionnement de la Commission
         3.1 quels principes retenir ?
         3.2 face à ces principes, comment la Commission fonctionne-t-elle ?
         3.3 les manquements de la Commission
         3.4 exemples concrets de manquements commis et réserves pour l'avenir
         3.5 l'absence d'exercice des sanctions prévues par la loi et défaut de surveillance, en droit et en fait

   D. La réparation du préjudice subi

I.   **Exposé des faits**

A.   Qui est Monsieur Patokh CHODIEV ?

Monsieur Patokh CHODIEV est un homme d'affaires né le 15 avril 1953 en Ouzbékistan, de nationalité belge.

Diplômé du sélectif et prestigieux Institut d'État des relations internationales de Moscou et titulaire d'un doctorat en sciences politiques, Monsieur Patokh CHODIEV a travaillé pendant plus d'une décennie comme spécialiste des relations nippo-soviétiques au sein du Ministère du commerce de l'Union Soviétique.

Il est membre de l'Académie des sciences naturelles de la République du Kazakhstan et a signé plus de trente publications universitaires relatives à l'histoire, l'économie et aux sciences politiques du Japon.

A la suite de ses fonctions au Ministère du commerce, avec deux associés, Messieurs Alexandre Mashkevitch et Alijan Ibragimov, Monsieur Patokh CHODIEV a développé plusieurs activités privées dans les secteurs minier, financier et assurantiel.

Monsieur CHODIEV a été naturalisé belge en 1997, après avoir obtenu tous les avis positifs nécessaires.

Il est aujourd'hui un chef d'entreprise respectable. Il n'a, au cours de sa longue carrière, publique comme privée, jamais fait l'objet d'une quelconque condamnation pénale, en Belgique ou à l'étranger.

Pourtant, Monsieur Patokh CHODIEV est, depuis le mois de septembre 2014, régulièrement mis en cause par les presses française et belge, se faisant l'écho de ce qu'on a appelé un « Kazakhgate ». Ce dernier aurait pris forme en 2011, moment auquel le président de la République française d'alors, Monsieur Nicolas Sarkozy, aurait, à la demande du Kazakhstan et pour permettre la conclusion d'un marché de vente d'hélicoptères entre l'Etat kazakh et la société Eurocopter, filiale du groupe EADS (respectivement devenues Airbus Helicopters et le groupe Airbus), tenté d'obtenir l'extinction de poursuites pénales à charge de Monsieur CHODIEV en Belgique, et sollicité à cet effet l'intervention de personnalités politiques belges influentes.

Alors pourtant qu'une ordonnance de la chambre du conseil du Tribunal de première instance de Bruxelles du 18 février 2011 a jugé qu'une partie des poursuites à l'encontre de Monsieur CHODIEV était irrecevable, et que, pour ce qui restait, elle considérait qu'il y avait eu dépassement du délai raisonnable, ce dépassement n'excluant toutefois pas le renvoi devant le tribunal correctionnel, ce serait – d'après la campagne de presse précitée – avec l'objectif d'éteindre les poursuites à sa charge qu'aurait été adoptée par le Parlement belge la loi du 14 avril 2011 portant des dispositions diverses, qui permet désormais la conclusion de transactions pénales extinctives de poursuites pénales, et qui a effectivement permis à Monsieur CHODIEV de conclure une transaction pénale en Belgique au mois de juin 2011.

En tant qu'elles mettent en cause Monsieur CHODIEV en tout cas, ces accusations sont inexactes et nuisent à ses intérêts et à sa réputation. Il était en effet bien connu depuis avant 2011, que l'idée d'une

tion destinée à introduire dans l'ordre juridique belge le mécanisme de la transaction pénale était dans l'air. Il était bien connu également que cette idée était poussée entre autres par le lobby diamantaire belge, particulièrement anversois, et qu'un projet de texte était prêt au Parlement belge en 2009, moment auquel cette affaire de vente d'hélicoptères n'existait pas.

B. La création d'une Commission d'enquête parlementaire

La présente citation s'inscrit dans le contexte de la « *Commission d'enquête parlementaire chargée d'examiner les circonstances ayant conduit à l'adoption et l'application de la loi du 14 avril 2011 portant des dispositions diverses, en ce qui concerne la transaction pénale* ».

Cette Commission a été instituée par une décision de la Chambre des représentants du 1er décembre 2016, prise en vertu de la loi du 3 mai 1880 sur les enquêtes parlementaires.

La proposition était justifiée par la nécessité, selon les auteurs de la proposition, de faire la clarté sur les soupçons de manipulation du législateur fédéral belge par une autorité étrangère, en l'occurrence la France, afin de régler un cas particulier, en l'occurrence celui du requérant, à l'intervention de personnalités politiques belges.

Au cours des travaux parlementaires, et plus particulièrement en commission de la Justice, il a été rappelé que l'article 4, § 1er, de la loi dispose expressément que la Chambre ou la Commission, ainsi que leurs présidents pour autant que ceux-ci soient habilités, peuvent prendre toutes les mesures d'instruction prévues par le Code d'instruction criminelle ; qu'en d'autres termes, une commission d'enquête peut agir en qualité de juge d'instruction ; que par conséquent, pour garantir la sérénité du débat, il convient de veiller à ce que chaque membre soit aussi impartial que possible, tant pour lui-même qu'à l'égard de la population (Doc. Parl., 2016-2017, n° 54 2179/003, Rapport fait au nom de la Commission de la Justice, p. 3). On doit ajouter que la Commission et ses membres sont tenus des mêmes obligations que celles qui s'imposent à un juge d'instruction.

Un intervenant a par ailleurs souligné que « *tous ceux qui, de près ou de loin, ont été acteurs ou témoins de l'avènement de la réglementation sur la transaction pénale élargie en 2011 devront veiller à respecter scrupuleusement le devoir d'impartialité. Il ne peut à aucun moment y avoir le moindre doute. Il ne faut pas trahir la confiance du citoyen* » (Rapport, p. 4).

Il a encore été exposé que les faits sur lesquels la Commission aurait à enquêter touchaient à l'Etat de droit et aux fondements de la démocratie, ce qui rendaient les exigences précitées d'impartialité d'autant plus pressantes.

Enfin, un membre a signalé que la Commission d'enquête parlementaire devrait enquêter aussi bien à charge qu'à décharge (Rapport, p. 11).

Assez curieusement, pourtant, au cours des travaux de la ~~même~~ commission de la Justice, les mêmes parlementaires qui rappelaient le devoir d'impartialité, se sont déjà permis de parler de « *personnages mafieux, comme M. CHODIEV* » (Rapport, p. 7), et de « *M. CHODIEV et ses comparses* » (rapport, p. 9). Il ne s'agissait là malheureusement que d'une anticipation de ce qu'on a pu constater depuis le début des travaux de la Commission d'enquête. Ni son président ni ses membres (ou en tout cas plusieurs d'entre eux) ne respectent leur devoir d'impartialité, comme il sera exposé dans la suite de la présente citation.

Au cours de la séance plénière de la Chambre, la question de l'impartialité de la Commission a encore été abondamment évoquée. Certains députés ont déclarés ne pas vouloir faire partie de la Commission

au vu du rôle qu'ils avaient joué lors de l'adoption de la loi sur la transaction pénale ; il a été rappelé que « *tous ceux qui, de près ou de loin, avaient été acteurs ou témoins de l'avènement de la règlementation sur la transaction pénale élargie en 2011 veillent à respecter scrupuleusement le devoir d'impartialité* ». « *Il ne peut y avoir, à aucun moment, le moindre doute. Il ne faut pas trahir la confiance du citoyen* », a-t-on répété (Ch., C.R.I., 2016-2017, n° 142, p. 62).

Au cours des débats, il a été précisé que la question était de savoir si un Etat voisin a pu influencer le processus parlementaire belge. « *Ce ne sera pas le procès d'une personne, quelle qu'elle soit* », a-t-on dit, « *même si tout démarre évidemment avec la révélation qui concerne un parlementaire et d'une personnalité éminente de la vie politique belge. Mais ce sera en tout cas la recherche de la vérification de ce qu'ont été les processus de décision dans un dossier comme celui-là. Que ce soit au sein du pouvoir exécutif, que ce soit au sein du pouvoir législatif, que ce soit au sein du pouvoir judiciaire* » (C.R.I., *ibid.*, p. 67).

On verra ci-dessous dans la présente citation qu'on est loin du compte. On se trouve bien dans un procès fait à des personnes, et on constate les dérives qui en sont la conséquence.

### C.   La Commission d'enquête parlementaire

La Chambre a donc adopté la proposition tendant à la création d'une Commission d'enquête parlementaire sur « *les circonstances ayant conduit à l'adoption et l'application de la loi du 14 avril 2011 portant des dispositions diverses, en ce qui concerne la transaction pénale* » lors de sa séance du 1er décembre 2016.

En vertu de l'article 1er, § 1, de la proposition, la Commission d'enquête a trois objets :

1°.   enquêter sur les circonstances ayant conduit à l'adoption et à l'application de la loi du 14 avril 2011 portant des dispositions diverses, en ce qui concerne la transaction pénale ;

2°.   examiner l'application par le Ministère public de l'article 216*bis* du Code d'instruction criminelle, notamment tel que modifié par la loi du 14 avril 2011 portant des dispositions diverses, à partir de l'entrée en vigueur de cette loi jusqu'au 20 août 2011 ;

3°.   examiner la façon dont MM. Patokh CHODIEV et Alijan IBRAGIMOV ont obtenu la nationalité belge.

Selon l'article 1er, § 2, la Commission rédigera des conclusions et formulera des recommandations. Elle établira aussi les responsabilités éventuelles.

Elle peut entendre toute personne qu'elle estime devoir faire comparaître et peut disposer de toutes les pièces qu'elle juge nécessaire à l'exécution de sa mission. (art.1 § 3) La Commission est mandatée pour procéder à des constats sur place et, le cas échéant, pour prendre les contacts internationaux requis pour l'accomplissement de sa mission.

La Commission est investie de tous les pouvoirs prévus par la loi du 3 mai 1880 sur les enquêtes parlementaires (art. 2), tout en ne se substituant pas aux enquêtes du pouvoir judiciaire, ni aux enquêtes et procédures extrajudiciaires (art. 3). Elle peut entrer en concours avec ces enquêtes et procédures, sans toutefois en entraver le déroulement (*ibid.*).

Les articles 4 et 5 fixent sa composition. En vertu de l'article 6, les réunions de la Commission sont publiques, mais elle peut en décider autrement à tout moment. Il est interdit aux membres de la Commission qui, à quelque titre que ce soit, l'assistent ou participent à ses travaux, de divulguer des

4

informations communiquées lors des réunions à huis clos. Les règles relatives au faux témoignage s'appliquent aux témoins qui comparaissent devant elle (art. 8 de la loi du 3 mai 1880).

Elle doit faire rapport à la Chambre des représentants dans les trois mois de son installation, sauf décision expresse de la Chambre d'accorder un délai supplémentaire (art. 7).

* * *

*

II.    L'objet de la présente action judiciaire

A.    Le comportement fautif de la Commission d'enquête et le dommage causé à Monsieur Patokh CHODIEV

La présente action est fondée sur la constatation que le déroulement des travaux de la Commission d'enquête ne se déroule pas conformément à la loi, ni conformément au principe d'impartialité. En outre, des violations sont régulièrement faites du droit de Monsieur CHODIEV au respect de sa vie privée et familiale, droit pourtant consacré par de nombreuses dispositions du droit belge et du droit international, la plus éminente d'entre elles étant l'article 8 de la Convention européenne de sauvegarde des droits de l'homme et des libertés fondamentales. En effet, des informations paraissent dans la presse qui relatent des propos tenus à huis clos. Par ailleurs, des témoins violent le secret professionnel, même en séance publique.

Alors même que la Commission ne pouvait, au début de ses travaux, et encore au moment de la présente citation, pas encore avoir d'idée sur l'implication de Monsieur Patokh CHODIEV dans le processus d'adoption de la loi sur la transaction pénale, des affirmations péremptoires étaient formulées à son endroit, de nature à le présenter comme un ennemi de la démocratie et de l'Etat belge, et prétendant qu'il mettrait ceux-ci en péril.

Cette précipitation apparaît d'autant plus téméraire que le premier volet de l'enquête, qui portait sur les circonstances de l'acquisition de la nationalité belge, a fait apparaître que les soupçons de trafic d'influence politique se sont dégonflés à mesure que cette enquête progressait. Les membres de la Commission pourraient en tirer une incitation à la prudence, *quod non*.

Les fautes commises créent par ailleurs un dommage considérable à Monsieur CHODIEV : à son image et à sa réputation, et à sa capacité de travail.

L'objet de l'action est donc de demander au tribunal de déclarer l'Etat belge responsable du préjudice causé à Monsieur CHODIEV par la Commission d'enquête et de condamner celui-ci à réparer son dommage.

Le 8 février 2017, un des conseils de Monsieur CHODIEV a écrit à la Commission d'enquête pour lui faire part de ses préoccupations. Le texte de ce courrier est intégralement reproduit ci-dessous (pièce 1 ) :

> « *Permettez-moi de vous écrire en qualité de conseil de Monsieur Patokh CHODIEV. Votre commission a été instituée afin d'enquêter sur les circonstances entourant l'adoption et l'application de la loi relative à la transaction pénale, de même que son application par le*

5

*Ministère public. Elle fut également chargée d'examiner la façon dont Monsieur CHODIEV a obtenu la nationalité belge.*

*Votre mission s'apparente à une fonction juridictionnelle, notamment du fait des prérogatives considérables que vous offre l'article 4 § 1 de la loi du 03 mai 1880. Il en résulte un devoir de réserve mais également, le cas échéant, l'obligation de respecter le secret professionnel.*

*Tout autre est le secret professionnel qui s'impose aux témoins.*

*A titre d'exemple, à l'issue des débats menés le mercredi 25 janvier, la presse a largement relaté l'audition de Monsieur RAPAILLE. Celui-ci a rappelé que ce qui concernait les informateurs représentait des données classifiées "très secret". Cette affirmation était le rappel d'une réalité évidente.*

*Néanmoins, le lundi 30 janvier, alors qu'aucun débat public n'avait eu lieu entretemps, la presse disait de mon client qu'il était devenu un contact régulier de la Sûreté de l'Etat, peu après sa naturalisation. Certains allaient même jusqu'à titrer "CHODIEV indicateur de la Sûreté depuis 1998". Ce nouvel article est d'autant plus surprenant qu'il fut rédigé sous la signature de Monsieur LALLEMAND, alors qu'à l'issue des débats du 25 janvier, il avait notamment écrit : "Selon nos informations, la Sûreté a effectivement essayé de recruter CHODIEV, mais en vain". Il poursuivait : "Les députés ne sauront jamais si CHODIEV est informateur de la Sûreté".*

*Si ma qualité d'avocat ne me permet pas de mener une enquête, rien n'interdit la réflexion et la volonté de comprendre, comme m'y invite à juste titre mon client. Que s'est-il donc passé entre le 25 janvier, date où la Commission se réunissait pour la troisième fois, et la publication de l'article du 30 janvier ?  Le revirement de situation trouve son explication dans ce dernier article du Soir du 30 janvier où Monsieur LALLEMAND, après avoir qualifié mon client de contact régulier de la Sûreté de l'Etat belge, poursuit : "C'est ce qui ressort d'un courrier adressé en janvier 2000 par la Sûreté au magistrat national, et dont les références ont été transmises à la commission d'enquête parlementaire "transaction pénale" ". Des indiscrétions ont été commises après la clôture des débats du 25 janvier. Elles concernent un élément matériel dont la presse n'avait pas été informée précédemment, à savoir le courrier adressé par la Sûreté au Magistrat national dès janvier 2000.*

*En l'état, ma lettre n'a pas pour objet d'approfondir cette question, mais de souligner que la présentation de mon client comme indicateur de la Sûreté depuis 1998, ce qu'il conteste d'ailleurs, constitue instantanément une atteinte à sa personne et à sa réputation.*

*Les matières que la commission traite doivent l'être avec réserve mais également dans le souci de respecter l'obligation au secret. Faut-il rappeler que l'article 48 de la loi du 18 juillet 1991, relative au fonctionnement des services de police et de renseignements organise une procédure lorsqu'un membre ou ancien membre du service de renseignements estime devoir garder le secret dont il est dépositaire parce que sa révélation risquerait de faire courir un danger physique à une personne. Il en est de même des membres de la commission, vis-à-vis desquels l'obligation existe à tout le moins en deux circonstances. Ils sont tenus au secret lorsque des réunions ont lieu à huis-clos. Par ailleurs, si l'indiscrétion commise a lieu dans un contexte autre que l'exercice de la fonction parlementaire, y compris dans les couloirs ou par des communications vers des journalistes, l'article 58 de la Constitution ne s'oppose pas à ce que des sanctions, même pénales, soient prises.*

*En qualité d'avocat, le seul message que je souhaite transmettre à la commission est lui rappeler le strict <u>respect de la loi</u>.  Les conséquences déjà ressenties par mon client*

6

*m'imposaient de vous en faire part, afin que la Commission y soit attentive lors de débats ultérieurs. »*

Aucune réaction n'a été réservée à ce courrier, sinon un accusé de réception adressé par le Président de la Commission le 15 février 2017 ( pièce 2 ). En revanche, les fuites dans la presse, les violations du secret professionnel et les atteintes à Monsieur CHODIEV se sont poursuivies.

\* \* \*

\*

### B.   Les fondements de la responsabilité de l'Etat

L'Etat peut être tenu responsable de fautes commises par chacun de ses trois pouvoirs : législatif, exécutif et judiciaire. Chacun de ces pouvoirs peut être tenu responsable à raison de fautes commises dans l'exercice de ses différentes fonctions. Ainsi le pouvoir législatif peut être tenu responsable pour les fautes commises dans sa fonction de législateur, mais également dans d'autres fonctions, et notamment ses fonctions d'enquêtes, de contrôle et de juridiction.

Le fondement légal de la responsabilité de l'Etat est l'article 1382 du code civil, qui fonde la responsabilité de droit commun et qui a été reconnu applicable à l'Etat et à toutes les autorités publiques depuis près d'un siècle.

L'Etat, dans toutes ses composantes, est ainsi tenu au respect de la loi, au sens large, c'est-à-dire au respect de toutes les normes de droit positif, y compris de droit international, en vigueur en Belgique. Il est également tenu au respect des principes fondamentaux qui régissent le bon fonctionnement des pouvoirs publics, comme le principe d'impartialité. Enfin, il est tenu à un devoir de prudence, de bonne gestion et de bonne organisation, qui fonde le respect dû aux administrés et aux justiciables.

L'Etat doit donc pouvoir être déclaré responsable du préjudice causé par une commission d'enquête parlementaire.

\* \* \*

\*

### C.   Les faits et comportements reprochés à l'Etat

Les griefs constitutifs de fautes sont présentés dans l'ordre suivant :

1   la période qui précède la constitution de la Commission d'enquête ;
2   la constitution de la Commission ;
3   le fonctionnement de la Commission ;
4   l'absence de contrôle et de sanction des comportements fautifs, en droit et en fait

### 1.   La période qui précède la Commission d'enquête

La mise en place d'une commission n'a pas été simple. Le journal "Le Monde" du mercredi 8 octobre 2014 publiait les commentaires de Mr Olivier MAINGAIN, sous le titre *"Si la Belgique a été utilisée, c'est un scandale d'Etat"*. Mr MAINGAIN expliquait avoir déjà tenté de susciter la création d'une commission en 2012, mais sans réponse. Il précisait à l'époque qu'il allait redemander la création d'une commission, mais qu'il avait peu de chance d'y parvenir (pièce 3);

Au fur et à mesure du temps, c'est la presse qui allait déterminer le sort réservé à l'affaire, et il n'est pas nécessaire de reprendre l'ensemble des articles publiés. Néanmoins, le 2 février 2017, "Le Vif/L'Express" publiait un article sous le titre : "*Kazakhgate : député, policier, juge, journaliste : chacun son job*". On y lisait : "*Les journalistes en font-ils trop ?* " Ou encore "*Cette enquête est pilotée par les journalistes*" déplorait un des députés, membre de la commission, alors que celle-ci débattait de l'audition d'un policier (pièce 4).

La Commission s'est révélée plus que perméable au rôle de la presse, en manière telle que cette dernière est devenue le moteur de son fonctionnement.

Le mouvement s'est d'ailleurs articulé également dans le sens inverse, certains commissaires profitant de la presse pour faire connaître au public leur point de vue. Une interaction délétère surgissait de la sorte, créant un manque de distance et une proximité presse/commissaires, avec des effets néfastes, mieux décrits plus loin. Ainsi, à titre d'exemple : "*Un milliardaire s'est montré suffisamment puissant pour influencer les trois pouvoirs en Belgique. Le Kazakhgate dépasse, à l'évidence, le seul cas DE DECKER. Attendre que la justice ait terminé son boulot pour lancer la commission d'enquête, c'est se moquer du monde !*" s'insurge le député <u>Georges GILKINET</u> (Ecolo) (Le Vif/L'Express, 18 novembre 2016) (pièce 5);

A la même période sur le "Site Apache", le député <u>Dirk VANDER MAELEN</u> s'exprime en disant : "*Dit dossier stinkt. Het wordt tijd dat het parlement zich hiermee gaat bezighouden*" (traduction libre : le dossier pue. Il va être temps que le parlement s'en occupe) (pièce 6);

Dans le journal "Le Soir" des 7 et 8 janvier 2017, soit 3 jours avant la première réunion de la Commission, Mr VANDER MAELEN accordait un long entretien, reproduit sur les trois premières pages du journal, ce qui est exceptionnel. Retenons provisoirement que, sans autre réserve, le futur président de la Commission, avant même qu'elle ait été installée, profitait de l'audience qui lui était ainsi accordée. Le titre de la première page était : "*On trouve le MR à toutes les étapes du Kazakhgate*"; s'exprimant de la sorte, d'une manière inadéquate pour celui qui devrait être un exemple, n'oubliant pas son appartenance au sp.a, il accordait la priorité à une attitude partisane, attaquant le MR ; il critiquait également l'enquête menée par la justice, et le fait que l'affaire n'ait pas été mise à l'instruction, comme en France ;

Toujours d'après "Le Soir", certains le présentaient comme "*un dur à cuire. Tant mieux.*"

Ces quelques exemples révèlent l'état d'esprit qui a précédé la création de la commission et le début de ses travaux (pièce 7). Comment s'étonner des dérives constatées par après, lors de la tenue des réunions de la Commission, alors que la création de la Commission d'enquête a été justifiée par certains parlementaires par leur volonté de ne pas attendre l'issue de l'enquête judiciaire ?

### 2.   La constitution de la Commission

Indépendamment de l'attitude des membres de la Commission, déjà avant sa création et durant son fonctionnement, la question se pose de savoir si sa composition est de nature à offrir toutes les garanties que nécessite une telle institution. Les fonctions que remplissent les membres requièrent que les témoins qui y comparaissent soient traités avec correction et réserve, sans faire d'eux - ou d'autres encore - des accusés.

Est-ce le cas ?

R

A considérer les commentaires faits sur Mr CHODIEV, la réponse à cette question est négative, comme il sera souligné ultérieurement.

Quel est l'objet de la Commission ? Il concerne la naturalisation de Mr CHODIEV, l'adoption de la loi du 14 avril 2011 sur la transaction pénale, et son application.

Comment confier l'examen de la loi sur la transaction pénale à une Commission dont 12 des 17 députés ont participé à l'adoption de la loi ? Parmi eux, Mr DELPÉRÉE, pressenti comme président, pour devenir simple commissaire ensuite ; et Mr VAN QUICKENBORNE, membre du gouvernement démissionnaire LETERME II, alors que ce dernier avait été le véritable moteur de la loi sur la transaction pénale en 2011 (pièce 8);

Avant même le début des séances, la question était posée : une telle composition offrait-elle à la Commission dans son ensemble l'aptitude de mener des débats dans le climat que nécessitent ses fonctions : discrétion, sérénité, respect de chacun et objectivité ? La réponse apparaît aujourd'hui très claire. Les conditions d'un fonctionnement objectif et régulier, conforme à la loi, n'étaient pas réunies.

3. **Les fautes commises par l'Etat belge en rapport avec la création et le fonctionnement de la Commission parlementaire d'enquête**

3.1 *Quels principes retenir ?*

Le droit d'enquête parlementaire (article 56 de la Constitution) ne peut s'abstraire du respect des exigences des normes de droit international et de droit interne qui régissent les droits de l'homme. Les rapports entre les enquêtes parlementaires et les droits de l'homme ont été étudiés par le Procureur général VELU (considérations sur les rapports entre les enquêtes parlementaires et les droits de l'homme, Académie Royale de Belgique, 1999).

Même si elles se défendent d'être des juridictions, tout en disposant du pouvoir de prendre toutes les mesures d'instruction prévues par le Code d'instruction criminelle, les commissions d'enquête parlementaires ont tendance à traiter parfois les témoins - ou d'autres encore - comme des accusés, voire des coupables, alors qu'ils n'ont pas pu bénéficier de la présomption d'innocence. L'atteinte à l'honneur et à la réputation de quelqu'un est établie lorsqu'elle est répétée de manière récurrente, sans nuance, s'appuyant sur des considérations inexactes, provisoires, parfois modifiées ensuite, mais formulées avec imprudence, sans véritable délibération.

Le requérant est conscient que la question de la responsabilité de l'Etat est débattue en doctrine et en jurisprudence, jusqu'au niveau de la Cour européenne des droits de l'homme (Bruxelles, 28 juin 2005, et le commentaire de M-F. Rigaux, *J.T*, 2005, 598-602 ; Cass., 1er juin 2006, et le commentaire de S. van Drooghenbroeck, *J.T.*, 2006, 461-463). Il va de soi, cependant, que l'honneur et la réputation des citoyens est un droit fondamental, qui ne peut être foulé ni par les parlementaires ni par les commissions d'enquête au nom de la liberté d'expression de ces derniers. Le droit d'enquête n'est pas un défouloir au prétexte d'une prétendue irresponsabilité qui serait à trouver dans l'article 58 de la Constitution au bénéfice des parlementaires lorsque cet article dispose qu' « *aucun membre de l'une ou de l'autre Chambre ne peut être poursuivi ou recherché à l'occasion des opinions et votes émis par lui dans l'exercice de ses fonctions* ».

Il revient aux commissions parlementaires de veiller au respect des droits de citoyens, comme il revient à la Chambre des représentants elle-même de prononcer, à l'égard des parlementaires qui se sont rendus coupables d'abus, les sanctions que prévoit son règlement. La Chambre elle-même engage

donc sa responsabilité si elle néglige d'utiliser les moyens dont elle dispose pour réprimer et prévenir les abus.

Le Règlement de la Chambre des représentants est pourtant clair quant au principe du respect des droits fondamentaux. Son article 146 est en effet formulé comme il suit :

*« 1. Si elle reçoit une demande visant à obtenir communication ou copie de procès-verbaux d'auditions de témoins qui ont eu lieu au cours de réunions publiques, la commission d'enquête prend sa décision souverainement, après avoir évalué les intérêts légitimes en présence.*

*Si, en donnant communication ou copie, la commission risque de porter atteinte à certains droits fondamentaux de la personne – et plus particulièrement au droit au respect de la vie privée, de la vie familiale, de l'honneur et de la réputation -, elle rejette la demande.*

*2. La disposition du n° 1 est également d'application:*

*– pour les demandes visant à obtenir communication ou copie de documents remis par des témoins dont le contenu a été divulgué dans les grandes lignes lors d'une réunion publique,*

*– et, si la commission d'enquête ne s'est pas engagée expressément à préserver le secret, pour les demandes visant à obtenir communication ou copie de procès-verbaux d'auditions de témoins qui ont eu lieu à huis clos et de documents remis par des témoins dont le contenu n'a pas été divulgué au cours d'une réunion publique.*

*3. Si elle reçoit une demande visant à obtenir communication ou copie de procès-verbaux d'auditions de témoins qui ont eu lieu à huis clos et dont la commission s'est expressément engagée à préserver le secret, la commission d'enquête la rejette.*

*4. Les décisions visées aux n° 1 à 3 peuvent être prises par le président de la commission d'enquête, si celui -ci y a été expressément habilité conformément à l'article 145, alinéa premier. »*

De même l'article 148 du Règlement de la Chambre dispose ce qui suit :

*« Au cours d'une enquête parlementaire ni la commission d'enquête ni la Chambre si elle mène elle-même l'enquête, ni leurs présidents respectifs en application de l'article 145, ne sont habilités à donner communication ou copie de dossiers judiciaires ou administratifs transmis à la Chambre, par les autorités compétentes, dans le cadre d'une enquête parlementaire, à d'autres personnes que les membres de la Chambre, les fonctionnaires compétents et les experts de la commission.*

*Dès que la commission d'enquête ou la Chambre a définitivement mis fin à ses travaux, ces dossiers sont renvoyés sans délai à l'autorité compétente. La Chambre peut décider qu'une copie de certains documents sera conservée à titre de documentation. »*

L'article 163*bis* du Règlement impose aux membres de la Chambre de respecter le Code de déontologie.

Enfin, en vertu de l'article 67 du Règlement de la Chambre, des sanctions peuvent être prises à l'égard des membres qui ne respectent pas l'obligation au secret :

*« Si un membre viole le secret imposé conformément au n° 1:*

10

*1° il perd, pour le reste de la législature, le droit d'être membre et d'assister aux réunions de tout organe de la Chambre auquel l'obligation de secret est applicable en vertu d'une disposition du présent Règlement ou en vertu d'une décision explicite de la Chambre;*

*2° il se voit appliquer une retenue de 20 % sur son indemnité parlementaire pendant une période de trois mois;*

*3° et il ne peut pas être remplacé au sein de l'organe de la Chambre dans lequel il s'est rendu coupable de cette violation. L'organe concerné est supposé compter un membre de moins à partir de ce moment.*

*3. La violation du secret est constatée par le président de la Chambre, après avis de l'organe dans lequel elle s'est produite et après audition du membre. »*

Il est donc indéniable qu'en ne faisant pas respecter son propre Règlement, la Chambre des représentants a failli à ses devoirs, ce qui engage sa responsabilité.

Enfin, il y a lieu de noter un arrêt de la Cour européenne des droits de l'homme du 18 février 2016, par laquelle celle-ci a jugé que lorsque les travaux d'une commission parlementaire d'enquête sont conduits en même temps qu'une procédure pénale portant sur les mêmes faits et circonstances, elle doit veiller à ne pas porter atteinte aux droits des personnes visées par la procédure pénale, et notamment à la présomption de leur innocence. De même en est-il du rapport de la commission (C.E.D.H., arrêt Rywin c. Pologne, 18 février 2016).

La jurisprudence de la Cour s'impose à la Belgique, et a préséance même sur les dispositions de sa Constitution. L'arrêt Rywin signifie que la responsabilité des commissions parlementaires d'enquête et de leurs membres peut être mise en cause devant les juridictions.

### 3.2    *Face à ces principes, comment la Commission fonctionne-t-elle ?*

Dès à présent, trois griefs majeurs peuvent déjà être soulignés

a) L'article 6 de la loi du 3 mai 1880 confie au président de la Commission la police de la séance. Même si la commission ne juge pas (en règle !), son président exerce ce rôle "*dans les limites des pouvoirs attribués aux présidents des cours et tribunaux*" ; or le président lui-même se comporte d'une manière qui laisse entendre un parti-pris, et à porter des jugements, comportement qui est contraire à la loi ; *a fortiori* néglige-t-il, en sa qualité de président, de rappeler les commissaires à leur devoir d'impartialité. En outre, la Commission ne s'est donné aucune règle méthodologique. Son fonctionnement est empirique. Elle est en revanche tenue par le Règlement de la Chambre.

b) Au surplus, après les nombreuses séances déjà menées, l'impression domine que la préoccupation des membres est d'agir en hommes et femmes politiques soucieux de donner des signaux politiques forts – et donc biaisés – plutôt que d'agir comme organes indépendants et impartiaux au service du citoyen, exigence pourtant rappelée lors des travaux préparatoires à la création de la Commission.

c) Enfin, la Commission se poursuit dans un climat "passionnel". Elle trouve sa genèse dans des révélations faites par la presse, et il y a lieu de craindre, voire de constater, que les contacts, non seulement aient été nombreux, mais également qu'ils aient été marqués par le souci d'ajouter à l'affaire son lot quotidien de piment. Le requérant a en outre le sentiment d'être l'otage de règlements de comptes entre partis, puisqu'il faut rappeler que l'enjeu principal des enquêtes de la Commission porte sur l'implication de personnalités politiques dans le cheminement et l'adoption de la loi relative à la transaction pénale et de l'influence qu'un Etat étranger aurait pu avoir sur le processus parlementaires. Ce contexte passionnel et partisan conduit à la tentation de communiquer à la presse des informations couvertes par le secret du huis clos, ce qui se passe effectivement.

### 3.3    *Les manquements de la Commission*

L'article 13 de la loi fixe le rôle de la Commission : les responsabilités éventuelles révélées par l'enquête doivent-elles conduire à des recommandations et le cas échéant entraîner une modification de la législation ?

Cet objectif est limité, mais la situation de la Commission est délicate du fait de la coexistence de son mandat (politique) et de l'enquête (judiciaire) actuellement menée. Certains s'en sont émus (pièce 9). Observons d'ailleurs qu'en droit français, une telle coexistence est interdite par la loi : règle de bon sens, fruit de l'expérience.

Dans la présente enquête, alors que l'exercice de ses propres compétences vaut de sérieuses critiques à la Commission, dans le même temps, celle-ci s'inquiète d'une éventuelle faute de procédure pouvant apparaître à l'occasion de l'implication d'un magistrat, justifiant le principe de *"privilège de juridiction"*. Un entretien de Mr GILKINET, relaté dans la presse, démontre qu'outre son rôle de commissaire, il se substitue au ministère public, et l'exprime dans la "Libre Belgique" (pièce 10); *"Il convient d'agir avec prudence pour éviter un vice de procédure"*, termine-t-il. D'une part, on s'étonne de cette immixtion dans le cours de la procédure judiciaire, et d'autre part on ne peut que dénoncer le fait que les parlementaires ne s'imposent pas la même prudence.

Or, des imprudences ont été commises, dès le début, à un point tel qu'après la 2ème séance, "Le Soir" titrait : *"Transaction pénale : les parlementaires commencent à cogner"* (pièce 11). Imagine-t-on un tel titre vis-à-vis d'un tribunal ? Est-il du rôle de la Commission de « cogner » ? Ou bien devrait-elle plutôt se concentrer sur la manifestation de la vérité ?

La situation s'est aggravée au fur et à mesure des séances, celles-ci se poursuivant généralement en audience publique, sans que la Commission ait pris en compte les atteintes portées à Mr CHODIEV, à son honneur, sa réputation et celle de sa famille.

Alors que la presse ("Le Soir" et "De Standaard") publiait le 1er février 2017 une carte blanche de la défense de Mr CHODIEV, qui invitait *"à la plus grande prudence"* (pièce 12), il faut constater que cet appel n'a pas été entendu.

Que l'enquête menée par la Commission soit délicate, est évident. Elle touche les fondements de la société, qu'il s'agisse de son fonctionnement judiciaire, législatif, voire même de sa sécurité, par les exposés qui furent faits par des membres de la Sûreté de l'Etat, du Comité P et du Comité R.

En décidant de la création d'une Commission, le pouvoir législatif ne pouvait ignorer de tels dangers, alors que la procédure judiciaire en cours a le même objet que celui de la Commission.

La preuve de violations individuelles du secret professionnel peut être malaisée à établir, car elle est fonction des écritures de journalistes qui auraient été le réceptacle de révélations couvertes par le secret. Cependant, la preuve est évidemment rapportée que des violations du secret ont eu lieu, puisque des informations couvertes par ce secret ont été publiées. Par conséquent, peu importe que l'on sache par qui les violations du secret ont été commises. En effet, le simple fait qu'elles aient été commises engage la responsabilité de la Commission, et donc de l'Etat belge.

Aucune attention ne fut notamment donnée à la mise en garde de la défense de Monsieur CHODIEV, alors que la lecture conjointe des articles publiés par Le Soir respectivement les 26 janvier (pièce 13) et 30 janvier 2017 (pièce 14) ne peut laisser aucun doute sur la révélation d'une information secrète.

Les mêmes critiques justifient l'article du 16 février (pièce 15), et doivent être soulignées :

- l'apparition au dossier d'une note de synthèse de la Sûreté de l'Etat, classifiée secrète ;
- sa lecture partielle, en séance publique, par le député VAN QUICKENBORNE ;
- l'audition de Mr RAES, de la Sûreté de l'Etat.

### 3.4    *Exemples concrets de manquements commis et réserves pour l'avenir*

Au moment où cette citation est rédigée et sous réserve, il n'est pas inutile de citer des exemples concrets qui démontrent, pris isolément ou considérés collectivement, l'attitude fautive de la Commission, portant aussitôt préjudice à Mr CHODIEV.

Ainsi,

1)    l'article 1 § 1 qui institue la Commission d'enquête parlementaire est clair : il délimite l'objet de l'enquête :

- alinéa 1 : l'adoption et l'application de la loi du 14 avril 2011,
- alinéa 2 : l'application par le ministère public de l'art. 216 bis du C.I.C.,
- alinéa 3 : "enfin", la façon dont Messieurs Patokh CHODIEV et Alijan IBRAGIMOV ont obtenu la nationalité belge;

Pour des motifs restés indéterminés, le troisième volet de l'enquête a été abordé en premier lieu, sans la moindre retenue, la Commission oubliant le respect des obligations notamment évoquées ci-dessus (3.1 et 3.2) entraînant un dommage immédiat pour Mr CHODIEV;

A supposer que ce troisième volet relatif à l'obtention de la nationalité belge devait entraîner de la part de la Commission des recommandations et l'établissement de responsabilités éventuelles (art. 1er, § 2), il faut constater dès à présent que la naturalisation de Mr CHODIEV fut accordée suite à 3 avis positifs; en revanche, rien ne permettait de la part de la Commission ce que l'intéressé a ressenti comme une véritable agressivité à son égard, aussitôt relayée par la presse;

2)    dès le 8 février 2007, le courrier adressé par un des conseils de Mr CHODIEV et intégralement repris ci-dessus basé sur un raisonnement concret et précis, rappelait à la Commission "le strict respect de la loi"; il y est fait référence à l'audition de Mr RAPAILLE; à nouveau convoqué le 29 mars 2017, le même témoin, par ailleurs président du Comité R, débuta son audition à 9h30 en exprimant son

irritation et son mécontentement du fait que certaines parties du rapport du Comité R avaient "fuité" vers la presse; il précisait que sa confiance en la Commission d'enquête avait été compromise et qu'à l'avenir, il serait même plus circonspect avant de transmettre des informations à la Commission; cette mise au point spontanée, par ailleurs non relatée par la presse (!), accrédite directement la mise en garde de la défense, par sa lettre du 8 février; il est prouvé de la sorte que le secret auquel sont tenus la Commission et ses membres a été violé, avec la conséquence dévastatrice dans la presse de publications immédiates avec un écho amplifié tel que le titre "Chodiev, indicateur de la Sûreté depuis 1998";

3)      ce climat délétère vis-à-vis de Mr CHODIEV ne prit fin que lorsque la Commission aborda ce que certains ont intitulé le "Diamondgate"; dans une atmosphère moins tendue face à une Commission moins nombreuse, il a suffi de 2 séances pour clôturer (provisoirement ?) ce volet; le requérant serait, en l'état, malvenu à commenter ces séances; faut-il imaginer  que le milieu diamantaire anversois, moteur non négligeable de l'économie belge, présente moins d'intérêt aux yeux de la Commission que le cas de Mr CHODIEV;

4)      ces différents griefs n'auraient pas existé si la Commission parlementaire avait rempli le rôle qui est le sien; en s'érigeant en juges, sans même respecter les règles de l'apparence *"Justice has to be done to be seen"*, elle a fait concurrence à la justice;

En outre, faisant fi de la présomption d'innocence, et ne limitant pas ses travaux au seul volet politique pour multiplier commentaires et accusations contre Mr CHODIEV, la Commission a violé les règles que la loi et la jurisprudence strasbourgeoise lui imposaient (Droit à un procès équitable au sens de la jurisprudence strasbourgeoise en 2016, Franklin Kuty, JLMB, 10 mars 2017);

5)      un dernier exemple doit être souligné et a définitivement confirmé la détermination de Mr CHODIEV à engager la présente action; il s'agit d'un entretien accordé à l'hebdomadaire HUMO par le président de la Commission parlementaire, Monsieur VAN DER MAELEN; publié le 11 avril 2017 dans le numéro 3997, et reproduit sur le site www.humo.be , cet article prive la Commission du moindre crédit; comment s'attendre à un travail objectif alors que celui qui devait en être le garant exprime publiquement son opinion personnelle et commet par la même occasion diverses fautes, tant en droit qu'en fait; outre le contenu des réponses données par Mr VAN DER MAELEN, on ne peut manquer d'être choqué par la complaisance qu'il a manifestée; un tel comportement est en contradiction complète avec la fonction de celui qui en est l'auteur;

6)      Mr CHODIEV se réserve le droit de compléter ces quelques exemples;


### 3.5     *L'absence d'exercice des sanctions prévues par la loi et défaut de surveillance, en droit et en fait*

Constitue un grief autonome le fait que la Commission et ses membres à titre individuel, dans l'exercice de leurs fonctions, n'aient pas fait l'objet de la moindre surveillance ni des sanctions qui auraient permis que soient évités, et en tout cas répétés, les disfonctionnements relevés ci-dessus.

Pourtant :

1.  l'article 1er de la loi du 3 mai 1880 sur les enquêtes parlementaires dispose que c'est la Chambre des représentants elle-même qui exerce le droit d'enquête conféré par l'article 56 de la Constitution, et l'article 2 qu'elle exerce ce droit par elle-même ou par une commission

formée dans son sein, ce qui signifie que la Chambre est responsable des fautes commises par la Commission qu'elle a instituée de même que des fautes commises par ses membres ;

2. l'article 3 de la même loi dispose clairement que « *les membres de la Chambre sont tenus au secret en ce qui concerne les informations recueillies à l'occasion des réunions non publiques de la commission* », et que « *toute violation de ce secret sera sanctionnée conformément au règlement de la Chambre* ».

3. il a été exposé ci-dessus que la Chambre dispose d'un Règlement qui rappelle expressément l'obligation de secret et qui prévoit les sanctions à l'égard des contrevenants.

La Commission, comme la Chambre des représentants elle-même, doivent donc s'imposer de faire respecter la loi. De même doivent-ils faire respecter le secret de l'instruction, puisqu'en vertu de l'article 8 de la loi du 3 mai 1880, « *les témoins, les interprètes et les experts sont soumis devant la Chambre, la commission ou le magistrat commis, aux mêmes obligations que devant le juge d'instruction* », ce qui revient à dire que les membres de la Commission sont tenus des mêmes obligations de respect du secret de l'instruction.

Ainsi, comment est-il possible, à titre d'exemple, que la lecture, ne fut-ce que partielle, d'un document classifié secret eut lieu en audience publique, ce que la presse a qualifié de la manière suivante : "*C'est une bombe*".

Enfin, le même article 8 de la loi reproduit pour les travaux de la Commission les règles relatives à l'audition des témoins et au faux témoignage, règles que les membres de la Commission ont manifestement perdu de vue.

* * *
*

D. La réparation du préjudice subi

De tout ~~cela~~ ce qui précède (voir ci-dessus II, A à C), seront retenues notamment les fautes suivantes, sans préjudice des autres manquements, actuels ou à venir, qui auraient à être invoqués :

- la faute commise par l'Etat belge, dans le chef de son pouvoir législatif, en ne prenant pas la mesure des risques inhérents à ce qu'une Commission parlementaire composée d'hommes et de femmes politiques pour rechercher la vérité sur une affaire qualifiée d'« affaire d'Etat » mettant en cause d'autres personnalités politiques ait des difficultés à garder la tête froide, et en décidant néanmoins la création d'une commission parlementaire sans s'assurer que celle-ci soit dotée des outils qui lui permettraient de fonctionner adéquatement, dans le respect de la loi et des droits des citoyens belges, dont le requérant ;
- la faute de l'Etat belge, également dans le chef de son pouvoir législatif, d'avoir accepté que la Commission soit composée de personnalités politiques qui ont été impliquées dans les faits qui sont l'objet même de ses enquêtes ;

15

- la faute qui consiste en la violation, dès les travaux préparatoires à la création de la Commission, et dans le cadre de son fonctionnement, de la qualité de citoyen belge présumé innocent de Mr CHODIEV, par l'utilisation de qualificatifs et par la formulation d'accusations et d'insinuations incompatibles avec ses droits fondamentaux ;
- la faute qui consiste en l'incapacité de la Commission d'agir avec réserve, prudence, objectivité, pour ne pas donner l'impression de tenir Mr CHODIEV pour responsable d'office, ou d'en faire le bouc émissaire de pratiques qui seraient plutôt à reprocher à des personnalités du monde politique ;
- les fautes qui, d'une manière générale et systémique, consistent en la violation directe de la loi, de la Constitution et du droit international, dont la Convention européenne des droits de l'homme ;

Ces fautes engagent la responsabilité de l'Etat, dans la mesure où la Commission parlementaire n'a pas respecté les critères d'une autorité normalement soigneuse et prudente placée dans les mêmes conditions;

Le dommage subi est certain et immédiat, ainsi qu'il a été exposé ci-dessus; il s'y ajoute le risque d'un dommage futur vis-à-vis de Mr CHODIEV dans la mesure où, chef d'entreprise actif dans de nombreux secteurs, la publicité permise par l'imprudence de la Commission a généré un handicap complémentaire, parfois difficile à surmonter pour permettre l'aboutissement de projets en cours; qu'il y va de la perte d'une chance, dont la réparation sera, le cas échéant, également réclamée;

Le dommage subi sera tout autant de nature économique et morale; l'importance des affaires menées par Mr CHODIEV peut conduire à un dommage qui, en l'état, est inestimable; quant au dommage moral, il affecte tant Mr CHODIEV que ses proches, lesquels sont douloureusement affectés par répercussion aux conséquences ressenties par chacun;

Dès lors, seront provisoirement réclamées comme réparation du préjudice subi,

- d'une part, une indemnité provisoirement évaluée à 1 € sur un dommage à préciser en cours d'instance,
- d'autre part, la publication du jugement à intervenir dans le Moniteur belge ainsi que dans les journaux, magazines, revues et supports informatiques suivants, ayant tous publié ou diffusé des articles sur l'affaire dite du Kazakhgate, mieux décrits au dispositif des présentes;

* * *

*

Les particularités de la cause, à savoir sa complexité, l'intérêt de l'affaire, les parties en cause et les circonstances qui la caractérisent justifient qu'elle soit attribuée par le président du tribunal à une Chambre à trois juges (art. 92 § 1/1);

16

SI EST-IL QUE ;

L'an deux mil dix-sept, le *dix-huit avril*

A la requête de :

Monsieur **Patokh CHODIEV**, de nationalité belge, résidant en Russie, 119002 Moscou, Maly Nikolopeskovsky Pereulok 5,

Ayant pour conseils Me Pascal VANDERVEEREN, dont le cabinet est établi à 1000 Bruxelles, rue des Minimes, 41, Eric GILLET, dont le cabinet est établi à 1050 Bruxelles, place Flagey, 18, avocats au Barreau de Bruxelles, et François Jongen, dont le cabinet est établi à 6870 Saint-Hubert, Rue d'Henzie 2, avocat au Barreau de Luxembourg.

Je soussigné Hugo CLEOPATER,
Huissier de Justice de résidence à 1030 SCHAERBEEK, Avenue de Roodebeek, 275

Ai donné CITATION à :

**l'Etat belge,** représenté par la Chambre des représentants, en la personne de son Président, Monsieur Siegfried Bracke, dont le bureau est établi Palais de la Nation, Place de la Nation 2, à 1000 Bruxelles,

ou étant et y parlant à : *Mms. Van der Hulst chase*

*greffier*

Fonctionnaire à ce délégué, qui ne vise pas mon original pour réception de la copie;

Attendu que l'exploit n'a pu être signifié comme il est dit aux art. 33 à 35 du Code Judiciaire, j'en ai laissé une copie à *la*
l'adresse prémentionnée du destinataire, conformément à l'art.38 § 1 du même code, à *hose*;

A comparaître le **JEUDI VINGT-SEPT AVRIL 2017** à NEUF HEURES du matin devant la PREMIERE CHAMBRE DU TRIBUNAL DE PREMIERE INSTANCE FRANCOPHONE DE BRUXELLES, Section civile, siégeant au local ordinaire de ses audiences, SALLE 7, Palais de Justice - Extension, Rue des Quatre Bras 13, audit BRUXELLES

**Pour :**

entendre dire pour droit qu'il a commis à l'égard du requérant des fautes qui ont entraîné des dommages matériels et moraux,

par conséquent, entendre condamner à payer au requérant une somme destinée à réparer ces dommages, évaluée provisionnellement à un euro, à préciser en cours d'instance.

17

Ordonner la publication du jugement à intervenir dans, notamment,

- La Libre Belgique,
- La Dernière Heure,
- Le Soir,
- Le Vif . L'Express,
- L'Echo,
- Nord Eclair - La Nouvelle Gazette,
- L'Avenir,
- Het Laatste Nieuws,
- Gazet van Antwerpen,
- De Morgen,
- De Standaard,
- Humo,

Qu'il s'agisse des publications papiers de ces différents organes ou de leurs sites respectifs,

```
FF*      130,61
VACS*     11,78
PC*        9,21
ENR       50,00
TPL        3,70
FRL      100,00
        --------
T/HTVA   305,30
*21%TVA   31,84
        ========
T/TVAC   337,14
```

S'entendre la partie citée condamner aux dépens de l'instance, en ce compris l'indemnité de procédure;

Entendre déclarer le jugement à intervenir exécutoire par provision, nonobstant tous recours et sans caution;

Et pour que la partie citée n'en ignore, je lui ai laissé une copie du présent exploit, s'il échet sous pli fermé conformément les dispositions de la loi.

Sous toutes réserves.

Dont acte. Coût : trois cent trente-sept euros et quatorze cents, à majorer éventuellement des frais de port.

L'Huissier de Justice.

**Droits d'enregistrement – Application de l'article *8bis* du C.enreg. –**
**Droit d'enregistrement:50,00 EUR**

-18

# EXHIBIT B



**Marianne RIGA et Paul-Henry STEPHENNE**

**Huissiers de Justice associés**

Marianne RIGA
*Huissier de Justice*

Paul-Henry STEPHENNE
*Huissier de Justice*

Marie-Isabelle DENEF
*Candidat-Huissier de Justice*

Mélissa BOURGUIGNON
*Maître en droit UCL*

SC sous forme de SPRL – RPM Namur
**Montagne Sainte Barbe, 158 – 5100 JAMBES**
Etude ouverte : du lundi au jeudi 8h30-17h
vendredi 8h30-16h

BCE: 0868.596.056
TVA: BE668.596.056

Tél: 081/74.56.14
Fax: 081/74.59.42

E-mail: riga.stephenne@skynet.be

Bpost: BE14-0000-7592-0583 BPOTBEB1
CBC: BE16-7320-3194-4474 CREGBEBB
ING: BE98-6304-3529-0993 BBRUBEBB

---

## CITATION

Référence de l'Etude : S200-17 / LW

L'an deux mil dix-sept, le ~~*DIK*~~ ~~*mai*~~

A la requête de :

Monsieur **CHODIEV Patokh**, administrateur de sociétés, de nationalité belge, résidant en RUSSIE à 169002 MOSCOU, Maly Nikolopeskovsky Perevlok, 5,

Ayant pour conseils Maître **Pascal VANDERVEEREN**, Avocat, ayant son cabinet situé à 1000 BRUXELLES, Rue des Minimes, 41, **Maître Eric GILLET**, avocat, ayant son cabinet situé à 1050 BRUXELLES, Place Flagey, 18 et **Maître François JONGEN**, avocat, ayant son cabinet situé à 6870 SAINT-HUBERT, rue d'Henzie, 2

Je soussigné(e)
Paul-Henry STEPHENNE, Huissier de Justice de résidence à Jambes-Namur, Montagne Sainte-Barbe, 158



Ai donné **CITATION** à :

Monsieur **GILKINET Georges, Michel, Amédée, Léon**, attaché parlementaire (salar.), né à Namur le 25/01/1971, numéro national 71012510561, domicilié à 5330 ASSESSE, Rue de la Gendarmerie, 16,

Où étant et y parlant à : *Aon ejoune, Mme BODART Bénédicte*

Ainsi déclaré, qui ne vise pas mon original pour réception de la copie ;

Attendu que l'exploit n'a pu être signifié comme il est dit aux art. 32 à 35 du Code Judiciaire, j'en ai laissé une copie à l'adresse prémentionnée du destinataire, conformément à l'art.38 § 1 du même Code ;

**A comparaître le MARDI SIX JUIN 2017 à NEUF HEURES du MATIN par devant le TRIBUNAL DE PREMIERE INSTANCE DE NAMUR, Division NAMUR, 7ème Chambre A, séant à Namur, siégeant au lieu ordinaire de ses audiences, au Palais de Justice, 1er étage, Place du Palais de Justice, audit NAMUR,**

**POUR :**

Le requérant a subi un préjudice très grave, en raison des agissements manifestement fautifs de la partie citée, parlementaire et membre de la *"Commission d'enquête parlementaire chargée d'examiner les circonstances ayant conduit à l'adoption et l'application de la loi du 14 avril 2011 portant des dispositions diverses, en ce qui concerne la transaction pénale"*.

La présente citation vise à indemniser le préjudice subi par le requérant, sur la base de l'article 1382 du Code civil.

## I.  Cadre général

### A.  Qui est Patokh CHODIEV ?

Monsieur Patokh CHODIEV est un homme d'affaires, né en Ouzbékistan le 15 avril 1953.

En 1971, Monsieur Patokh CHODIEV a entamé des études à l'Institut des relations internationales de Moscou, un établissement sélectif et prestigieux, dont il a été diplômé en 1975, en tant que docteur en Sciences politiques.

À partir de 1975, Patokh CHODIEV a travaillé pendant plus d'une décennie en tant qu'expert des relations entre la Russie et le Japon au sein du ministère soviétique du Commerce extérieur. Dans ce cadre, il a d'ailleurs été envoyé de 1975 à 1980 au Japon comme conseiller auprès du chef de la mission commerciale soviéto–japonaise.

Le requérant est membre de l'Académie des sciences naturelles de la république du Kazakhstan et il est l'auteur de plus de trente ouvrages d'histoire, d'économie et de sciences politiques consacrés au Japon.

Au terme de ces activités auprès du ministère du Commerce (qui ont pris fin en 1989), Monsieur Patokh CHODIEV a développé avec deux associés, Messieurs Alexandre MASHKEVITCH et Alijan IBRAGIMOV, différentes activités dans le secteur privé. Ces activités se sont situées principalement dans le domaine de l'industrie minière, des finances et des assurances. Elles se situent dans la période de la *"glasnost"* (transparence), de la *perestroïka* (réformes politiques et économiques), de l'éclatement de l'Union soviétique et de la privatisation de différentes entreprises d'État, aussi bien en Russie que dans d'autres États de l'ex–Union soviétique dont le Kazakhstan.

À partir de 1991, Monsieur Patokh CHODIEV s'est établi en Belgique, où il a acquis la nationalité belge en 1997.

À l'heure actuelle, Monsieur Patokh CHODIEV est un homme d'affaires respecté qui, avec ses associés, emploie à l'échelle mondiale plus de 80.000 personnes.

Durant sa longue carrière aussi bien dans le secteur public que dans le secteur privé, Monsieur Patokh CHODIEV n'a jamais fait l'objet d'une condamnation pénale, ni en Belgique, ni à l'étranger.

*     *     *

Néanmoins, Monsieur Patokh CHODIEV, depuis le mois de septembre 2014, est cité à maintes reprises dans la presse française et belge, dans le cadre de ce que l'on a appelé communément et par commodité le "Kazakhgate". Même si l'appellation de "Kazakhgate" avait déjà été utilisée par les médias belges à la fin des années 1990 et au début des années 2000, dans le cadre de différents projets d'investissement de la société belge Tractebel au Kazakhstan, l'actuel "Kazakhgate" aurait, d'après les médias, pris forme en 2011, à savoir au moment où le président de la République française de l'époque, Monsieur Nicolas Sarkozy, aurait tenté, à la demande du Kazakhstan, de mettre fin à des poursuites pénales engagées depuis longtemps en Belgique contre le requérant, et cela afin de permettre la conclusion d'un accord de vente d'hélicoptères entre le Kazakhstan et l'entreprise Eurocopter, filiale du groupe EADS (devenus depuis lors respectivement Airbus Helicopters et le groupe Airbus). Toujours selon les mêmes médias, Monsieur Nicolas Sarkozy aurait pour cela sollicité l'intervention de politiciens belges influents.

Les poursuites pénales en question engagées en Belgique contre le requérant couraient depuis plus d'une dizaine d'années. Lesdites poursuites pénales ont pour origine une notification de la Cellule de traitement des informations financières (CTIF).

Même si la Chambre du conseil, par une ordonnance en date du 18 février 2011, avait notamment déjà jugé qu'une partie des poursuites à l'encontre de Monsieur Patokh CHODIEV était irrecevable et que le délai raisonnable pour le traitement du dossier pénal avait été dépassé, le requérant, en dépit de ce dépassement du délai raisonnable constaté par la Chambre du conseil, a été renvoyé devant le tribunal correctionnel pour y répondre d'un certain nombre d'accusations.

D'après la campagne de presse précitée, la loi du 14 avril 2011 portant des dispositions diverses aurait été adoptée, à l'instigation d'une puissance étrangère (à savoir la France) de manière « accélérée » par le

Parlement belge dans le but d'éteindre les poursuites pénales visant Monsieur Patokh CHODIEV. Cette loi prévoyait en effet l'élargissement des possibilités d'application pour la conclusion de transactions en matière pénale, une disposition dont Monsieur Patokh CHODIEV avait effectivement fait usage en juin 2011.

Même si cette campagne de presse a incontestablement donné une mauvaise image de Monsieur Patokh CHODIEV, les faits cités et les accusations portées sont tout à fait injustes et ces contrevérités manifestes portent préjudice aux intérêts et à la réputation du demandeur. Déjà bien avant 2011 (et même dès 2004), l'idée d'étendre le champ d'application de la transaction en matière pénale était dans l'air dans les milieux politiques et judiciaires. Les motifs sous-jacents à cet élargissement étaient notamment l'arriéré judiciaire, le fait qu'un grand nombre d'affaires se trouvaient prescrites, la volonté d'éviter de classer sans suite les faits punissables en raison de capacités d'instruction et de poursuites insuffisantes,... Dans le passé, des raisons similaires avaient déjà été à la base de différents élargissements du champ d'application de la réglementation relative à la transaction en matière pénale, qui avait déjà fait son entrée dans l'ordre judiciaire belge en 1935.

Il est également de notoriété publique que la dernière modification législative concernant l'article 216 bis du Code d'instruction criminelle, en 2011, avait été pilotée notamment par des lobbyistes du secteur diamantaire belge et par le parquet général d'Anvers et que depuis 2010 au moins, un projet de texte (final) avait été déposé au Parlement belge.

B.    La création de la Commission d'enquête parlementaire

La présente citation se situe dans le contexte de la « *Commission d'enquête parlementaire chargée d'examiner les circonstances ayant conduit à l'adoption et l'application de la loi du 14 avril 2011 portant des dispositions diverses, en ce qui concerne la transaction pénale* ».

Cette Commission avait été instituée par une décision de la Chambre des représentants du 1er décembre 2016, prise en vertu de la loi du 3 mai 1880 sur les enquêtes parlementaires. (Voir Doc. parl. 2016-2017, n° 54 2179/06) à la suite d'une proposition déposée à la Chambre des représentants le 23 novembre 2016 (Voir Doc. parl. 2016-2017, n° 54 2179/001).

La proposition était justifiée par la nécessité, selon les auteurs de la proposition, de faire la clarté sur les soupçons de manipulation du législateur fédéral belge par une autorité étrangère, la France, afin de régler un cas particulier, celui du requérant, à l'intervention de personnalités politiques belges. Comme il apparaît du texte introductif de la proposition en date du 23 novembre 2016, ces soupçons de manipulation se basaient tous sur les sources de presse et sur les informations parues dans la presse.

Dans le cadre de la discussion parlementaire de la proposition de loi datée du 23 novembre 2016, et plus particulièrement au sein de la Commission de la justice, il a été rappelé que l'article 4, § 1er de la loi du 3 mai 1880 sur les enquêtes parlementaires prévoit expressément que la Chambre ou la Commission, ainsi que leurs présidents dans la mesure où ils y sont autorisés, peuvent prendre toutes les mesures d'instruction prévues dans le Code d'instruction criminelle. Autrement dit, une Commission d'enquête peut agir comme un juge d'instruction. Par conséquent, pour assurer la sérénité des débats, il convient de veiller à ce que chaque membre se comporte de la manière la plus impartiale possible aussi bien vis-à-vis de lui-même que vis-à-vis de la population, (Doc. parl. , 2016-2017, n° 54 2179/003, Rapport au nom de la Commission de la Justice, p. 3). Il convient d'ajouter à cet égard que la Commission et ses membres sont tenus par les mêmes obligations que celles qui s'appliquent dans le cas d'un juge d'instruction.

Un intervenant a par ailleurs souligné que « *tous ceux qui, de près ou de loin, ont été acteurs ou témoins de l'avènement de la réglementation sur la transaction pénale élargie en 2011 devront veiller à respecter scrupuleusement le devoir d'impartialité. Il ne peut à aucun moment y avoir le moindre doute. Il ne faut pas trahir la confiance du citoyen* » (Rapport, p. 4).

Il a encore été exposé que les faits sur lesquels la Commission aurait à enquêter touchaient à l'Etat de droit et aux fondements de la démocratie, ce qui rendaient les exigences précitées d'impartialité d'autant plus pressantes.

Enfin, un membre a signalé que la Commission d'enquête parlementaire devrait enquêter aussi bien à charge qu'à décharge (Rapport, p. 11). Il est remarquable, pourtant, qu'au cours des travaux de la même Commission de la Justice, les mêmes parlementaires qui rappelaient le devoir d'impartialité, se sont permis de parler, à l'occasion de la mise sur pied de la Commission d'enquête parlementaire, de « personnages mafieux, comme M. CHODIEV » (Rapport, p. 7), et de « M. CHODIEV et ses comparses » (Rapport, p. 9). Il ne s'agissait là malheureusement que d'un signe avant-coureur de ce qu'on a pu constater depuis le début des travaux de la Commission d'enquête. Ni son président, ni ses membres (ou en tout cas plusieurs d'entre eux) ne respectent leur devoir d'impartialité et de confidentialité. En outre, l'enquête menée par la Commission parlementaire ne se focalise pas sur les dysfonctionnements liés au système (en l'espèce les dysfonctionnements éventuels dans la procédure de naturalisation et les dysfonctionnements éventuels (peut-être même au sein de la Chambre) lors de l'élaboration de la loi du 14 avril 2011), pas plus que sur les responsabilités (politiques) à cet égard : l'enquête de la Commission a plutôt pris l'allure, incontestablement, d'une enquête portant sur des personnes (parmi lesquelles Monsieur Patokh CHODIEV).

Au cours de la séance plénière de la Chambre, la question de l'impartialité de la Commission a encore été abondamment évoquée. Certains députés ont déclaré ne pas vouloir faire partie de la Commission compte tenu du rôle qu'ils avaient joué lors de l'adoption de la loi sur la transaction pénale ; il a été rappelé que tous ceux qui avaient été acteurs ou témoins de l'avènement de la règlementation sur la transaction pénale élargie en 2011 veillent à respecter scrupuleusement le devoir d'impartialité. Il ne pouvait y avoir, à aucun moment, le moindre doute. Il ne fallait pas trahir la confiance du citoyen (Ch., C.R.I., 2016-2017, n° 142, p. 62).

Au cours des débats, il a été précisé que la mission de la Commission d'enquête parlementaire consistait à examiner si un Etat voisin avait influencé le processus parlementaire belge. « *Ce ne sera pas le procès d'une personne, quelle qu'elle soit* », a-t-on dit, « *même si tout démarre évidemment avec la révélation qui concerne un parlementaire et une personnalité éminente de la vie politique belge. Mais ce sera en tout cas la recherche de la vérification de ce qu'ont été les processus de décision dans un dossier comme celui-là. Que ce soit au sein du pouvoir exécutif, que ce soit au sein du pouvoir législatif, que ce soit au sein du pouvoir judiciaire* » (Ch., C.R.I., 2016-2017, n° 142, p. 67).

La réalité de la présente Commission d'enquête parlementaire a toutefois été sensiblement différente. Il appert des audiences (qui ont fait l'objet d'un compte rendu détaillé dans la presse) et des activités de la Commission d'enquête parlementaire que l'enquête s'est tout au contraire bel et bien orientée vers un certain nombre de personnes (parmi lesquelles le requérant). De manière totalement infondée, l'enquête menée jusqu'à présent par la Commission d'enquête parlementaire porte atteinte à l'honneur du requérant, nuit à sa réputation et expose le requérant à l'humiliation et au mépris publics. Comme cela sera précisé ci-après, le comportement manifestement fautif de la partie citée, en tant que membre de la Commission d'enquête parlementaire, y a incontestablement contribué.

C.     La Commission d'enquête parlementaire

Lors de sa séance du 1er décembre 2016, la Chambre a donc adopté la proposition tendant à la création d'une Commission d'enquête parlementaire sur « *les circonstances ayant conduit à l'adoption et l'application de la loi du 14 avril 2011 portant des dispositions diverses, en ce qui concerne la transaction pénale* ».

En vertu de l'article 1er, § 1, de la proposition, la Commission d'enquête a trois objets :
1°.     enquêter sur les circonstances ayant conduit à l'adoption et à l'application de la loi du 14 avril 2011 portant des dispositions diverses, en ce qui concerne la transaction pénale ;

2°.     examiner l'application par le Ministère public de l'article 216*bis* du Code d'instruction criminelle, notamment tel que modifié par la loi du 14 avril 2011 portant des dispositions diverses, à partir de l'entrée en vigueur de cette loi jusqu'au 20 août 2011 ;

3°.     examiner la façon dont MM. Patokh CHODIEV et Alijan IBRAGIMOV ont obtenu la nationalité belge.

Selon l'article 1er, § 2, la Commission rédigera des conclusions et formulera des recommandations. Elle établira aussi les responsabilités éventuelles.

Elle peut entendre toute personne qu'elle estime devoir faire comparaître et peut disposer de toutes les pièces qu'elle juge nécessaire à l'exécution de sa mission. (art.1 § 3). La Commission est mandatée pour procéder à des constats sur place et, le cas échéant, pour prendre les contacts internationaux requis pour l'accomplissement de sa mission. (art.1 § 3).

La Commission est investie de tous les pouvoirs prévus par la loi du 3 mai 1880 sur les enquêtes parlementaires (art. 2), tout en ne se substituant pas aux enquêtes du pouvoir judiciaire, ni aux enquêtes et procédures extrajudiciaires (art. 3). Elle peut entrer en concours avec ces enquêtes et procédures, sans toutefois en entraver le déroulement (ibid.).

Les articles 4 et 5 fixent sa composition. En vertu de l'article 6, les réunions de la Commission sont publiques, mais elle peut en décider autrement à tout moment. Il est interdit aux membres de la Commission qui, à quelque titre que ce soit, assistent ou participent à ses travaux, de divulguer des informations communiquées lors des réunions à huis clos. Les règles relatives au faux témoignage s'appliquent aux témoins qui comparaissent devant elle (art. 8 de la loi du 3 mai 1880).

Elle doit faire rapport à la Chambre des représentants dans les trois mois de son installation, sauf décision expresse de la Chambre d'accorder un délai supplémentaire (art. 7).

D.     Déroulement de la Commission d'enquête parlementaire

À l'heure actuelle, force est de constater que les travaux de la Commission d'enquête parlementaire ne se déroulent pas conformément aux dispositions légales et/ou au règlement interne de la Chambre, pas plus qu'ils ne respectent le principe d'impartialité.

Durant les séances (publiques) un certain nombre de droits fondamentaux du requérant (comme ceux qui sont protégés par la Constitution, le droit belge et le droit international) ont été et sont encore violés à maintes reprises, notamment le droit de Monsieur Patokh CHODIEV au respect de sa vie privée et familiale (tel qu'il est protégé par l'article 8 de la Convention européenne de sauvegarde des droits de l'homme et des libertés fondamentales), ainsi que la présomption d'innocence. Le bon renom et la réputation de Monsieur Patokh CHODIEV ont également été à maintes reprises salis et traînés dans la boue.

En outre, le requérant constate que des informations étaient souvent parues dans la presse relatives à des séances de la Commission d'enquête parlementaire qui se sont déroulées à huis clos, ce qui indique que des membres de la Commission ont violé la confidentialité de la séance à huis clos y compris lors d'une séance publique. À titre d'exemple, le requérant renvoie aux séances de la Commission d'enquête parlementaire suivantes (et dont la presse s'est fait l'écho) :

-     Commission d'enquête parlementaire en date du 15 février 2017, (voir Le Soir, 16 février 2017, "CHODIEV menace l'Ordre démocratique du pays"), durant laquelle, entre autres :
    • une note de synthèse de la sûreté de l'État classée secrète a été rendue publique en séance publique ;

-     Commission d'enquête parlementaire en date du 29 mars 2017, au cours de laquelle Monsieur Rapaille, président du Comité R, avant le début de la séance, a exprimé son insatisfaction et son irritation au sujet des fuites qui avaient permis que certaines parties d'un rapport du Comité R (qui

avait été envoyé à la Commission d'enquête parlementaire) se retrouvent dans la presse. Il a en outre ajouté que sa confiance dans la Commission était compromise et qu'il s'exprimerait avec toutes les réserves nécessaires, encore plus que précédemment.

La preuve des violations à la confidentialité et/ou au secret professionnel est par conséquent évidente puisque des informations tombant sous le coup de la confidentialité et/ou du secret professionnel ont été publiées.

De telles indiscrétions au sein de la Commission d'enquête parlementaire ont déjà existé dès le début du travail de cette Commission. Le titre du journal "Le Soir", après la deuxième session de la Commission d'enquête parlementaire était le suivant : *"Transaction pénale : les parlementaires commencent à cogner"* ; pouvons-nous nous imaginer un tel titre par rapport à un tribunal ? Le rôle de la Commission est-il de « cogner » ? Ou la Commission d'enquête parlementaire ne ferait-elle pas mieux de se concentrer sur la recherche de la vérité ?

Même si la presse ("Le Soir" et "De Standaard") a publié le 1er février 2017 une lettre ouverte de Monsieur Patokh CHODIEV demandant de faire preuve de la plus grande prudence à cet égard, aucune suite ne lui a été donnée.

*

Il n'est pas nécessaire d'expliquer davantage à quel point l'enquête de la Commission est délicate puisqu'il s'agit notamment de son propre (dys)fonctionnement et de son propre travail (parlementaire) et qu'elle touche aux fondements de la société, notamment son fonctionnement législatif et judiciaire, en raison des exposés présentés par les membres de la sûreté de l'État, du Comité P et du Comité R.

Même lorsque la Commission, au début de ses travaux, et encore au moment de la présente citation, ne pouvait et ne peut toujours pas avoir la moindre idée de l'implication de Monsieur Patokh CHODIEV dans le processus d'adoption de la loi sur la transaction pénale, des assertions définitives ont été formulées à son encontre en le présentant comme un ennemi de la démocratie et de l'État belge, dont on soutenait qu'il les mettait en danger.

En l'espèce, de telles assertions sont d'autant plus téméraires que le « volet naturalisation » de l'enquête de la Commission d'enquête parlementaire concernant la manière dont Monsieur CHODIEV a acquis la nationalité belge, montre que les suppositions relatives des influences politiques illicites se sont dissipées au fur et à mesure des progrès de l'enquête. Les membres de la Commission auraient dû en tirer la leçon qu'il leur fallait faire preuve de toute la prudence nécessaire, ce qui ne fut pas le cas.

En outre, à présent que de nombreuses séances ont déjà eu lieu, l'impression prévaut que les membres de la Commission, des hommes et des femmes politiques, souhaitaient avant tout envoyer des signaux politiques – et donc empruns de parti pris - plutôt que d'agir comme un organe indépendant et impartial au service du citoyen, une exigence qui pourtant leur avait été rappelée lors des travaux préparatoires à la constitution de la Commission.

E.    Les relations ininterrompues entre la presse et (des membres de) la Commission d'enquête parlementaire

La mise en place d'une Commission d'enquête parlementaire n'est pas une mince affaire. Le journal "Le Monde" du mercredi 8 octobre 2014 avait publié les commentaires de Monsieur Olivier MAINGAIN, sous le titre *"Si la Belgique a été utilisée, c'est un scandale d'État"*. Monsieur MAINGAIN expliquait qu'il avait tenté déjà en 2012 de mettre sur pied une telle Commission, mais sans résultat. Il avait indiqué clairement qu'il souhaitait à nouveau demander la constitution d'une telle Commission mais que ses chances d'y parvenir étaient très minces.

Au fil du temps, il est apparu très clairement que c'était la presse qui allait déterminer le sort de cette affaire et, il n'est pas nécessaire de reprendre tous les articles publiés à ce sujet pour s'en assurer.

Le requérant renvoie notamment à cet égard à la proposition de constitution de la Commission d'enquête parlementaire. La proposition elle-même montrait que les données factuelles sur la base desquelles la prétendue immixtion d'une puissance étrangère dans l'ordre législatif belge se trouvait retenue et qui était par conséquent à la base de la constitution de la Commission d'enquête parlementaire, provenaient de sources journalistiques.

Le requérant renvoie également à l'hebdomadaire "Le Vif/L'Express" daté du 2 février 2017, dans lequel un article avait été publié portant le titre : "*Kazakhgate : député, policier, juge, journaliste : chacun son job*". L'article posait la question : "*Les journalistes en font-ils trop ?* "Ou encore : "*Cette enquête est pilotée par les journalistes*", propos tenus par un parlementaire membre de la Commission, qui déplorait cette situation, alors que la Commission débattait de l'audition d'un policier.
Force est d'ailleurs de constater que la Commission s'est montrée plus qu'accessible s'agissant du rôle de la presse dans cette affaire, et cela de telle manière que, selon l'avis du requérant, c'est la presse elle-même qui est devenue le moteur du fonctionnement de la Commission.

Les contacts ont eu lieu d'ailleurs dans les deux sens. Sans devoir faire appel à tous les articles de presse à ce sujet, l'existence de ces échanges bilatéraux qui ont eu lieu et qui continuent d'avoir lieu entre les membres de la Commission d'enquête parlementaire et la presse ne fait pas le moindre doute. Certains membres de la Commission d'enquête parlementaire ont fait et font encore (y compris en dehors des audiences et de l'enceinte du Parlement) volontiers usage de la presse pour faire connaître leur position au public.

C'est ainsi qu'est née, entre membres de la Commission parlementaire et des journalistes, une dynamique irrésistible qui a fait que des membres de la Commission d'enquête parlementaire ne pouvaient plus s'exprimer sans préjugés et de manière objective, ce qui a eu pour le requérant des conséquences préjudiciables manifestes.

À titre d'exemple, le requérant renvoie notamment aux déclarations suivantes faites par des membres de la Commission d'enquête et parues dans la presse :

Dans *Le Vif l'Express* du 18 novembre 2016, la partie citée a tenu les propos suivants :
« *Un milliardaire s'est montré suffisamment puissant pour influencer les trois pouvoirs en Belgique. Le Kazakhgate dépasse, à l'évidence, le seul cas DE DECKER. Attendre que la justice ait terminé son boulot pour lancer la Commission d'enquête, c'est se moquer du monde !* »,
(*Le Vif/L'Express*, 18 novembre 2016);

À la RTBF Info (5 janvier 2017), la partie citée a tenu les propos suivants :
"Le député Ecolo Georges Gilkinet, membre de la Commission d'enquête parlementaire, aimerait savoir si des fonctionnaires belges ont également été arrosés. Pour lui il y assez d'éléments pour avoir des soupçons : « *On sait qu'il y a des montants versés sur des comptes, notamment le paiement des avocats, des lobbyistes, monsieur De Decker ; et on apprend maintenant que de l'argent, 5 millions d'euros en cash, a circulé entre la Suisse et la France. A qui cela a-t-il bénéficié ? J'espère que c'est bien aussi l'objet de l'enquête policière et judiciaire en cours en Belgique. L'enquête parlementaire devra aussi s'y intéresser.* »
Cet argent a-t-il pu servir à rétribuer des personnes en Belgique ?
« *Manifestement, il y a dans ce dossier une pratique de rétro-commissions, de blanchiment d'argent vers certains interlocuteurs. Y en a-t-il eu aussi ici ? On peut le soupçonner parce que c'est la pratique habituelle* », poursuit le député.
Différentes déclarations ont également été faites par le président de la Commission d'enquête parlementaire :

(i) Préalablement à la constitution de la Commission d'enquête parlementaire, le président a, sur son propre site Internet du SP.A, reproduit un article du site Internet Apache mettant dans la bouche de la partie citée les propos suivants: *"Dit dossier stinkt. Het wordt tijd dat het parlement zich hiermee gaat bezighouden"*. (Traduction libre : « Ce dossier pue. Il est temps que le parlement s'en occupe »).

(ii) Trois jours avant la première réunion de la Commission d'enquête parlementaire, le président a en outre donné une longue interview au journal Le Soir, qui en a donné une relation dans son édition datée du 7/8 janvier 2017. Lors de cette interview, il a, sans la moindre réserve, fait abondamment usage du forum qui lui était offert. Le titre de la première page était *"On trouve le MR à toutes les étapes du Kazakhgate"*.

(iii) de plus, le président ne s'est pas privé, pendant l'enquête (pénale) qui était menée à cette époque-là à propos d'une prétendue influence exercée par un homme politique belge, à la critiquer ouvertement et publiquement, en prétendant que l'enquête devait être menée par un juge d'instruction et en se posant expressément la question de savoir pourquoi l'affaire n'avait pas été confiée à un juge d'instruction comme cela était le cas en France.

Les exemples précités illustrent la mentalité qui régnait s'agissant de la Commission d'enquête parlementaire, avant même que cette Commission ne soit constituée et dès le début de ses travaux. Comment s'étonner des constatations faites par la Commission d'enquête parlementaire par la suite sachant que selon certains parlementaires, la création de cette Commission d'enquête était clairement justifiée par leur volonté de ne pas attendre l'issue de l'instruction pénale ?

En outre, la Commission d'enquête parlementaire se trouve prise dans un climat « passionnel ». Elle trouve son origine dans des révélations qui ont été faites par la presse et l'on ne peut s'empêcher de constater l'existence, entre des membres de la Commission parlementaire d'enquête et la presse de nombreux contacts et que ces contacts avaient et ont encore un but très clair, à savoir ajouter à cette enquête un piment supplémentaire (sensationnaliste), en se focalisant sur le rôle présupposé de certains individus (parmi lesquels le requérant). Monsieur Patokh CHODIEV éprouve en outre le sentiment d'être pris en otage dans les conflits politiques entre les partis. Il convient en effet de rappeler que les enquêtes de la Commission ont pour objectif principal de vérifier l'implication de responsables politiques dans l'élaboration et dans l'adoption de la loi sur la transaction pénale, ainsi que l'influence possible d'un État étranger sur le processus parlementaire. Ce contexte passionnel crée une tentation de communiquer à la presse des informations qui tombent pourtant sous le coup de la confidentialité et/ou du secret professionnel, tentation à laquelle certains ont effectivement succombé.

## II.   LA DEMANDE D'INDEMNISATION SUR LA BASE DE L'ARTICLE 1382 DU CODE CIVIL

A.   Le comportement manifestement fautif de la partie citée et les manquements dans le chef de la partie citée qui constituent immanquablement une faute au sens de l'article 1382 du Code civil.

Le requérant estime que la partie citée a agi et continue d'agir de manière manifestement fautive, en ayant causé et en causant encore au requérant un préjudice. Le requérant reproche par conséquent à la partie citée des fautes ayant causé un dommage au sens de l'article 1382 du Code civil, pour lesquelles il souhaite être indemnisé.

Le comportement manifestement fautif de la partie citée et les manquements dans le chef de la partie citée apparaissent notamment des éléments figurant ci-après.

(i)   L'absence d'impartialité dans le chef de la partie citée ou à tout le moins l'apparence de partialité et l'absence de retenue suffisante dans le chef de la partie citée

Durant les mois écoulés, à plusieurs reprises, la partie citée a montré une absence complète d'impartialité dans son chef et une absence de réserve suffisante.

Le respect du principe d'impartialité est pourtant fondamental pour le bon fonctionnement des pouvoirs publics, tout comme le fait de faire preuve de la prudence nécessaire et d'une réserve suffisante.

Les éléments (factuels) suivants, entre autres, indiquent de manière incontestable un défaut d'impartialité dans le chef de la partie citée :

- Le fait d'être membre ou de devenir membre d'une Commission d'enquête parlementaire qui doit mener l'enquête sur une législation dans l'adoption de laquelle la partie citée était elle-même impliquée en tant que membre du Parlement.

- Le fait d'accepter et de poursuivre une présence comme membre dans la Commission d'enquête parlementaire "Kazakhgate" qui ne répond pas aux conditions nécessaires d'impartialité.

Le requérant estime que la composition de la Commission d'enquête parlementaire n'est pas de nature à offrir toutes les garanties qui sont exigées d'une telle institution, à laquelle même des tâches constitutionnelles sont confiées. La Commission est en effet constituée par différents membres qui ont été impliqués dans les faits qui font l'objet même de l'enquête qui est menée par la Commission d'enquête parlementaire.

Comment peut-on confier l'enquête sur la loi sur la transaction pénale à une Commission dont 12 des 17 membres ont participé à l'adoption de la loi en question ?

Même avant le début des séances de la Commission d'enquête parlementaire, la question avait dès lors été posée à bon droit de savoir si cette composition de la Commission dans son ensemble offrait les garanties requises pour que les débats puissent être menés dans le climat requis par ses fonctions : discrétion, sérénité, respect de chacun et objectivité. La réponse est aujourd'hui tout à fait évidente.

Si l'on tient compte notamment des agissements de la Commission d'enquête parlementaire, les conditions pour un fonctionnement objectif et régulier, de cette commission, conformément à la loi et à ses propres règlements, ne sont absolument pas remplies.

Le fait que la partie citée soit membre d'une Commission parlementaire qui ne respecte pas les principes fondamentaux d'impartialité, d'objectivité, de discrétion et de respect de chacun constitue immanquablement un signe de manque d'impartialité dans le chef de la partie citée, et il existe à tout le moins une apparence de partialité (dans le chef de ladite partie citée).

- La relation ininterrompue entre la presse et la Commission d'enquête parlementaire (ou certains membres de cette Commission d'enquête) porte atteinte à la règle de l'impartialité.

La participation à une Commission d'enquête parlementaire (i) qui se laisse guider de manière débridée par la presse, et/ou (ii) qui se laisse guider dans son enquête par ces informations de presse, et/ou (iii) qui fait immédiatement appel à des données qui ont été fournies par la presse, et/ou (iv) qui à son tour fait fuiter des données au profit de la presse, constitue incontestablement une violation de l'impartialité nécessaire que l'on peut attendre d'un membre de la Commission d'enquête parlementaire, ou du moins crée une apparence de partialité dans le chef du membre de la Commission d'enquête parlementaire.

Il convient d'ailleurs de faire remarquer à cet égard que la partie citée avait donné à plusieurs reprises publiquement et dans les médias sa vision (personnelle) sur cette question, aussi bien en

son propre nom qu'au nom de son parti ECOLO, et cela avant même la constitution de la Commission d'enquête parlementaire. Il semble dès lors au requérant que la partie citée, via la Commission parlementaire, ne souhaite que voir la confirmation du projet qu'il avait déjà adopté, au lieu de l'enquête objective que la Commission se doit de mener.

Il appert d'ailleurs des déclarations de la partie citée dans les médias, que cette partie citée fait preuve d'un parti pris très considérable concernant l'enquête à mener par la Commission et d'un manque total d'impartialité. Le requérant a incontestablement subi un préjudice du fait de ces déclarations.

(ii)     le fait de (continuer) à participer à la Commission d'enquête parlementaire qui ne respecte pas les droits fondamentaux du requérant.

Dans la relation des faits, le requérant a déjà indiqué que durant les audiences (publiques) un certain nombre de ses droits fondamentaux (tels qu'ils sont protégés par la Constitution et le droit international) avaient été et sont violés, notamment le droit au respect de la vie privée et familiale de Monsieur Patokh CHODIEV (tel qu'il est protégé par l'article 8 de la Convention européenne de sauvegarde des droits de l'homme et des libertés fondamentales) ainsi que la présomption d'innocence. Le bon renom et la réputation de Monsieur Patokh CHODIEV ont également été à maintes reprises salis et traînés dans la boue.

Même si l'on soutient que la Commission d'enquête parlementaire ne constitue pas une juridiction, la Commission d'enquête parlementaire peut prendre toutes les mesures d'enquête décrites dans le code d'instruction criminelle. À cet égard, la Commission d'enquête parlementaire a incontestablement tendance (comme cela est manifestement le cas en l'espèce) à traiter ses témoins – ou d'autres encore – comme des suspects et à les considérer comme coupables, la présomption d'innocence étant du même coup violée. Du moins c'est l'apparence qu'elle crée. L'atteinte portée à l'honneur et à la bonne réputation d'une personne est présente lorsque des données contestables sont souvent répétées par des membres de la Commission parlementaire (y compris en dehors de l'enceinte de la Commission d'enquête parlementaire), sans nuance et sans la moindre possibilité de contradiction, en s'appuyant sur des considérations incorrectes et provisoires qui parfois sont adaptées mais souvent aussi formulées de manière imprudente.

Il ne fait pas de doute que le respect de l'honneur et de la réputation des citoyens constitue un droit fondamental qui ne peut être foulé aux pieds, au nom de la liberté d'expression, par des parlementaires ou des commissions d'enquête. Le droit d'enquête des parlementaires ne peut consister, sous prétexte d'une prétendue irresponsabilité parlementaire qui trouverait à s'appuyer sur l'article 58 de la Constitution, en une violation des droits fondamentaux des individus.

Il revient à la Commission d'enquête parlementaire, mais aussi à chacun de ses membres individuellement, de veiller au respect des droits des citoyens et au respect des lois ainsi que de son règlement intérieur. En l'espèce, force est de constater qu'en dépit de violations incontestables de la confidentialité par des membres de la Commission d'enquête parlementaire, la partie citée continue de faire partie de la Commission d'enquête parlementaire en question. Une telle manière d'agir de la partie citée est incontestablement fautive, et contribue à ce que des données qui sont incontestablement confidentielles sortent malgré tout à l'extérieur, après quoi les médias s'en emparent avec avidité. Comment est-il possible, par exemple, que la lecture, même partielle d'un document classifié puisse avoir lieu en séance publique. La presse a commenté l'événement de la manière suivante : *"C'est une bombe"*, (voir *Le Soir* du 16 février 2017).
La partie citée se comporte de manière fautive lorsqu'elle ne respecte pas les lois et le propre règlement de la Commission d'enquête parlementaire. Conjuguée avec les fuites en faveur de la presse, une telle manière d'agir porte incontestablement préjudice à la réputation et aux intérêts de Monsieur Patokh CHODIEV.

Il appert des considérations qui précèdent que la partie citée, dans le cadre du fonctionnement de la Commission parlementaire, ne respecte pas le règlement de la Chambre et des commissions d'enquête parlementaires.

Par conséquent, la partie citée manque incontestablement à la tâche qui lui a été confiée. La faute consiste notamment en l'incapacité de la partie citée de remplir son rôle de membre de la Commission d'enquête parlementaire avec la prudence et l'objectivité nécessaires de manière à ne pas donner l'impression que Monsieur Patokh CHODIEV était tenu responsable, ou faisait office de bouc émissaire, pour des pratiques qui sont davantage imputables à des personnes appartenant au monde politique et/ou judiciaire.

Le défaut de respect des lois/règlements dans le chef de la partie citée est d'autant plus dramatique que l'un des conseils de Monsieur Patokh CHODIEV, dans une lettre en date du 8 février 2017, avait déjà exprimé à l'attention de la Commission d'enquête parlementaire ses préoccupations quant à ses modes de fonctionnement. Le contenu de cette lettre datée du 8 février 2017 était le suivant :

> « *Permettez-moi de vous écrire en qualité de conseil de Monsieur Patokh CHODIEV. Votre Commission a été instituée afin d'enquêter sur les circonstances entourant l'adoption et l'application de la loi relative à la transaction pénale, de même que son application par le Ministère public. Elle fut également chargée d'examiner la façon dont Monsieur CHODIEV a obtenu la nationalité belge.*
>
> *Votre mission s'apparente à une fonction juridictionnelle, notamment du fait des prérogatives considérables que vous offre l'article 4 § 1 de la loi du 03 mai 1880. Il en résulte un devoir de réserve mais également, le cas échéant, l'obligation de respecter le secret professionnel.*
>
> *Tout autre est le secret professionnel qui s'impose aux témoins..*
>
> *A titre d'exemple, à l'issue des débats menés le mercredi 25 janvier, la presse a largement relaté l'audition de Monsieur RAPAILLE. Celui-ci a rappelé que ce qui concernait les informateurs représentait des données classifiées "très secret".*
>
> *Cette affirmation était le rappel d'une réalité évidente.*
>
> *Néanmoins, le lundi 30 janvier, alors qu'aucun débat public n'avait eu lieu entretemps, la presse disait de mon client qu'il était devenu un contact régulier de la Sûreté de l'Etat, peu après sa naturalisation. Certains allaient même jusqu'à titrer "CHODIEV indicateur de la Sûreté depuis 1998". Ce nouvel article est d'autant plus surprenant qu'il fut rédigé sous la signature de Monsieur LALLEMAND, alors qu'à l'issue des débats du 25 janvier, il avait notamment écrit : "Selon nos informations, la Sûreté a effectivement essayé de recruter CHODIEV, mais en vain". Il poursuivait : "Les députés ne sauront jamais si CHODIEV est informateur de la Sûreté".*
> *Si ma qualité d'avocat ne me permet pas de mener une enquête, rien n'interdit la réflexion et la volonté de comprendre, comme m'y invite à juste titre mon client.*
>
> *Que s'est-il donc passé entre le 25 janvier, date où la Commission se réunissait pour la troisième fois, et la publication de l'article du 30 janvier ? Le revirement de situation trouve son explication dans ce dernier article du Soir du 30 janvier où Monsieur LALLEMAND, après avoir qualifié mon client de contact régulier de la Sûreté de l'Etat belge, poursuit : "C'est ce qui ressort d'un courrier adressé en janvier 2000 par la Sûreté au magistrat national, et dont les références ont été transmises à la Commission d'enquête parlementaire "transaction pénale" ". Des indiscrétions ont été commises après la clôture des débats du 25 janvier. Elles concernent un élément matériel dont la presse n'avait pas été informée précédemment, à savoir le courrier précité adressé par la Sûreté au Magistrat national.*

*Ma lettre n'a pas pour objet d'approfondir cette question, mais de souligner que la présentation de mon client comme indicateur de la Sûreté depuis 1998, ce qu'il conteste d'ailleurs, constitue instantanément une atteinte à sa personne et à sa réputation.*

*Les matières que la Commission traite doivent l'être avec réserve mais également dans le souci de respecter l'obligation au secret. Faut-il rappeler que l'article 48 de la loi du 18 juillet 1991, relative au fonctionnement des services de police et de renseignements organise une procédure lorsqu'un membre ou ancien membre du service de renseignements estime devoir garder le secret dont il est dépositaire parce que sa révélation risquerait de faire courir un danger physique à une personne? Il en est de même des membres de la Commission, vis-à-vis desquels l'obligation existe à tout le moins en deux circonstances. Ils sont tenus au secret lorsque des réunions ont lieu à huis-clos. Par ailleurs, si l'indiscrétion commise a lieu dans un contexte autre que l'exercice de la fonction parlementaire, y compris dans les couloirs ou par des communications vers des journalistes, l'article 58 de la Constitution ne s'oppose pas à ce que des sanctions, même pénales, soient prises.*

*En qualité d'avocat, le seul message que je souhaite transmettre à la Commission est lui rappeler le strict respect de la loi. Les conséquences déjà ressenties par mon client m'imposaient de vous en faire part, afin que la Commission y soit attentive lors de débats ultérieurs. ».*

Les préoccupations de Monsieur CHODIEV n'ont pas suscité la moindre attention, alors qu'une lecture conjointe des articles publiés par *Le Soir* respectivement les 26 janvier 2017 et le 30 janvier 2017 ne laisse aucun doute sur la révélation d'informations secrètes.

Malgré cette mise en garde explicite exprimée au nom du requérant à l'intention de la Commission d'enquête parlementaire pour faire respecter la loi, le requérant doit bien constater que les fuites dans la presse, les violations du secret professionnel et les accusations portées à son encontre continuent et que la Commission d'enquête parlementaire poursuit ses activités de la même manière, en ce compris les fuites des informations vers la presse (voir entre autres encore récemment la Commission d'enquête parlementaire en date du 29 mars 2017, au cours de laquelle Monsieur Rapaille (président du comité R) a lui-même exprimé son insatisfaction et son irritation à propos des fuites dans la presse du rapport du comité R).

(iii)     le non-respect de la mission attribuée à la Commission d'enquête parlementaire.

Comme déjà exposé plus haut, la mission de la Commission d'enquête parlementaire est limitée. Elle consiste à :
- enquêter sur les circonstances ayant conduit à l'adoption et à l'application de la loi du 14 avril 2011 portant des dispositions diverses, en ce qui concerne la transaction pénale ;
- examiner l'application par le Ministère public de l'article 216bis du Code d'instruction criminelle, notamment tel que modifié par la loi du 14 avril 2011 portant des dispositions diverses, à partir de l'entrée en vigueur de cette loi jusqu'au 20 août 2011 ;
- et "enfin", examiner la façon dont MM. Patokh CHODIEV et Alijan IBRAGIMOV ont obtenu la nationalité belge.

Chaque membre de la Commission d'enquête parlementaire (et en particulier son président) doit veiller à ce que l'enquête menée par la Commission d'enquête parlementaire reste dans les limites de sa mission, s'agissant tant de la nature de l'enquête qui lui a été confiée que de son objet.

Pourtant, le requérant se voit forcé de constater que la Commission d'enquête parlementaire ne s'en est pas tenue à sa mission.

Pour ce qui concerne l'objet de l'enquête qui lui a été confiée, le requérant constate notamment que – contrairement à la mission consistant à vérifier de quelle manière Monsieur Patokh CHODIEV et Monsieur Alijan IBRAGIMOV avaient acquis la nationalité belge – il apparaît que lors des séances de la Commission d'enquête parlementaire (au sujet desquelles la presse a été informée), l'on a également examiné de quelle manière des membres de la famille de Monsieur Patokh CHODIEV avaient acquis la nationalité belge ou s'étaient efforcés de l'acquérir.

Pour ce qui concerne la nature de l'enquête confiée à la Commission, il avait été indiqué à l'occasion de la constitution de la Commission d'enquête parlementaire que « *la Commission d'enquête parlementaire n'a pas pour but de juger quelqu'un* » et que « *même si tout part d'une révélation concernant un parlementaire et une personne éminente de la politique belge, il s'agit d'exposer les processus de prise de décision dans les trois pouvoirs, dans une affaire comme celle-ci* ». Il est impossible de sérieusement contester le fait que la présente Commission d'enquête parlementaire a pourtant bel et bien été dirigée contre un certain nombre de personnes (parmi lesquelles le requérant). Cela apparaît incontestablement des audiences (dont la presse s'est ensuite fait l'écho de manière détaillée et en stigmatisant souvent le requérant) ainsi que des activités de la Commission d'enquête parlementaire.

*

Force est en outre de constater que les membres de la Commission parlementaire ne sont pas parvenus à ce que la Commission parlementaire s'en tienne au rôle qui lui avait été assigné. En permettant que la Commission d'enquête parlementaire se métamorphose en juge, sans respecter les règles d'impartialité et même en n'évitant pas l'apparence de la partialité, l'on a permis à la Commission d'enquête parlementaire vienne concurrencer la justice. En permettant que – en violation de la présomption d'innocence – les activités de la Commission d'enquête parlementaire ne se limitent pas à l'établissement de la responsabilité politique, mais au contraire en accumulant les commentaires et les accusations à l'encontre de Monsieur Patokh CHODIEV et en leur donnant libre cours, les droits fondamentaux de Monsieur Patokh CHODIEV ont été incontestablement violés (voir Droit à un procès équitable au sens de la jurisprudence strasbourgeoise en 2016, Franklin Kuty, *JLMB*, 10 mars 2017).

*

Les manquements précités, pris chacun individuellement et a fortiori pris dans leur ensemble, sont très graves et ils constituent incontestablement une faute au sens de l'article 1382 du Code civil dans le chef de la partie citée.

L'on peut en effet attendre d'un parlementaire qu'il connaisse lui-même la loi (en ce compris les droits fondamentaux tels qu'ils figurent dans la Convention européenne des droits de l'homme) et le règlement intérieur, et qu'il respecte lui-même les droits fondamentaux (parmi lesquels le droit du requérant au respect de sa vie privée) et qu'il veille à les faire respecter. Ou, pour le dire de manière plus large, qu'il ne subordonne pas le respect de la loi (au sens le plus large) à ses intérêts politiques personnels en faisant en sorte que le forum offert par la Commission d'enquête parlementaire lui serve à se profiler (politiquement) et à assurer sa notoriété (politique).

L'on peut également attendre d'un membre de la Commission d'enquête parlementaire qu'il fasse preuve de retenue et qu'il respecte le règlement de la Chambre.

La partie citée n'a pas non plus (en tant que membre de la Commission d'enquête parlementaire) fait en sorte qu'il ne soit pas porté atteinte, durant les travaux de la Commission d'enquête parlementaire, à la présomption d'innocence dans le chef de Monsieur Patokh CHODIEV, puisqu'il a été à tout le moins permis qu'il soit fait usage de certaines qualifications stigmatisantes et qu'il soit formulé à l'encontre de Monsieur Patokh CHODIEV des accusations et des insinuations qui sont incompatibles avec ses droits fondamentaux.

Par souci d'exhaustivité, le requérant fait d'ores et déjà remarquer que les faits et manquements cités plus haut ne le sont qu'à titre d'illustration du comportement manifestement fautif de la partie citée et ne peuvent être considérés en aucune manière comme limitatifs.

Le requérant se réserve le droit, dans la suite de la procédure, d'apporter des exemples (factuels) complémentaires de ce comportement manifestement fautif et de ces manquements dans le chef de la partie citée.

Les fautes commises mettent en cause de manière incontestable la responsabilité de la partie citée puisque la partie citée n'a pas agi comme l'on pourrait l'attendre d'une personne normalement prudente placée dans des circonstances identiques.

* * *
*

La comparaison chronologique de l'attitude de Mr CHODIEV d'une part, et de la partie citée d'autre part, permettra une appréciation plus aisée des fautes commises, entraînant sa responsabilité.

Ainsi :

1) le 1er février, un des conseils de Mr CHODIEV s'exprimait en son nom dans la presse, demandant le respect de la présomption d'innocence et du procès équitable.
2) Le 8 février, un rappel identique, précis et documenté était adressé à la Commission, et lui rappelait "le strict respect de la loi"; sauf un accusé de réception convenu, il n'eut aucun effet concret, si ce n'est la confirmation par le président que le courrier était envoyé aux membres de la Commission; la partie citée en a eu connaissance.
3) Le 18 avril, une citation en responsabilité était notifiée à l'Etat belge, représenté par la Chambre des représentants.

Quelle fut la réaction de la partie citée à cette suite de démarches ?
Il n'y en a eu aucune.
En effet, et à titre d'exemples :

1) Que lit-on dans "La Libre Belgique" des 28 et 29 janvier ? La partie citée s'y exprime et craint que l'enquête pénale soit frappée d'un vice de procédure. Il démontre qu'outre son rôle de commissaire, il se substitue au ministère public, et exprime : *"Il convient d'agir avec prudence pour éviter un vice de procédure"*. D'une part, on s'étonne de cette immixtion dans le cours de la procédure judiciaire, et d'autre part on ne peut que dénoncer le fait que les parlementaires ne s'imposent pas la même prudence.
2) Le 18 avril, après la trêve pascale, la partie citée accorde un long entretien au journal "Le Soir", s'exprimant à titre individuel, sans même se soucier du fait qu'il n'est qu'un commissaire parmi d'autres; sans la moindre prudence, il relève à nouveau le "Kazakhgate", détaillant la liste des responsabilités de chacun d'abord, et la liste des indice ensuite, terminant par le *"compromission des pouvoirs exécutif et judiciaire"*, thèmes non encore abordés par la Commission, ce qui démontre le peu de sérieux d'un tel comportement.
3) Le même jour, sur la radio nationale RTBF La Première", il s'exprime à 8h45, utilisant des termes dévastateurs, et se livrant aux mêmes excès en disant *"Il ne faut pas passer à côté du noyau nucléaire (sic) du Kazakhgate"*.
4) Le 19 avril, dès le début de la réunion de la Commission, la grande majorité de ses collègues ne fut pas dupe et fit les plus vifs reproches à ceux qui ne cessaient d'entretenir avec la presse des contacts déplacés, et surtout le président de la Commission ( ! ) et la partie citée; la Commission faillit imposer avant de décider, au terme d'une longue réunion à huis clos, de déposer plainte au parquet pour déterminer l'origine des fuites vers la presse ( ! );
5) Les mêmes griefs d'atteinte à la réputation de Mr CHODIEV par la partie civile se confirmeront lors d'entretiens accordés à 19h le 19 avril, lors du journal radio (RTBF -

La Première), mais aussi à RTL-TVI, le dimanche 23 avril à 11h, lors du magazine "C'est pas tous les jours dimanche" animé par Mr DEBORSU, la partie citée versa dans un tel excès qu'elle se fit rappeler à l'ordre par un de ses collègues, également commissaire et sidéré par les propos qu'il entendait;

En bref, comment s'attendre à un travail d'objectivité, d'écoute, de remise en cause et d'impartialité de la part de la partie citée, si au terme de 4 mois de réunions, elle reste imperméable à ces qualités nécessaires à la fonction occupée;

Le maintien d'une telle attitude, face aux mises en garde initiées par Mr CHODIEV, confirme l'existence et la gravité de la fuite;

De tels propos démontrent une violation, par la partie citée, de l'obligation de secret qui le lie et qui a lieu dans un contexte autre que l'exercice de sa fonction parlementaire ; partant, l'article 58 de la Constitution ne s'oppose pas à ce que des sanctions civiles soient prises ;
Ce point de vue est confirmé du fait que toutes les mesures déjà prises pour appeler les parlementaires à la raison n'ont été d'aucun effet ;


B.      Le préjudice causé à Monsieur Patokh CHODIEV

Les fautes commises ont en outre entraîné pour Monsieur Patokh CHODIEV, qui est présent dans de nombreux secteurs, un préjudice considérable à son image et sa réputation, ainsi qu'à ses opportunités professionnelles. En raison de la tension de la presse et des réactions reprises dans la presse, il est déjà apparu que le requérant avait subi un préjudice. Ce préjudice est causé par le comportement fautif de la partie citée.

Le préjudice subi est certain et direct.

À cela s'ajoute le risque d'un préjudice futur dans le chef de Monsieur Patokh CHODIEV au cas où il ne porterait pas remède à l'avenir aux fautes qui lui sont reprochées.

Le préjudice subi par la partie citée consiste d'une part dans le dommage (financier et économique) très important causé au requérant (« dommage matériel »), et d'autre part dans le mépris public auquel le requérant (et ses proches) se trouve exposé (« dommage moral »). Compte tenu de l'importance de ses activités commerciales, l'impact des agissements fautifs de la partie citée ne peut être sous-estimé et le préjudice subi par le requérant est tout à fait considérable.

À titre de réparation du préjudice qu'il a subi, Monsieur Patokh CHODIEV réclame dès lors
-       une indemnité, provisoirement évaluée à 1 € et à préciser en cours d'instance, pour le dommage matériel
-       une indemnité, provisoirement évaluée à 1 €, pour le dommage moral,
-       la publication du jugement à intervenir au Moniteur belge, ainsi que dans les journaux, magazines, périodiques et sur des sites Internet qui, dans le passé, ont publié des articles concernant le Kazakhgate.


Il existe de toute évidence un lien de cause à effet entre la faute et le préjudice subi.


**PAR CES MOTIFS** et tous les autres à faire valoir en cours d'instance et ici expressément réservés:

Entendre déclarer recevable et fondée la demande du requérant;

Entendre dès lors condamner la partie citée à payer au requérant une indemnité provisoirement évaluée à 1 € tant pour le dommage matériel que pour le dommage moral, plus les intérêts compensatoires et judiciaires qui seront précisés davantage dans le cours de l'instance;

Ordonner la publication du jugement au Moniteur belge ainsi que dans les journaux et périodiques suivants : La Libre Belgique, la Dernière Heure, Le Soir, Le Vif-L'express, l'Echo, le Nord Eclair, la Nouvelle Gazette, L'Avenir, qu'il s'agisse des publications papiers de ces différents organes ou de leurs sites respectifs ;

Entendre condamner la partie citée au fait de l'instance, y compris l'indemnité de procédure indexée estimée à 1.320 € ;

Entendre déclarer le jugement exécutoire par provision, nonobstant tous recours et sans caution ni cantonnement ;

Demande fondée sur les motifs repris aux attendus qui précèdent, les Lois et Règles en la matière, et sur tous autres moyens de droit ou de fait à faire valoir en prosécution de cause;

Et pour que la (les) partie(s) citée(s) n'en ignore(nt), je lui (leur) ai laissé une copie du présent exploit, (à chacune d'elles séparément) s'il échet sous pli fermé conformément les dispositions de la loi.

Sous toutes réserves.

Dont acte. Coût : cent septante-trois euros et quarante-trois cents, à majorer éventuellement des frais d'envoi, soit 0,96 EUR.

L'Huissier de Justice.

| | |
|---|---|
| FF* | 58,08 |
| VACS* | 11,78 |
| DINF* | 12,33 |
| PC* | 13,33 |
| DCOP* | 3,43 |
| | 98,95 |
| ENR | 50,00 |
| TPL | 3,70 |
| | 53,70 |
| T/HTVA | 152,65 |
| *21%TVA | 20,78 |
| T/TVAC | 173,43 |
| * | 0,79 |
| T/HTVA | 153,44 |
| *21%TVA | 20,95 |
| T/TVAC | 174,39 |
| *FRL | 100,00 |
| CONTRI. | 20,00 |

Droits d'enregistrement - Application de l'article 8bis du C. enreg.
Droit d'enregistrement : 50,00 EUR



**Marianne RIGA et Paul-Henry STEPHENNE**     Huissiers de Justice associés

SC sous forme de SPRL – RPM Namur     BCE: 0698.596.056     TVA: BE698.596.056

Montagne Sainte Barbe, 158 – 5100 JAMBES

Etude ouverte : Du lundi au jeudi : 8h30 - 17h / Vendredi : 8h30 - 16h

Tél: 081/74.56.14
Fax: 081/74.59.42
E-mail: riga.stephenne@skynet.be

bpost: BE14-0000-7592-0583 BPOTBEB1
CBC: BE10-7320-3194-4474 CREGBEBB
ING: BE98-6304-3529-0993 BBRUBEBB

**Marie-Isabelle DENEF** Candidat-Huissier de Justice     **Mélissa BOURGUIGNON** Maitre en droit UCL.

------------------------------------------------------------------------------------------

S200-17 # O / MID

    09.05.2017   11:42:39 [25] >LogID:147814619<

N.N./71.01.25 105-61  INFORMATIONS LEGALES

010 (NM)  25.01.1971 Gilkinet,Georges Michel Amédée Léon
                Sexe : M.
020(ADR)  07.07.1994 5330/1130/Rue de la Gendarmerie,16
          01.01.1981 5020/6467/Rue de Manstée(ML),17
          10.11.1972 5020/0034/Manstée(ML),1016/E000
          25.01.1971 5020/0024/Fontaine(Haute)(ML),393
001(COM)  07.07.1994 Assesse (5330)
          01.01.1977 Namur  /Fusion /(5020)
          25.01.1971 Malonne
070(PRF)  01.07.2007 12266/3/Attaché Parlementaire (Salar.)
114(FIL)  15.03.1999 10/Parent de Gilkinet,Léa Christiane Liliane Dominique
                        (99.03.15 448-38)
          06.02.2002 10/Parent de Gilkinet,Arthur Jean Georges Thierry
                        (02.02.06-359-31)
120(E.C)  29.04.1994 20/Marié(e) avec Bodart,Bénédicte Renée Cèlestine
                        Ghislaine (71.04.11 270-46) à Onhaye Acte no : 0005
          25.01.1971 10/Célibataire
140(PRM)  07.07.1994 02/Epouse Bodart,Bénédicte Renée Cèlestine Ghislaine
                        (71.04.11 270-46)
          15.03.1999 03/Fille Gilkinet,Léa Christiane Liliane Dominique
                        (99.03.15 448-38)
          06.02.2002 03/Fils Gilkinet,Arthur Jean Georges Thierry
                        (02.02.06=359-31)
100(L.N)  25.01.1971 /00000/ Namur
031(NAT)  25.01.1971 Belge

# EXHIBIT C

## DAGVAARDING

Heden, vierentwintig mei, **tweeduizendzeventien**;

TEN VERZOEKE VAN

De Heer Patokh Chodiev, ondernemer, wonende te Rusland, 119002 Moskou, Maly Nikolopeskovsky Pereulok 5

Eiser,

Hebbende als raadslieden, meester Pascal VANDERVEEREN, advocaat te 1000 Brussel, Miniemenstraat 41 en meester Christiaan BARBIER, advocaat te 1050 Brussel, Tervurenlaan 270

**Inleiding**

Gedaagde, de Heer Dirk Van der Maelen, is parlementslid en voorzitter van de "*Parlementaire onderzoekscommissie belast met het onderzoek naar de omstandigheden die hebben geleid tot de aanneming en de toepassing van de wet van 14 april 2011 houdende diverse bepalingen, voor wat de minnelijke schikking in strafzaken betreft*" (gemeenzaam bekend als de Parlementaire Commissie "Kazachgate).

Gedaagde heeft de afgelopen maanden herhaaldelijk en op volgehouden wijze manifest foutief gehandeld en dit zowel buiten de Parlementaire Commissie als binnen de betreffende commissie. Vooreerst heeft gedaagde ((toekomstig) voorzitter zijnde van de parlementaire commissie) in eigen naam op diverse tijdstippen publiekelijk belastende, lasterlijke en volkomen ongefundeerde aantijgingen afgelegd o.m. aangaande eiser. Daarnaast is gedaagde onmiskenbaar te kort geschoten in zijn taak als Voorzitter van de Parlementaire Onderzoekscommissie en slaagt hij er evenmin de activiteiten van de Parlementaire Commissie op wettige wijze te laten verlopen en deze commissie haar eigen reglementen te laten respecteren.

Door zijn manifest foutieve handelswijze (met inbegrip van de afgelegde lasterlijke en belastende publieke verklaringen) heeft gedaagde aan eiser zeer ernstige schade berokkend. Herhaaldelijk en op laakbare wijze heeft gedaagde o.m. de goede naam en reputatie van eiser besmeurd. Daarnaast heeft gedaagde eiser op zeer grove wijze geschonden in zijn meest fundamentele grondrechten, waaronder het recht van eiser op eerbiediging van privé-, familie- en gezinsleven, het vermoeden van onschuld en het recht op een eerlijk proces.

Huidige dagvaarding strekt er toe de door eiser geleden schade vergoed te zien op basis van artikel 1382 van het Burgerlijk Wetboek.

I.     **Algemeen kader**

A.     Wie is Patokh CHODIEV ?

De heer Patokh CHODIEV is een zakenman geboren in Oezbekistan op 15 april 1953.

In 1971 ging eiser studeren aan het selectieve en prestigieuze Rijksinstituut voor de Internationale Betrekkingen te Moskou, waar hij in 1975 als Doctor in de Politieke Wetenschappen afstudeerde.

Vanaf 1975 heeft eiser gedurende meer dan een decennium gewerkt als expert "Russisch-Japanse relaties" binnen het Ministerie van (Buitenlandse) Handel van de Sovjet-Unie. In het kader hiervan werd hij trouwens vanaf 1975 tot 1980 uitgestuurd naar Japan als raadgever van het hoofd van de Russisch – Japanse handelsmissie.

Eiser is lid van de Academie voor Natuurwetenschappen van de Republiek Kazachstan en heeft meer dan dertig publicaties over de geschiedenis, de economie en de politieke wetenschappen van Japan geschreven.

Na zijn werkzaamheden bij het Ministerie van Handel (beëindigd in 1989) heeft eiser, samen met twee partners, de heren Alexander Mashkevitch en Alijan Ibragimov verschillende activiteiten in de privé-sector ontwikkeld. Deze activiteiten situeerden zich voornamelijk op het gebied van de mijnbouw, financiën en verzekeringen. Zij situeren zich in de periode van de *glasnost"* (openheid), van de *perestrojka* (staatkundige en economische hervormingen), van het uiteenvallen van de Sovjet-Unie en van de hiermee gepaard gaande privatisering van diverse staatsondernemingen, zowel in Rusland als in staten van de Ex-Sovjetunie (waaronder Kazachstan).

Vanaf 1991 heeft eiser zich in België gevestigd, waar hij in 1997 de Belgische nationaliteit verwierf.

Vandaag de dag is eiser een gerespecteerde ondernemer, die – samen met zijn partners – wereldwijd meer dan 80.000 werknemers te werk stelt.

Eiser heeft tijdens zijn lange carrière, zowel in de publieke als private sector, nooit het voorwerp uitgemaakt van een strafrechtelijke veroordeling, noch in België noch in het buitenland.

*            *            *

Eiser geeft uw rechtbank mee dat hij in België wel het voorwerp heeft uitgemaakt van een zeer langdurende strafrechtelijke vervolging. Deze strafrechtelijke vervolging vond haar oorsprong in een melding vanwege de Cel voor Financiële Informatieverwerking (in 1996), waarbij door de C.F.I. verdachte financiële transacties aan het Parket werden gerapporteerd. Eiser werd in deze aanvankelijke melding zelfs niet als (direct) betrokkene geviseerd.

In het kader van deze betreffende strafrechtelijke vervolging werden aan eiser beweerde feiten van valsheid in geschrifte, witwas en "bendevorming" ten laste gelegd. Eiser heeft de hem ten laste gelegde feiten steeds betwist.

Na jarenlang onderzoek (meer dan een decennium !) werd de betreffende vervolging uiteindelijk aan de Raadkamer voorgelegd met het oog op het regelen van de rechtspleging.

Hoewel de Raadkamer bij een beschikking dd. 18 februari 2011 o.m. reeds oordeelde dat een deel van de geformuleerde tenlasteleggingen lastens eiser onontvankelijk waren, en dat de redelijke termijn voor de behandeling van de strafzaak was overschreden, werd eiser, ondanks deze door de Raadkamer vastgestelde overschrijding van de redelijke termijn, naar de Correctionele Rechtbank verwezen uit hoofde van een aantal tenlasteleggingen.

Lopende de beroepsprocedure tegen de verwijzingsbeschikking van de Raadkamer dd. 18 februari 2011 hebben de voormalige raadslieden van eiser op 17 juni 2011 een minnelijke schikking met het

Parket Generaal te Brussel afgesloten. De tussengekomen minnelijke schikking dd. 17 juni 2011 (en de correcte naleving van de in de minnelijke schikking voorziene voorwaarden) werd bij arrest dd. 30 juni 2011 door de Kamer van Inbeschuldigingstelling bevestigd, waardoor na meer dan 15 jaar onderzoek, de strafvordering lastens eisers definitief in België kwam te vervallen. N.a.v. het afsluiten van de minnelijke schikking heeft eiser **geen schuld** m.b.t. het verweten strafbare feiten bekend, hetgeen trouwens uitdrukkelijk in de minnelijke schikking werd opgenomen.

De betreffende minnelijke schikking dd. 17 juni 2011 werd afgesloten op basis van het destijds geldend artikel 216bis Wetboek Strafvordering (op dat ogenblik was artikel 216bis Wetboek Strafvordering laatst gewijzigd door de wet van 14 april 2011 houdende diverse bepalingen).

*

Ondanks het feit dat de betreffende strafrechtelijke vervolging van eiser in België reeds in 2011 op een definitieve wijze werd beëindigd, wordt eiser sinds de maand september 2014 veelvuldig genoemd in de Franse en Belgische pers in het kader van wat men gemeenzaam en gemakshalve "Kazachgate" is gaan noemen. Ook al werd de naam "Kazachgate" door de Belgische media reeds gebruikt eind jaren 1990, begin jaren 2000 in het kader van diverse investeringsprojecten van de Belgische vennootschap Tractebel in Kazachstan, zou het huidige "Kazachgate" volgens de media bewerdelijk vorm hebben gekregen in 2011, zijnde het ogenblik waarop de toenmalige President van de Franse Republiek, de heer Nicolas Sarkozy, op vraag van Kazachstan zou getracht hebben om bovenvermelde langlopende strafrechtelijke vervolging in België te doen beëindigen en dit teneinde een overeenkomst tot verkoop van helikopters tussen Kazachstan en de onderneming Eurocopter, filiaal van de groep EADS (resp. Airbus Helicopters en de groep Airbus) te kunnen afsluiten. Hiervoor zou, volgens diezelfde media, de Heer Nicolas Sarkozy zich beroepen hebben op de tussenkomst van invloedrijke Belgische politici.

Volgens vernoemde pers zou in het bijzonder de wet van 14 april 2011 houdende diverse bepalingen (die voorzag in een uitbreiding van de toepassingsmogelijkheden voor het sluiten van een minnelijke schikking in strafzaken) op instigatie van een buitenlandse mogendheid (m.n. Frankrijk) "versneld" door het Belgisch Parlement zijn aangenomen met de achterliggende bedoeling om bovenvermelde strafrechtelijke vervolging lastens eiser te doen vervallen.

Hoewel de betreffende persartikels onmiskenbaar eiser in een slecht daglicht plaatsen, zijn de aangehaalde feiten en beschuldigingen volkomen onjuist en schaden dergelijke manifeste onwaarheden onmiskenbaar zijn (economische) belangen en zijn goede naam en reputatie. Enerzijds stelt eiser zich thans zelf, op basis van de thans verspreide informatie, ernstige vragen en maakt hij het meest ruime voorbehoud omtrent de omvang van de minnelijke schikking én de wijze waarop de minnelijke schikking namens hem werd onderhandeld en afgesloten. Anderzijds leefde immers reeds ruim vóór 2011 (zelfs vanaf 2004) immers in politieke en gerechtelijke kringen de idee om het toepassingsgebied van de minnelijke schikking in strafzaken uit te breiden. Achterliggende redenen voor deze uitbreiding waren o.m. de gerechtelijke achterstand, het feit dat een groot aantal zaken verjaarden, het vermijden van straffeloos seponeren van strafbare feiten bij gebreke aan opsporings- en vervolgingscapaciteit, .... Gelijkaardige redenen lagen in het verleden ook reeds ten grondslag aan diverse uitbreidingen van het toepassingsgebied van de regelgeving van de minnelijke schikking in strafzaken, die reeds in 1935 in de Belgische rechtsorde is opgenomen.

Het is ook bekend dat de laatste wetswijziging van artikel 216 bis Wetboek Strafvordering in 2011 werd aangestuurd o.m. door lobbyisten van de Belgische diamantsector en door het Antwerpse Parket Generaal en dat minstens reeds sedert 2009 een (finale) ontwerptekst voorlag bij het Belgische Parlement, i.e. op een ogenblik dat er nog geen sprake was van enige verkoop van helikopters.

B.    De oprichting van een parlementaire onderzoekscommissie in 2016

De oprichting van een Parlementaire Onderzoekscommissie was niet eenvoudig.

In 2012 had de Heer Mangain reeds gepoogd om een parlementaire onderzoekscommissie aangaande de totstandkoming van de wet van 14 april 2011 te laten oprichten.

Vanaf september 2014 werd aangaande de beweerde inmenging van een buitenlandse mogendheid bij de totstandkoming van deze Belgische wetgeving uitvoerig en op geregelde tijdstippen in de pers bericht. O.m. de krant "Le Monde" van woensdag 8 oktober 2014 publiceerde de commentaar van de heer Olivier MAINGAIN, onder de titel *"Si la Belgique a été utilisée, c'est un scandale d'Etat"* - vrije vertaling : "Indien België gebruikt is geweest, is dat een Staatsschandaal".

Deze veelvuldige publicaties in de pers werd door een aantal politici, die hierin ongetwijfeld een ideaal forum zagen om zichzelf politiek te profileren en dit politiek uit te buiten, aangegrepen om op 23 november 2016 in de Kamer van Volksvertegenwoordigers de oprichting van een parlementaire onderzoekscommissie voor te stellen (zie Parl. St. 2016-2017, n° 54 2179/001).

Het voorstel tot oprichting van de Commissie werd door de indieners (waarvan gedaagde één van hen was) o.m. gemotiveerd door de vraag naar klaarheid omtrent de vermoedens van manipulatie van de Belgische federale wetgever door een buitenlandse autoriteit, te weten Frankrijk. Zoals trouwens blijkt uit de ingediende tekst van het voorstel dd. 23 november 2016 gaan deze vermoedens van inmenging van een buitenlandse mogendheid in de Belgische wetgevende orde trouwens alle terug op persbronnen en op in de pers verschenen berichten.

Uiterst merkwaardig is het te moeten vaststellen dat de indieners van het voorstel (of minstens een aantal hiervan) net diegenen waren/zijn die zich eerder in de pers op zeer uitgebreide en affirmatieve wijze omtrent deze beweerde inmenging van een buitenlandse mogendheid hadden uitgelaten en dergelijke inmenging bestempelden als "staatsschandaal".

Op 1 december 2016 werd de « *Parlementaire onderzoekscommissie belast met het onderzoek naar de omstandigheden die hebben geleid tot de aanneming en de toepassing van de wet van 14 april 2011 houdende diverse bepalingen, voor wat de minnelijke schikking in strafzaken betreft*» opgericht bij toepassing van de wet van 3 mei 1880 op het Parlementair onderzoek.

In concreto werd de Parlementaire onderzoekscommissie belast met navolgende opdrachten (artikel 1 §1 van het voorstel):

  1°.  Een onderzoek te voeren naar de omstandigheden die hebben geleid tot de aanneming en de toepassing van de wet van 14 april 2011 houdende diverse bepalingen, voor wat de minnelijke schikking in strafzaken betreft;

  2°.  Na te gaan hoe het openbaar ministerie toepassing heeft gegeven aan artikel 216*bis* van het Wetboek van strafvordering, meer bepaald zoals gewijzigd bij de wet van 14 april 2011 houdende diverse bepalingen, vanaf de inwerkingtreding van deze wet tot 20 augustus 2011;

3°.  Een onderzoek in te stellen naar de wijze waarop de heren Patokh Chodiev en Alijan Ibragimov de Belgische nationaliteit hebben verkregen.

In de loop van de parlementaire bespreking n.a.v. de oprichting van de Parlementaire Onderzoekscommissie werd trouwens verduidelijkt dat de opdracht van de Parlementaire onderzoekscommissie er o.m. uit bestaat om te achterhalen of een naburige Staat het Belgisch parlementair proces heeft beïnvloed. « Ce ne sera pas le procès d'une personne, quelle qu'elle soit », heeft men gezegd, « même si tout démarre évidemment avec la révélation qui concerne un parlementaire et d'une personnalité éminente de la vie politique belge. Mais ce sera en tout cas la recherche de la vérification de ce qu'ont été les processus de décision dans un dossier comme celui-là. Que ce soit au sein du pouvoir exécutif, que ce soit au sein du pouvoir législatif, que ce soit au sein du pouvoir judiciaire » (Parl. St., Integraal Verslag, 2016-2017, nr. 142, p. 67) Of zoals vrij vertaald in de Parlementaire stukken : « De parlementaire onderzoekscommissie heeft niet tot doel iemand te berechten », « zelfs indien alles vertrekt met de onthulling die betrekking heeft op een parlementair en een eminente persoon in de Belgische politiek. Het gaat er om de besluitvormingsprocessen bij de drie machten bloot te leggen in een zaak zoals deze.»

Luidens artikel 1, § 2, zal de parlementaire onderzoekscommissie haar conclusies en aanbevelingen formuleren. Zij zal eveneens de eventuele verantwoordelijkheden bepalen.

De commissie kan elke persoon horen die ze meent te moeten laten verschijnen en ze kan beschikken over alle stukken die ze nuttig acht voor de vervulling van haar taak. De commissie is ertoe gemachtigd vaststellingen te doen ter plaatse en in voorkomend geval de internationale contacten te leggen die nodig zijn om haar taak te volbrengen. (art.1 § 3).

De commissie krijgt alle bevoegdheden waarin de wet van 3 mei 1880 op het parlementair onderzoek voorziet (art. 2), en zal bij de uitoefening van haar opdracht niet in de plaats treden van de onderzoeken van de rechterlijke macht of van buitengerechtelijke onderzoeken en procedures (art. 3). Haar onderzoek kan daarmee samenlopen, maar mag het verloop ervan niet hinderen (ibid.).

De artikelen 4 en 5 hebben betrekking op haar samenstelling. Op grond van artikel 6, zijn de commissievergaderingen openbaar, maar zij kan hierover op elk ogenblik anders beslissen. Het is de leden van de commissie verboden, evenals de personen die haar, in welke hoedanigheid ook, bijstaan of aan haar werkzaamheden deelnemen, informatie te verspreiden die in de commissievergaderingen met gesloten deuren wordt meegedeeld.  De regels aangaande de valse getuigenis zijn van toepassing op de getuigen die voor haar verschijnen (art. 8 van de wet van 3 mei 1880).

Zij brengt binnen drie maanden na haar oprichting verslag uit bij de Kamer van Volksvertegenwoordigers, behoudens een uitdrukkelijke beslissing van de Kamer om de commissie een bijkomende termijn te gunnen voor de indiening van haar verslag (art. 7).

C.    Wettelijk kader van een parlementaire onderzoekscommissie

Het functioneren van de parlementaire onderzoekscommissie wordt geregeld door de wet van 3 mei 1880 op het Parlementair onderzoek en door haar eigen interne reglementen.

Artikel 4, § 1 van de wet van 3 mei 1880 op het parlementair onderzoek voorziet o.m. uitdrukkelijk dat de Kamer of de Commissie, evenals hun voorzitters in zoverre deze hiertoe gemachtigd worden, alle in het Wetboek van Strafvordering voorziene onderzoeksmaatregelen kunnen stellen.

Een onderzoekscommissie kan met andere woorden optreden als onderzoeksrechter, hetgeen onder meer onmiskenbaar inhoudt (i) dat, om de sereniteit van het debat te verzekeren, erover dient te worden gewaakt dat elk lid zich zo onpartijdig mogelijk opstelt, zowel ten aanzien van zichzelf als ten aanzien van de bevolking (Parl.St., 2016-2017, n° 54 2179/003, Verslag namens de Commissie voor de Justitie, p. 3) en (ii) dat de Commissie en haar individuele commissieleden gehouden zijn tot dezelfde verplichtingen als dewelke gelden voor een onderzoeksrechter.

Van de individuele leden van de commissie kan derhalve o.m. verwacht worden dat zij zich tijdens het te voeren parlementair onderzoek onpartijdig opstellen, dat zij het onderzoek met deskundigheid voeren, dat zij zich terughoudend, objectief, discreet en respectvol opstellen (zeker in hun relaties naar de pers toe), dat zij hun onderzoek beperken tot de hen door het Parlement opdragen opdracht en dat zij hun onderzoek à charge en à décharge voeren.

Vanzelfsprekend dient zowel de commissie als haar individuele leden alle wetten en haar eigen intern reglement te respecteren. Tijdens haar werking dienen de leden er o.m. op toe te zien dat zij de vertrouwelijkheid/geheim behouden van hetgeen door getuigen bvb. achter gesloten deuren wordt gezegd en mogen zij op geen enkele wijze de fundamentele grondrechten van individuelen personen (waaronder het recht op eerbiediging van privé-, familie- en gezinsleven, het vermoeden van onschuld, het recht op een eerlijk persoon) met de voeten treden.

Eiser verwijst in dit verband o.m. naar artikel 3 van de Wet van 3 Mei 1980, dat voorziet dat *"de leden van de Kamer tot geheimhouding (zijn) verplicht met betrekking tot de informatie verkregen naar aanleiding van de niet-openbare commissievergaderingen. Schendingen van die geheimhouding wordt gestraft met de sanctie bepaald in het reglement van de Kamer."* Artikel 67 van het Reglement van de Kamer voorziet trouwens uitdrukkelijk in sancties ten aanzien van de leden die hun geheimhoudingsplicht niet respecteren.

De vrijheid van meningsuiting van parlementairen kan bovenvermelde fundamentele rechten van individuen niet aantasten en kan de betreffende schending van de geheimhoudingsplicht op geen enkele wijze verantwoorden. Onder het mom van een vermeende parlementaire onverantwoordelijkheid die zou te vinden zijn in artikel 58 van de Grondwet, is het parlementair onderzoek absoluut geen vrijgeleide om fundamentele grondrechten van individuen te schaden.

## II.   Het verloop van de Parlementaire onderzoekscommissie tot op heden

Het hoeft niet meer toegelicht te worden het onderzoek van de commissie in casu delicaat is, vermits het o.m. een onderzoek naar het (dys)functioneren van het Parlement (en haar leden) en naar de (parlementaire) werking zou moeten inhouden. Het onderzoek raakt de grondslagen van de maatschappij, waaronder haar wetgevende en rechterlijke functie evenals haar veiligheid, ten gevolge van de uiteenzettingen van de leden van de Staatsveiligheid, het Comité P en het Comité I.

Op heden moet evenwel vastgesteld worden dat de werkzaamheden van de parlementaire onderzoekscommissie niet verlopen overeenkomstig de wettelijke bepalingen en/of het intern reglement van de Kamer, noch overeenkomstig het beginsel van onpartijdigheid.  Uit de hoorzittingen (waaromtrent de pers uitvoerig bericht) en uit de activiteiten van de Parlementaire onderzoekscommissie blijkt o.m. dat het parlementair onderzoek wel degelijk gericht is tegen een aantal personen (waaronder eiser). Op een totaal ongefundeerde wijze krenkt het door de commissie tot op heden gevoerde onderzoek de eer van eiser, wordt zijn reputatie besmeurd en wordt eiser blootgesteld aan de openbare verachting en publieke vernedering.

(i)      Vooreerst is de samenstelling van de parlementaire onderzoekscommissie niet van die aard om alle waarborgen te bieden die een dergelijke instelling, aan wie zelfs grondwettelijke taken worden toevertrouwd, vereist. 12 van de 17 commissieleden waren immers betrokken bij de feiten die thans het voorwerp zijn van het onderzoek dat door de Parlementaire onderzoekscommissie wordt gevoerd.

Nochtans was vóór aanvang van de zittingen van de parlementaire onderzoekscommissie terecht de vraag gesteld of dergelijke samenstelling van de commissie in haar geheel de garanties bood om het parlementair onderzoek te voeren in een klimaat dat noodzakelijk is voor het goed functioneren van de parlementaire onderzoekscommissie : discretie, sereniteit, respect van eenieder en objectiviteit. Het antwoord is vandaag zeer duidelijk. Mede gelet op de handelswijze van de parlementaire onderzoekscommissie zijn de voorwaarden voor een objectief en regelmatig functioneren overeenkomstig de wet en haar reglementen, in het geheel niet vervuld.

(ii)   Na de talrijke zittingen die reeds hebben plaatsgevonden, overheerst onmiskenbaar de indruk dat de leden van de commissie, politici, vooral krachtige politieke – en dus vooringenomen - signalen wensen uit te sturen, eerder dan te handelen als onafhankelijk en onpartijdig orgaan ten dienste van de burger.

(iii)   Daarnaast werden/worden tijdens de (openbare) hoorzittingen o.m. een aantal fundamentele grondrechten in hoofde van eiser (zoals deze beschermd worden door de grondwet en het internationaal recht) veelvuldig geschonden, waaronder het recht op eerbiediging van het privé-, familie- en gezinsleven van eiser (zoals beschermd door artikel 8 van het Europees Verdrag tot bescherming van de Rechten van de Mens en de Fundamentele Vrijheden) en het vermoeden van onschuld. Daarnaast werd ook goede naam en reputatie van eiser veelvuldig besmeurd en door het slijk gehaald.

(iv)   Eiser diende daarenboven vast te stellen dat er zeer vaak gegevens in de pers verschenen afkomstig uit hoorzittingen van de Parlementaire onderzoekscommissie die plaatsvonden achter gesloten deuren, hetgeen er volgens eiser zeer duidelijk op wijst dat parlementsleden de vertrouwelijkheid van de gesloten zitting hebben geschonden (zowel in openbare zitting, als in de pers). Het bewijs dat er inbreuken op de vertrouwelijkheid en/of het beroepsgeheim hebben plaatsgevonden is evident, vermits informatie die onmiskenbaar onder de vertrouwelijkheid en/of het beroepsgeheim valt, werd gepubliceerd.

Bij wijze van voorbeeld kan verwezen worden naar navolgende zittingen van de Parlementaire onderzoekscommissie (waaromtrent de pers heeft bericht) :

-   parlementaire onderzoekscommissie dd. 15 februari 2017, (zie Le Soir, 16 februari 2017 , "Chodiev menace l'Ordre démocratique du pays – vrij vertaald : "Chodiev bedreigt de democratische orde van het land"), waarbij onder meer
    • een synthesenota van de Staatsveiligheid met de classificatie geheim in openbare zitting werd geopenbaard;

    • door de heer VINCENT VAN QUICKENBORNE de betreffende synthesenota dd. 2 augustus 2016 zelfs gedeeltelijk werd voorgelezen;

-   parlementaire onderzoekscommissie dd. 29 maart 2017, waarbij de Heer Rapaille, Voorzitter van het Comité I, voor de aanvang van de hoorzitting zijn ongenoegen en irritatie heeft geuit dat bepaalde gedeelten van een rapport van het Comité I (toegezonden aan de Parlementaire Onderzoekscommissie) naar de pers waren gelekt. De heer Rapaille stelde daarenboven dat het vertrouwen in de commissie dan ook is geschaad en hij met het nodige voorbehoud zal spreken, nog meer dan vroeger.

(v)   Eiser diende daarnaast vast te stellen dat de commissie zich meer dan toegankelijk heeft opgengesteld voor de rol van de pers in deze en dit op een wijze dat deze laatste – naar het oordeel van eiser – zelfs de motor van haar functioneren is geworden.

De contacten bestonden trouwens in dubbele richting. Zonder dienaangaande alle persartikels te moeten bijbrengen, is het bestaan van de één-tweetjes die tussen de leden van de Parlementaire Onderzoekscommissie en de pers hebben plaatsgevonden en nog steeds plaatsvinden, boven elke twijfel verheven. Sommige leden van de Parlementaire onderzoekscommissie maakten/maken (ook buiten de hoorzitting en buiten de muren van het Parlement) immers gretig gebruik van de pers om hun standpunt aan het publiek ter kennis te brengen.  De voorbeelden hiervan zijn legio.

Op die manier kwam tussen bepaalde leden van de parlementaire commissie en een aantal journalisten een niet te stoppen dynamiek tot stand, waardoor leden van de parlementaire onderzoekscommissie zich niet meer onbevooroordeeld en objectief konden opstellen, met de voor eiser zichtbare nefaste gevolgen en schade.

(vi)   Tot slot bevindt de Parlementaire onderzoekscommissie zich ontegensprekelijk in een "passioneel" klimaat. Zij vindt haar oorsprong in onthullingen die door de pers werden gedaan en men kan niet om de vaststelling heen dat er tussen leden van de Parlementaire Onderzoekscommissie en de pers veelvuldige contacten zijn/waren, en dat deze contacten een zeer duidelijk doel hadden, m.n. aan het onderzoek een zeker (sensatiegericht) pigment toe te voegen waarbij gefocust wordt op de vermeende rol van individuele personen (waaronder eiser). Eiser heeft bovendien het gevoel dat hij gegijzeld wordt door partijpolitieke twistpunten tussen partijen. Er moet immers aan herinnerd worden dat de onderzoeken van de commissie tot hoofddoel hadden de betrokkenheid van politici bij de totstandkoming en aanneming van de wet betreffende de minnelijke schikking in strafzaken na te gaan evenals de mogelijke invloed van een buitenlandse staat op het parlementair proces. Deze passionele context maakt het aanlokkelijk om de pers informatie mee te delen die vallen onder de vertrouwelijkheid en/of het beroepsgeheim, wat ook effectief gebeurt.

*

De hierboven aangehaalde schendingen van de wet en van de fundamentele grondrechten in hoofde van eiser, alsook de talrijke indiscreties binnen de parlementaire onderzoekscommissie zijn er vanaf het prille begin van de werking van de Parlementaire onderzoekscommissie steeds geweest. Zelfs wanneer de commissie, bij aanvang van de werkzaamheden, nog geen idee kan/kon hebben over de betrokkenheid van eiser in het proces tot aanneming van de wet inzake de minnelijke schikking in strafzaken, zijn jegens eiser al decisieve beweringen geformuleerd, op een dergelijke wijze dat hij werd voorgesteld als een vijand van de democratie en de Belgische Staat, en wordt voorgehouden dat hij deze in gevaar brengt.

Eiser heeft de Parlementaire onderzoekscommissie uitdrukkelijk op de betreffende schendingen en tekortkomingen gewezen. Enerzijds werd op 1 februari 2017 door "Le Soir" en "De standaard" een open brief van eiser gepubliceerd, waarin eiser verzocht om de grootste voorzichtigheid aan de dag te leggen. Anderzijds werd de Parlementaire onderzoekscommissie op 8 februari 2017 zelf rechtstreeks door één van de raadslieden van eiser aangeschreven.

Geen enkele aandacht werd besteed aan de namens eiser geuite bekommernissen om de wet te doen respecteren. Integendeel zelfs, eiser diende vast te stellen dat de perslekken, de inbreuken op het beroepsgeheim en de vertrouwelijkheid en de ongefundeerde aantijgingen aan zijn adres onverminderd blijven voortduren en dat de parlementaire onderzoekscommissie, onder het voorzitterschap van gedaagde, haar activiteiten op dezelfde wijze als voorheen is blijven voortzetten, inclusief het lekken van informatie naar pers (zie o.m. recentelijk nog de parlementaire onderzoekscommissie dd. 29 maart 2017, waarbij de Heer Rapaille (voorzitter van het Comité) zelf zijn irritatie en ongenoegen heeft geuit omtrent het lekken van het verslag van comité I naar de pers).

Vermits door de Parlementaire Onderzoekscommissie geen enkel gevolg werd verleend aan de betreffende

brieven van eiser en de schendingen onmiskenbaar voortduurden, is eiser gedwongen geweest om op 18 april 2017 de Belgische Staat te dagvaarden in aansprakelijkheid en teneinde het volstrekt onwettig, minstens gebrekkig functioneren van de Parlementaire onderzoekscommissie, waardoor de goede naam en de (economische) belangen van eiser werden geschaad, te doen ophouden.

In weerwil van dergelijke dagvaarding, die in het bijzonder tot doel had de eerbiediging van de wettelijke bepalingen door de Parlementaire onderzoekscommissie, zonder hierbij de parlementaire commissie te willen beperken in haar noodzakelijke rol de waarheid trachten te achterhalen, bleef gedaagde zich evenwel manifest foutief gedragen. Eiser verwijst hierbij in het bijzonder naar de feiten en elementen, die dateren van nà 18 april 2017, en die hierna onder hoofdstuk III.A.4.3. worden uiteengezet, hetgeen eiser dan ook genoodzaakt heeft om gedaagde te dagvaarden.

*

Het is onbetwistbaar dat de Belgische Staat aansprakelijk is voor het wettig en correct functioneren van de Parlementaire Onderzoekscommissie (als commissie)

Het is al evenzeer onbetwistbaar dat ook individuele leden van de parlementaire onderzoekscommissie (in het bijzonder de voorzitter) zich wettig en correct moeten gedragen, zowel binnen het functioneren van de Parlementaire onderzoekscommissie als daarbuiten en dat zij – op basis van artikel 1382 van het Burgerlijk Wetboek - eveneens aansprakelijk zijn voor hun eigen individuele (foutieve) handelswijze, waardoor aan eiser schade werd berokkend.

Zoals hierna zal worden aangetoond, heeft gedaagde zich in casu manifest foutief gedragen en is hij schromelijk te kort geschoten in zijn rol als voorzitter, waardoor hij aan eiser onmiskenbaar substantiële schade heeft berokkend.

III.   **DE VORDERING TOT SCHADEVERGOEDING OP BASIS VAN ARTIKEL 1382 BURGERLIJK WETBOEK LASTENS GEDAAGDE**

A.    De manifest foutieve handelswijze van gedaagde en tekortkomingen in hoofde van gedaagde, die onmiskenbaar een fout in de zin de van artikel 1382 Burgerlijk Wetboek uitmaken.

Gedaagde heeft op een manifest foutieve wijze gehandeld en handelt nog steeds foutief, waardoor hij aan eiser schade heeft berokkend en nog steeds berokkent. Eiser verwijst derhalve aan gedaagde schadeverwekkende fouten in de zin van artikel 1382 van het Burgerlijk Wetboek, waarvoor hij vergoed wenst te worden.

Samengevat verwijt eiser aan gedaagde o.m. navolgende manifest foutieve gedragingen en tekortkomingen, die onmiskenbaar schade berokkenen aan de goede naam van eiser en een inbreuk vormen op zijn fundamentele grondrechten :

- Een volkomen gebrek aan onpartijdigheid in hoofde van gedaagde, minstens een schijn van partijdigheid
- Het herhaaldelijk publiekelijk afleggen van belastende en voor eiser tergende aantijgingen waardoor eiser gediscrediteerd wordt;
- Het schromelijk tekortschieten door gedaagde in zijn taak als voorzitter van de Parlementaire onderzoekscommissie;

A.1.   Een volkomen gebrek aan onpartijdigheid in hoofde van gedaagde, minstens een schijn van partijdigheid.

<u>en een volkomen gebrek aan terughoudendheid in hoofde van gedaagde</u>

Gedurende de afgelopen maanden heeft gedaagde diverse keren blijk gegeven van een **absoluut gebrek aan onpartijdigheid** in zijn hoofde en volkomen gebrek aan enige terughoudendheid. De eerbiediging van het beginsel van onpartijdigheid is nochtans fundamenteel voor het goed functioneren van de publieke machten, net zoals het aan de dag leggen van de nodige omzichtigheid én terughoudendheid.

O.m. navolgende (feitelijke) elementen wijzen op een absoluut gebrek aan onpartijdigheid in hoofde van gedaagde.

(i)    Het lid zijn/worden van een parlementaire onderzoekscommissie die onderzoek voert naar een wetgeving waarbij gedaagde als lid van het Parlement zelf bij de stemming betrokken was. Meer zelfs, gedaagde was zelfs aanwezig in de Commissie voor de Financiën en de Begroting bij de bespreking van het amendement dat tot uitbreiding van het toepassingsgebied van artikel 216bis Wetboek Strafvordering, opgenomen in de wet van 14 april 2011.

(ii)   Het opnemen/verderzetten van het voorzitterschap van de parlementaire onderzoekscommissie "Kazachgate" die niet aan de noodzakelijke voorwaarden van onpartijdigheid voldoet.

Het opnemen door gedaagde van een lidmaatschap (en zelfs van het voorzitterschap) van een parlementaire commissie die de fundamentele beginselen van onpartijdigheid, objectiviteit, discretie en respect van eenieder niet eerbiedigt, wijst onmiskenbaar op een gebrek aan onpartijdigheid in hoofde van gedaagde, minstens bestaat er een schijn van partijdigheid (in hoofde van gedaagde).

(iii)  Het herhaaldelijk (publiekelijk) afleggen van belastende en voor eiser tergende verklaringen door gedaagde, zowel <u>voorafgaand</u> aan de oprichting van de Parlementaire onderzoekscommissie als na de oprichting van de Parlementaire onderzoekscommissie.

Voorafgaand aan de oprichting van de parlementaire onderzoekscommissie heeft gedaagde reeds veelvuldig en op affirmatieve wijze verklaringen afgelegd omtrent het nog door de Parlementaire onderzoekscommissie te voeren onderzoek. Deze verklaringen, waarvan hierna een aantal illustraties worden weergegeven en die op zich reeds zeer tergend en kwetsend zijn voor eiser, geven blijk van een ongerechtvaardigde en grenzeloze vooringenomenheid van gedaagde, die hem hinderen een objectief parlementair onderzoek te voeren met de nodige zin voor objectiviteit en terughoudend.

Bovendien illustreren de door gedaagde zelf afgelegde verklaringen (in het bijzonder het uitgebreid interview dat gedaagde aan "Le Soir" begin januari 2017 heeft toegestaan en het uitgebreid interview dat gedaagde aan het magazine Humo in april 2017 heeft toegestaan) dat gedaagde zich niet uitdrukt op een wijze die verwacht wordt van iemand die als voorzitter van een parlementaire onderzoekscommissie een voorbeeldfunctie vervult. Als (politiek) lid van S.PA, gaf gedaagde immers de voorkeur aan een partijpolitieke houding, de MR aanvallend. Dergelijke handelswijze is vanzelfsprekend zeer problematisch in hoofde van gedaagde en ondermijnt a priori op onbetwistbare wijze het vertrouwen dat de burger (waaronder eiser) in de werking van de parlementaire onderzoekscommissie en in het door deze commissie gevoerde onderzoek kan hebben.

Het interview van gedaagde dat werd gepubliceerd in Humo op 11 april 2017 ontneemt tegelijkertijd elke geloofwaardigheid aan gedaagde om als voorzitter te kunnen blijven functioneren en elk krediet aan de parlementaire onderzoekscommissie om een objectief en sereen parlementair onderzoek te voeren. In het betreffende artikel geeft gedaagde, die zelf de garantie zou moeten zijn voor een objectief en onpartijdig onderzoek, ronduit publiekelijk zijn eigen persoonlijke mening, waarbij hij op een partijdige en niet objectieve wijze terzelfdertijd zowel onderscheiden feitelijk en juridische fouten maakt, alsook (vertrouwelijke) informatie m.b.t. nog in de toekomst te houden commissiezittingen en af te nemen

verhoren, publiekelijk te grabbel gooit, hetgeen aan eiser onmiskenbaar schade berokkent. Evenmin deinst gedaagde er in het betreffende interview voor terug reeds affirmatieve conclusies te formuleren (o.m. m.b.t. de minnelijke schikking), daar waar het onderzoek in de Parlementaire onderzoekscommissie nog loopt. Het betreffende interview illustreert daarnaast evenzeer duidelijk de persoonlijke drijfveer van gedaagde, die haaks staat op hetgeen van een Voorzitter in de parlementaire onderzoekscommissie verwacht kan worden. Niet alleen de door gedaagde in het interview verstrekte antwoorden, ook de inschikkelijkheid van gedaagde om het betreffende interview toe te staan, zijn voor eiser ronduit schokkend en schade verwekkend. Uit het afgelegde interview blijkt dat het parlementair onderzoek geen onderzoek meer is naar de systeemgebonden dysfuncties (in casu eventuele dysfuncties in het naturalisatieproces en eventuele dysfuncties (mogelijkerwijze in de Kamer zelf) bij de totstandkoming van de wet van 14 april 2011) en de (politieke) verantwoordelijkheden dienaangaande, doch dat het hier onmiskenbaar eerder een onderzoek naar personen (waaronder eiser) betreft, waarbij de fundamentele grondrechten van deze personen worden geschonden.

(iv)     De continue relatie pers – parlementaire onderzoekscommissie (of leden van de parlementaire onderzoekscommissie) doet afbreuk aan de vereiste van onpartijdigheid in hoofde van gedaagde.

Het deelnemen en zelfs voorzitten van een Parlementaire Onderzoekscommissie (i) die zich op ongebreidelde wijze laat sturen door de pers en/of (ii) die zich door deze persinformatie laat leiden bij haar onderzoek en/of (iii) die onmiddellijk een beroep doet op gegevens die door de pers worden aangereikt en/of (iv) die op haar beurt zelfs gegevens lekt naar de pers, houdt ongetwijfeld een schending van in de noodzakelijke onpartijdigheid dat van een lid van de Parlementaire onderzoekscommissie (en zeker van haar Voorzitter) kan worden verwacht, minstens creëert het een schijn van partijdigheid.

(v)      Het niet optreden tegen leden van de Parlementaire onderzoekscommissie die wettelijke regels en reglementen schenden

Zoals hierna op pertinente wijze zal worden aangetoond, blijft gedaagde volkomen in gebreke om op te treden tegen leden van de Parlementaire onderzoekscommissie die wettelijke regels en reglementen schenden. Het niet optreden tegen deze leden van de Parlementaire onderzoekscommissie illustreert ééns te meer het gebrek aan eerbiediging van de regel van de onpartijdigheid, minstens wordt door de Voorzitter de schijn van partijdigheid gewekt.

A.2.     Het (publiekelijk) afleggen van zowel voor eiser tergende als foutieve verklaringen waarbij eiser door gedaagde volkomen in diskrediet wordt gebracht

In de afgelopen maanden heeft gedaagde op geregelde tijdstippen publiekelijk zowel voor eiser tergende als foutieve verklaringen afgelegd, waarbij eiser – zonder enige mogelijkheid op tegenspraak – publiekelijk werd gestigmatiseerd door gedaagde. Vermits gedaagde voorzitter is van de parlementaire onderzoekscommissie wordt aan de door hem (repetitief) afgelegde verklaringen en niet onderbouwde aantijgingen een niet te onderschatten weerklank en geloofwaardigheid gegeven, hetgeen het stigmatiserend karakter van de afgelegde verklaringen alleen maar vergroot.  Gedaagde voelt zich in het geheel niet geremd om publiekelijk foutieve informatie aangaande eiser uit te brengen. Evenmin voelt gedaagde zich geremd om tijdens de betreffende verklaringen de regels van de vertrouwelijkheid van de Parlementaire onderzoekscommissie te eerbiedigen. In de betreffende verklaringen doet gedaagde trouwens een voorafname op hetgeen door de Parlementaire commissie nog dient te worden onderzocht.

Gelet op het herhaald afleggen van dergelijke ongepaste verklaringen, is de handelswijze van gedaagde ronduit verwerpelijk en laakbaar.

Bij wijze van voorbeeld verwijst eiser naar navolgende feiten en verklaringen die de voorgaande foutieve

handelswijze van gedaagde onmiskenbaar illustreren (en waarbij eiser zich het recht voorbehoudt om in het verdere verloop van huidige procedure deze foutieve handelswijze verder te illustreren).

- Voorafgaand aan de oprichting van de Parlementaire Onderzoekscommissie heeft gedaagde op 16 november 2016 op zijn eigen website van de SP.A een artikel van de "website Apache" weergegeven, waarin gedaagde o.m. als volgt werd geciteerd : *"Dit dossier stinkt. Het wordt tijd dat het parlement zich hiermee gaat bezighouden"*. Ondanks zijn benoeming tot voorzitter van de Parlementaire Onderzoekscommissie, staat het betreffende artikel nog steeds op de betreffende website.

- Drie dagen voor de eerste vergadering van de Parlementaire Onderzoekscommissie, gaf gedaagde een lang interview aan de Krant Le Soir, gepubliceerd in de weekendkrant van 7/8 januari 2017. Tijdens dit interview heeft gedaagde, toekomstig voorzitter van de Parlementaire Onderzoekscommissie, zonder enig voorbehoud, gulzig gebruik gemaakt van het forum dat hem werd aangeboden. De titel van de eerste pagina was: *"On trouve le MR à toutes les étapes du Kazachgate"* (of vrij vertaald : men vindt de MR in elk stadium van Kazachgate").

- Daarenboven liet gedaagde niet na om tevens het (strafrechtelijk) onderzoek dat op dat ogenblik werd gevoerd naar vermeende invloed door een Belgisch politicus, openlijk en publiekelijk te bekritiseren, voorhoudende dat het onderzoek door een Onderzoeksrechter diende te worden gevoerd, en zich uitdrukkelijk de vraag stellende waarom de zaak niet aan een onderzoeksrechter werd overgedragen, zoals in Frankrijk het geval was.

- Gedaagde vond het eveneens nodig om (lopende het parlementair onderzoek) aan het magazine Humo een zeer uitgebreid interview te geven, dat werd gepubliceerd op 11 april 2017 (Humo, nr. 3997/15), alsook op de website van Humo werd weergegeven.

Zonder limitatief te kunnen zijn, bevat het betreffende interview verschillende lasterlijke, belastende en niet onderbouwde aantijgingen, die eiser zeer aanzienlijke schade berokkenen, zowel wat zijn persoonlijke goede naam en faam betreft als wat zijn zakelijke belangen betreft. De toon van dit artikel en het woordgebruik waren daarenboven uiterst negatief en zelfs agressief t.a.v. eiser. Eiser verwijst hierbij o.m. naar navolgende passages uit het interview (waarbij de tekst in vetjes ook in vetjes in de originele tekst voorkomt en waarbij de onderlijningen door eiser werden aangebracht):

*(...)*
*Economische tsaar*
*HUMO U noemt het netjes 'een wet op bestelling van het Elysée'. Je kunt het net zo goed een wet op bestelling van de Russische maffia noemen.*
*Van der Maelen «Aanwijzingen voor de directe betrokkenheid van de Russische maffia hebben we niet. Maar de afkoopheft wel mogelijk gemaakt dat het probleem van iemand die banden heeft met de Russische maffia op zeer welwillende wijze werd opgelost. In een achterafkamertje hebben Chodiev en zijn trawanten, in ruil voor een blanco strafblad, 500.000 euro per persoon betaald. Voor hen is dat peanuts.»*

*HUMO En die 18 miljoen euro die Chodiev ook heeft betaald?*
*Van der Maelen «Dat bedrag is een verbeurdverklaring, geen straf. Chodiev moest teruggeven wat hij zich wederrechtelijk had toegeëigend.*
*Een blanco strafblad was volgens alle experts van groot belang voor Chodiev. Anders moest hij zijn*

*miljardenbedrijven van de internationale beurzen halen. In de VS, Canada en Hongkong lachen ze niet met een veroordeling voor fiscale fraude. Het was dus een koopje.*
*»Chodievs advocaten hebben in eerste instantie geprobeerd hun cliënt naar de raadkamer te laten doorverwijzen met opschorting van straf (sic). Dat zou volstaan hebben om de beurzen het signaal te geven dat Chodievs gerechtelijke problemen voorbij waren. Maar de onderzoeksrechter (sic) heeft dat geweigerd, op 18 februari 2011. En nu wordt het interessant: op 20 februari 2011 gaan Armand De Decker en Catherine Degoul, als Belgische en Franse advocaat van Chodiev, thuis op bezoek bij minister van Justitie Stefaan De Clerck. Op 22 februari 2011 gaan ze naar het kabinet van De Clerck. Op 24 februari 2011 dient Servais Verherstraeten zijn wetsvoorstel in, dat op 2 maart 2011 als amendement wordt goedgekeurd in de commissie Financiën. U ziet: toen Chodiev dreigde veroordeeld te worden, hebben zijn raadgevers het geweer van schouder veranderd. Dankzij een nieuwe wet kon hij alsnog aan vervolging ontsnappen.»*

**HUMO Chodiev zou volgens onze informatie de onderzoeksrechter onder zware druk hebben gezet.**
*Van der Maelen «Een onderzoeksrechter heeft voor onze commissie verklaard dat Chodiev privédetectives had ingeschakeld. De bedoeling was bezwarende gegevens te verzamelen om hem te chanteren. De onderzoeksrechter heeft die informatie aan Staatsveiligheid doorgegeven, Staatsveiligheid heeft vastgesteld dat hij zich niét had vergist.»*

**HUMO Chodiev is geen eenvoudige jongen. Volgens Jean-François Etienne des Rosaies, de schimmige raadgever van Sarkozy die de Belgische lobby heeft opgezet, is hij een ex-KGB'er, kandidaat-president van Oezbekistan én een intimus van de Russische president Poetin.**
*Van der Maelen «Chodiev, een Oezbeek van geboorte, was indertijd het hoofd van de dienst Buitenlandse Investeringen en Buitenlandse Handel van de Sovjet-Unie. Hij zat op een sleutelpositie: gas en grondstoffen gingen door zijn handen.*
*»Uit het Franse gerechtelijk onderzoek weten we dat het Elysée Chodiev een uiterst belangrijk persoon noemde vanwege zijn invloed in alle voormalige Sovjetstaten. De Fransen wilden via Chodiev niet alleen helikopters en treinen verkopen in Kazachstan, ze hoopten ook met zijn steun een helikopterfabriek te kunnen bouwen in Rusland. De economische tsaar na de val van de Sovjet-Unie: dát is Chodiev.»*

**HUMO Waarom is hij in 1995 naar België gekomen?**
*Van der Maelen «Hij heeft om pragmatische redenen de Belgische nationaliteit aangevraagd. Met een Belgisch paspoort heb je zonder visum toegang tot 170 landen.»*

**HUMO Hij bouwde opmerkelijk snel een politiek netwerk uit in ons land.**
*Van der Maelen «Hij was de buur van Serge Kubla (MR), de burgemeester van Waterloo. En via Tractebel heeft hij kennisgemaakt met de top van de Belgische politiek. Tractebel hoopte dankzij hem een Kazachs bedrijf in handen te krijgen dat gas transporteerde vanuit Rusland naar Europa. En de elektriciteitscentrales in Kazachstan, Chodiev zou Tractebel en Petrofina gouden contracten met de Kazachse president Nazarbajev laten afsluiten. Het is helaas anders gelopen.»*

*(....)*

**HUMO Intussen was wel bekend dat Chodiev contacten met de Russische maffia onderhield. Maar Staatsveiligheid hield die informatie voor zich.**
*Van der Maelen (blaast) «Daar hangt een dikke mist over.»*

**HUMO Zijn er dan geen vijf negatieve rapporten van Staatsveiligheid over Chodiev?**
*Van der Maelen «Wat zijn naturalisatie betreft wel, ja.»*

**HUMO Wat stond daarin?**

*Van der Maelen «In die rapporten werd melding gemaakt van Chodievs nauwe contacten met de Russische maffia. Dat had moeten volstaan om zijn naturalisatie te weigeren. Maar in dat dossier zaten ook aanbevelingsbrieven van Tractebel om hem toch alstublieft maar de Belgische nationaliteit te geven. Chodiev is Belg geworden omdat Staatsveiligheid niet aan de alarmbel heeft getrokken.»*

*(...)*

*HUMO Wanneer zijn de gerechtelijke problemen met Tractebel begonnen?*
*Van der Maelen «Toen iemand, als gevolg van de interne spanningen bij Tractebel, aan het gerecht lekte dat 'het Kazachse trio' (Patokh Chodiev, **Alijan Ibragimov** en **Alexander Machkevitch**) 55 miljoen dollar commissiegeld had gekregen. Daarvan is 5 miljoen dollar gegaan naar de projectleider van Tractebel, een Griek. Wat er met de overige 50 miljoen is gebeurd, blijft een raadsel. Op dat geld is in elk geval geen belasting betaald, en daarom is Chodiev vervolgd en is er een schikking getroffen. Maar Chodiev had, zoals bekend, nog andere gerechtelijke problemen.»*

*HUMO : Vanaf volgende week gaat u na of die schikking er is gekomen door toedoen van het Elysée. Het wordt spannend : helikopters, valiezen vol geld – het lijkt Agusta wel :*
*Van de Maelen :"Het bevat genoeg stof voor een spannende tv-reeks, dat staat vast. Ik moet me terughoudend opstellen, maar **Guy Rapaille** van het Comité I, dat toeziet op de werking van de Staatsveiligheid, heeft in een uitermate interessant rapport toelichting gegeven bij de periode 2008-2012. We zullen er gebruik van maken als we binnenkort **Alain Winants**, het hoofd van Staatsveiligheid tot 2014, en zijn opvolger **Jaak Raes** ondervragen. Er is nieuws over de rol van Armand De Decker."*

Bovenvermelde door gedaagde afgelegde belastende en foutieve verklaringen – die trouwens het parlement onderzoek doorkruisen  - brengen onherstelbare schade toe aan de goede naam van eiser, in het bijzonder wat de navolgende lasterlijke aantijgingen betreft :
• Beweerde banden en nauwe contacten van eiser met de Russische maffia;
• Het beweerd onder druk zetten van een onderzoeksrechter door eiser;
• Het voorhouden dat de economische tsaar na de val van de Sovjet Unie eiser is;
• Het beweerd voorhouden dat eiser Belg is geworden omdat Staatsveiligheid niet aan de alarmbel heeft getrokken;
• Het beweerd voorhouden dat eiser op de gelden, ontvangen van Tractebel in elk geval geen belasting zou hebben betaald en dat daarom eiser werd vervolgd en er dienaangaande een minnelijke schikking werd gesloten.
• Het beweerd voorhouden dat eiser (buiten de zaak die minnelijk werd afgesloten) nog andere gerechtelijke problemen had.

De aantasting van de eer en de goede naam van iemand wordt onmiskenbaar in het gedrang gebracht wanneer fundamenteel betwistbare en betwiste gegevens door gedaagde (ook buiten de muren van de parlementaire onderzoekscommissie) worden vertolkt, zonder nuance en zonder enige mogelijkheid op tegenspraak, zich steunend op incorrecte en voorlopige beschouwingen die soms worden aangepast, maar vaak ook zeer onvoorzichtig en met een volkomen gebrek aan objectiviteit worden geformuleerd.
Bovenvermelde belastende, niet onderbouwde en zelfs foutieve verklaringen die door gedaagde buiten de muren van het Parlement werden afgelegd, kunnen in casu daarenboven niet anders gezien worden dat een idee fixe van gedaagde, waarbij gedaagde zich in het bijzonder – doch volkomen onterecht - focust op de persoon van eiser. Hoeft dit trouwens te verwonderen wanneer gedaagde n.a.v. het wetsvoorstel dd. 23 november 2016 tot oprichting van de parlementaire onderzoekscommissie reeds op affirmatieve wijze voorhield dat *"maffiose figuren zoals de Heer Chodiev, in staat (bleken) om regerings- en parlementsleden te beïnvloeden tot het nemen van wetgevende initiatieven"* en dat *"zijn invloed mogelijks zelfs tot bij de magistratuur strekt"* (Parl. St. Doc 54 2179/03, p. 7, eigen onderlijning)

A.3.    de manifest foutieve handelswijze van gedaagde in zijn hoedanigheid van voorzitter van de

<u>Parlementaire Onderzoekscommissie</u>

Gedaagde is voorzitter van de betreffende Parlementaire Onderzoekscommissie.

Artikel 6 van de wet van 3 mei 1880 vertrouwt de voorzitter van de parlementaire onderzoekscommissie de taak toe om de orde in de vergadering te handhaven. Hoewel de commissie in beginsel niet berecht, heeft de voorzitter *"dezelfde bevoegdheden als de voorzitter van de hoven en rechtbanken"*.

In deze hoedanigheid van voorzitter schiet gedaagde onmiskenbaar te kort in de hem opgedragen taak als Voorzitter van de parlementaire onderzoekscommissie :

- Gedaagde laat na om de leden van de commissie te wijzen op hun plicht tot onpartijdigheid. Gedaagde schiet zelfs persoonlijk schromelijk tekort in zijn plicht tot onpartijdigheid;

- Gedaagde slaagt er niet om, op het niveau van de parlementaire onderzoekscommissie, het recht op privé-leven van eiser, het vermoeden van onschuld en het recht op een eerlijk proces in hoofde van eiser te doen eerbiedigen. Gedaagde slaagt er evenmin in erover te waken dat de Parlementaire Onderzoekscommissie de op haar rustende verplichting nakomt om de door het Europees Verdrag van de Rechten beschermde rechten van één van haar burgers te doen eerbiedigen. Door het schenden van de vertrouwelijkheid en het lekken van (vertrouwelijke) informatie naar de pers door (leden van) de Parlementaire Onderzoekscommissie wordt in casu immers onmiskenbaar een inbreuk gepleegd op artikel 8 van het EVRM (dat het recht op eerbiediging van privé-, familie- en gezinsleven omvat), alsook op artikel 6 van het EVRM (dat het "recht op een eerlijk proces" bevat). Gedaagde slaagt er niet alleen in deze inbreuken door de (leden van de) Parlementaire Onderzoekscommissie) te voorkomen, hij werkt daarentegen mee aan de betreffende inbreuken.


- Gedaagde laat na om op passende en adequate wijze op te treden tegen de leden van de Parlementaire Onderzoekscommissie die de wet en/of het intern reglement van de Kamer schenden. Gedaagde blijft  o.m. volkomen in gebreke op te treden wanneer leden van de parlementaire onderzoekscommissie (vertrouwelijke en/of door het beroepsgeheim beschermde) informatie (al dan niet vernomen in gesloten zitting) lekken naar de pers, dan wel dergelijke informatie kenbaar maken in openbare zitting, dan wel geclassificeerde informatie voorlezen tijdens een openbare hoorzitting.

  Er kan niks anders dan vastgesteld worden dat, ondanks onmiskenbaar schendingen van de geheimhouding door leden van de parlementaire onderzoekscommissie, gedaagde, als voorzitter van de parlementaire onderzoekscommissie, geen enkel démarche heeft ondernomen om hier op te reageren. Dergelijke handelswijze van gedaagde is ongetwijfeld foutief en draagt er toe bij dat gegevens, die onmiskenbaar vertrouwelijk zijn, toch naar buiten worden gebracht waarna deze vervolgens gretig door de media worden opgepikt.

  Het gebrek aan enige reactie en/of krachtdadig optreden door gedaagde wordt in casu des te meer schrijnend, nu één van de raadsleden van de eiser bij schrijven van 8 februari 2017 reeds uitdrukkelijk zijn bezorgdheden aan de parlementaire onderzoekscommissie omtrent haar werkwijze heeft overgemaakt.

- Gedaagde blijft volkomen in gebreke ervoor te zorgen dat de activiteiten van de Parlementaire Onderzoekscommissie zich beperken tot de opdracht die aan de Parlementaire Onderzoekscommissie werd toevertrouwd.

Het is onmiskenbaar de taak van de voorzitter van de parlementaire onderzoekscommissie om te waken dat het door de parlementaire onderzoekscommissie gevoerde onderzoek binnen de krijtlijnen blijft van haar opdracht, zowel naar de aard van het toevertrouwde onderzoek, als naar het voorwerp van het toevertrouwde onderzoek.

Wat het voorwerp van het toevertrouwde onderzoek betreft, heeft eiser o.m. vastgesteld dat – in strijd met de opdracht om na te gaan op welke wijze de Heer Patokh Chodiev en de Heer Alijan Ibragimov hebben verworven – blijkt dat in de zittingen van de Parlementaire onderzoekscommissie (waaromtrent in de pers werd bericht) o.m. ook nader werd ingegaan op de wijze waarop familieleden van de heer Patokh Chodiev de Belgische nationaliteit hebben verworven/trachten te verwerven.

Wat de aard van het toevertrouwde onderzoek betreft, werd er n.a.v. de oprichting van de parlementaire onderzoekscommissie op gewezen dat "*de parlementaire onderzoekscommissie niet tot doel (heeft) iemand te berechten* » en dat « *zelfs indien alles vertrekt met de onthulling die betrekking heeft op een parlementair en een eminente persoon in de Belgische politiek, het gaat er om de besluitvormingsprocessen bij de drie machten bloot te leggen  in zaak zoals deze*". Het kan niet ernstig in vraag gesteld worden dat huidige Parlementaire Onderzoekscommissie daarentegen wel degelijk gericht is tegen een aantal personen (waaronder eiser). Dit blijkt onmiskenbaar uit de hoorzittingen (waaromtrent de pers vervolgens uitvoerig bericht met een vaak stigmatiserend karakter voor eiser) en de activiteiten van de parlementaire onderzoekscommissie.

De voorzitter slaagt er daarenboven niet in de parlementaire onderzoekscommissie haar rol te laten spelen die haar toebedeeld is. Integendeel, door de parlementaire onderzoekscommissie toe te laten zich te ontpoppen tot rechter, zonder de regels van onpartijdigheid te eerbiedigen of zelfs de schijn van partijdigheid te vermijden, laat hij de parlementaire onderzoekscommissie concurreren met justitie. Door toe te laten dat – in weerwil van het vermoeden van onschuld – de werkzaamheden van de Parlementaire onderzoekscommissie zich niet beperken tot het vaststellen van de politieke verantwoordelijkheid, maar daarentegen de commentaren en de aantijgingen tegen eiser op te stapelen en de vrije loop te laten, werden de fundamentele rechten van de heer Patokh Chodiev onmiskenbaar geschaad (zie Droit à un procès équitable au sens de la jurisprudence strasbourgeoise en 2016, Franklin Kuty, JLMB, 10 mars 2017);

A.4.   Besluit

A.4.1.   Manifest foutieve handelswijze van gedaagde

De voorafgaande feitelijke elementen (opgenomen onder III.A.1 t.e.m. III.A.3), alsook de hierna volgende feitelijke elementen (opgenomen onder III.A.4.2. en III.A.4.3. en die dateren van na de diverse pogingen die eiser heeft ondernomen om de parlementaire onderzoekscommissie de wettelijke bepalingen te doen respecteren) tonen onmiskenbaar aan dat gedaagde manifest foutief handelt (en blijft handelen) en volkomen te kort schiet in de hem opgedragen taak. De fout bestaat o.m. in het onvermogen van gedaagde om er zorg voor te dragen dat de parlementaire onderzoekscommissie handelt met de nodige omzichtigheid, voorzichtigheid en objectiviteit, zodat niet de indruk wordt gewekt dat eiser verantwoordelijk wordt gehouden, of als zondebok wordt aangeduid, van praktijken die eerder toe te rekenen zijn aan personen uit de politieke en/of justitiële wereld. In ieder geval wekt de manifest foutieve handelswijze van gedaagde de indruk dat de parlementaire onderzoekscommissie eerder voor andere doeleinden wordt gebruikt dan het opsporen van politieke

verantwoordelijkheden en gouvernementele dysfuncties, m.n. voor het beschadigen van de goede naam van eiser en het in diskrediet brengen van eiser op een volstrekt ontoelaatbare en onwettige wijze(zie o.m. de aangehaalde publieke lasterlijke verklaringen, de georkestreerde lekken vanuit de parlementaire onderzoekscommissie naar de pers, de publieke speculaties door gedaagde, de manifeste vooringenomenheid in hoofde van gedaagde, …).

Bovenvermelde tekortkomingen, elk individueel genomen en zeker in hun geheel genomen, zijn zeer ernstig en maken onmiskenbaar een fout uit in de zin van artikel 1382 Burgerlijk Wetboek in hoofde van gedaagde.

Van een parlementslid mag immers worden verwacht dat hij zelf de wet (met inbegrip van de fundamentele grondrechten zoals vervat in het E.V.R.M.) en het intern reglement kent, dat hij zelf de grondrechten (waaronder het recht op privacy van eiser) eerbiedigt en zorgt voor de naleving ervan. Of zelfs ruimer gesteld, dat hij de naleving van de wet in de meest ruime zin) niet ondergeschikt maakt aan zijn persoonlijk politiek belang, waarbij het forum van de Parlementaire Onderzoekscommissie wordt aangewend om zich (politiek) te profileren en (politiek) te kunnen scoren.

Daarnaast kan van gedaagde, in zijn rol van voorzitter van de parlementaire onderzoekscommissie, eveneens verwacht worden dat hij adequaat en doeltreffend optreedt als hij vaststelt dat leden van de Parlementaire Onderzoekscommissie op systematische wijze de grondwet, het internationaal recht (waaronder de fundamentele rechten en vrijheden), wetten en/of reglementen overtreden. In casu is gedaagde dienaangaande evenwel schromelijk tekort geschoten.

Gedaagde is er evenmin in geslaagd er zorg voor te dragen dat zowel voor de oprichting van de Commissie, als tijdens de werking van de Parlementaire onderzoekscommissie het vermoeden van onschuld van eiser niet werd aangetast, vermits minstens toegelaten werd dat gebruik werd gemaakt van bepaalde stigmatiseerde kwalificaties en beschuldigingen en insinuaties t.a.v. eiser werden geformuleerd die onverenigbaar zijn met zijn fundamentele rechten.

Volledigheidshalve merkt eiser nu reeds op dat de bovenvermelde aangehaalde feiten en tekortkomingen louter illustratief zijn voor de manifest foutieve handelswijze van gedaagde en geenszins als limitatief aanzien kunnen worden. Eiser behoudt zich het recht voor om in het verdere verloop van het geding bijkomende (feitelijke) voorbeelden van deze manifest foutieve handelswijze en tekortkomingen in hoofde van gedaagde bij te brengen.

De begane fouten brengen de aansprakelijkheid van gedaagde ongetwijfeld in het gedrang, vermits gedaagde niet gehandeld heeft zoals van een normaal voorzichtig handelend persoon in dezelfde omstandigheden kon worden verwacht.

A.4.2.  De houding van gedaagde

Algemeen dient te worden gesteld dat de houding van gedaagde manifest foutief is en ten zeerste in vraag dient te worden gesteld, hetgeen eiser er toe gebracht heeft gedaagde voor de Rechtbank te dagvaarden.

De gedaagde heeft nagelaten om op enige (adequate) wijze gevolg te geven aan de onderscheiden verwittigingen en waarschuwingen die namens eiser werden geformuleerd :

- de open brief namens eiser, gepubliceerd in Le Soir en De Standaard van 1 februari 2017 en waaromtrent ruim werd bericht;
- Een schrijven dd. 8 februari 2017, gericht aan gedaagde, in zijn hoedanigheid van voorzitter van de parlementaire onderzoekscommissie, er toe strekkende de voorzitter

op een onderbouwde en gefundeerde wijze uit te nodigen de wetgeving te willen eerbiedigen;

- De dagvaarding dd. 18 april 2017, waarbij de Belgische Staat in aansprakelijkheid werd gedagvaard wegens het gebrekkig functioneren van de parlementaire onderzoekscommissie

Eiser heeft derhalve op zeer behoedzame en omzichtige wijze geageerd. Zijn enige voornemen hierbij was dat de parlementaire commissie haar werkzaamheden zou verderzetten, met eerbiediging van de wettelijke bepalingen, zonder hierbij de parlementaire commissie te willen beperken in de noodzakelijke rol de waarheid trachten te achterhalen. Evenwel laat dit voornemen van eiser de parlementaire commissie, noch haar voorzitter toe (die het blijkbaar niet schijnen te begrijpen) om eiser in een kwaad daglicht te stellen, zowel vóór als na de besprekingen in de parlementaire onderzoekscommissie.

Gedaagde verliest uit het oog dat de parlementaire commissie haar werkzaamheden dient te beperken tot het vaststellen van de politieke verantwoordelijkheden en gouvernementele dysfuncties. De wet, noch de rechtspraak laten hierbij toe dat beschuldigingen t.a.v. eiser werden/worden geformuleerd (EHRM, Rywin tegen Polen, 18 februari 2016).

Eenvoudig gesteld, het zoeken naar de waarheid en de zorg voor transparantie zijn enkel geloofwaardig, wanneer deze gepaard gaan met de nodige omzichtigheid.

A.4.3.   <u>Een aantal concrete voorbeelden van de houding van gedaagde nà de dagvaarding van de Belgische Staat dd. 18 april 2017</u>

Navolgende voorbeelden illustreren dat gedaagde, ook na 18 april 2017, zich manifest foutief blijft gedragen :

- Gedaagde vond het op 18 april 2017 onmiddellijk noodzakelijk de tegen de Belgische Staat uitgebrachte dagvaarding te becommentariëren. Publiekelijk liet hij weten in de dagvaarding een poging tot destabilisering en intimidatie van de parlementaire onderzoekscommissie door eiser te zien. Eens te meer gaat gedaagde voorbij aan de realiteit : in plaats van te aanvaarden dat de parlementaire onderzoekscommissie niet behoorlijk functioneert (of dit minstens op een objectieve wijze te willen onderzoeken), gaat gedaagde aan het initiatief van eiser om een procedure op te starten, een volstrekt onaanvaardbare interpretatie en draagwijdte geven.
- Bij de aanvang van een geanimeerde commissievergadering dd. 19 april 2017 was gedaagde het voorwerp van diverse kritieken van de overige commissieleden, waarbij aan gedaagde zijn contacten met de pers werden verweten. De parlementaire onderzoekscommissie stond op deze vergadering trouwens op het punt om uiteen te spatten.
- In antwoord op de vraag van het tijdschrift HUMO wat de reactie van gedaagde op de betreffende dagvaarding van de Belgische Staat was, liet hij op 25 april 2017 weten dat hij de dagvaarding zag als een aanbeveling om nog dieper te graven. Hij voegde eraan toe dat dat de parlementaire onderzoekscommissie een politieke organisatie is die niet onderworpen is aan de gerechtelijke regels. Het radicale karakter van dergelijk antwoord is zonder twijfel de diepere oorzaak en tegelijkertijd een onmiskenbare illustratie van het falen van de commissie t.a.v. eiser en van haar volkomen gebrek of onpartijdigheid.
- Gedaagde herhaalde deze zienswijze op 28 april 2017, o.m. in La Libre Belgique.
- Eens te meer gaf gedaagde in een interview op 11 mei 2017 uiting van zijn absolute minachting t.a.v. eiser, voorhoudende – volstrekt ten onrechte evenwel – dat eiser zich nog in het jaar 1989 bevond en "achter het ijzeren gordijn", daar waar België (volgens gedaagde) een parlementaire democratie is. Dergelijke uitlating van gedaagde is op zichzelf evenwel

onverzoenbaar met de regels van een democratisch systeem, waarin o.m. het luisteren naar anderen en het respect voor anderen centraal staan.

- Meer zelfs, in hetzelfde interview bij RTBF dd. 11 mei 2017 (19.30) gaf gedaagde aan dat de 17 commissieleden allen op één dezelfde lijn stonden. Dit staat evenwel vanzelfsprekend volledig haaks op het 19 april 2017 bestaande risico op het volledig imploderen van de commissie, op de op 23 april 2017 gevoerde betwisting tussen twee commissieleden tijdens het RTL programma "C'est pas tous les jours dimanches" (vrij vertaald : "het is niet elke dag zondag"), enz.

- Tijdens de zitting van de parlementaire onderzoekscommissie dd. 17 mei 2017 werd gedaagde door één van de experten van de parlementaire onderzoekscommissie tot de orde geroepen vermits hij t.a.v. een opgeroepen getuige (de Heer Verherstraeten) maar tendentieuze vragen bleef stellen, alsook voor de wijze waarop hij zich in de parlementaire onderzoekscommissie uitliet.

A.4.4. <u>Geen parlementaire immuniteit</u>

Eiser merkt hierbij op dat de bepaling van artikel 58 van de grondwet voor hem geen onbekende is en dat hij bij huidige dagvaarding hieraan geenszins voorbij gaat. Om deze parlementaire immuniteit beter te begrijpen, verwijst eiser o.m. naar de website van de Kamer (www.dekamer.be), waarbij wordt aangegeven dat de verklaringen die door de voorzitter van een parlementaire commissie worden afgelegd, enkel van de betreffende immuniteit genieten voor zover het woord door hem uit naam van de parlementaire commissie wordt gevoerd.

Dit is in de voorliggend geval geenszins het geval, gelet op de onophoudelijke en frequente verklaringen vanwege gedaagde in de pers. Ter illustratie hiervan kan verwezen worden naar de hierboven reeds aangehaalde interviews van gedaagde in Le Soir van 7/8 januari 2017 (zelfs voorafgaand aan de werkzaamheden van de commissie) en in Humo dd. 11 april 2017.

Of deze verklaringen afgelegd werden in de wandelgangen van het Parlement, op televisie of gedurende een interview, al dan niet op zijn eigen initiatief, dan wel hierom gevraagd, houdt (in het licht van artikel 58 van de grondwet) geen enkel verschil in. Evenmin relevant is het feit dat de commissie een "politieke organisatie" zou zijn (zoals gedaagde ten onrechte voorhoudt). Artikel 58 van de Grondwet biedt immers geen enkele immuniteit aan de auteur van afgelegde verklaringen in de gevallen waar er sprake is van indiscreties door de auteur, van een gebrek aan terughoudendheid in zijn hoofde en/of van verklaringen die het recht op privacy aantasten.

B.   <u>De aan eiser berokkende schade</u>

De begane fouten hebben bovendien geleid tot een aanzienlijke schade in hoofde van eiser, die ondernemer is in talrijke sectoren : aan zijn imago en zijn reputatie, en zijn mogelijkheid om te werken. Uit de persaandacht en de reacties in de pers opgenomen, is reeds gebleken dat eiser schade heeft geleden. Deze schade is veroorzaakt door het foutief handelen van gedaagde.

Deze geleden schade is zeker en direct.

Hieraan wordt het risico op toekomstige schade met betrekking tot eiser toegevoegd, in de mate dat de gedaagde er niet in slaagt de hem verweten fouten in de toekomst te remediëren en er niet in slaagt de Parlementaire onderzoekscommissie de grondwet, de fundamentele rechten zoals vervat in de internationale verdragen, de wet en de reglementen te doen naleven.

De schade die eiser lijdt, bestaat enerzijds uit de zeer aanzienlijke (financiële en economische) schade die aan eiser werd aangebracht ("materiële schade") en anderzijds uit de publieke verachting waaraan eiser (en zijn

naasten) wordt (worden) blootgesteld ("immateriële schade"). Gelet op de omvang van zijn zakelijke activiteiten, kan de impact van de foutieve handelswijze van gedaagde niet worden onderschat en is de door eiser geleden schade zeer aanzienlijk.

Als herstel van de door hem geleden schade, vordert eiser dan ook

- €  1 provisioneel aan materiële schade, verder te begroten tijdens de procedure
- €  1 provisioneel aan morele schade,
- de publicatie van het tussen te komen vonnis  in het Belgisch Staatsblad, evenals in diverse kranten, magazines, tijdschriften en op websites, die in het verleden reeds artikels inzake Kazachgate hebben gepubliceerd, zoals deze nader gepreciseerd worden in het dispositief van huidige dagvaarding

Er is evident een oorzakelijk verband tussen de fout en de geleden schade.

*

De eigenheid van huidig geschil (met inbegrip van de complexiteit en het belang van de zaak), alsmede de betrokken partijen en de omstandigheden, verantwoorden dat huidige zaak door de Voorzitter van de Rechtbank toevertrouwd zou worden aan een Kamer, zetelend met 3 rechters (artikel 92 §1/1 Gerechtelijk Wetboek).

*                               *                               *

ZO IS HET DAT

Ik ondergetekende Bart DE MEYER, plvv. Gerechtsdeurwaarder van Leo BERGE, gerechtsdeurwaarder te Geraardsbergen, Herenveld 2,

Dagvaarding heb gegeven aan

Van der Maelen Dirk, wonende te 9500 GERAARDSBERGEN/Smeerebbe-Vloerzegem, Smeerebbestraat 10A

waar ik het afschrift
kon ter hand stellen overeenkomstig de artikelen 33 tot 35 van het gerechtelijk wetboek;

zodat ik het afschrift waarvoor niet werd getekend voor ontvangst
heb achtergelaten onder gesloten omslag, overeenkomstig artikel 38 par 1 van hetzelfde wetboek;

**OM TE VERSCHIJNEN VOOR DE RECHTBANK VAN EERSTE AANLEG OOST-VLAANDEREN, AFDELING OUDENAARDE, O EERSTE KAMER ZETELEND IN BURGERLIJKE ZAKEN, IN HAAR GEWONE GEHOORZAAL OP HET GERECHTSHOF, BOURGONDIESTRAAT TE OUDENAARDE,
OP DINSDAG 13 JUNI AANSTAANDE, OM NEGEN UUR IN DE VOORMIDDAG.**

Teneinde

De vordering van eisers ontvankelijk en gegrond te horen verklaren;

Dienvervolgens gedaagde te horen veroordelen om te betalen aan eiser de som van € 1 provisioneel uit hoofde van zowel materiële als morele schade, meer vergoedende en gerechtelijke intresten, verder te preciseren in de loop van het geding;

De publicatie van het tussen te komen vonnis te bevelen  in
- De Standaard;
- De Tijd;
- De Morgen;
- Gazet van Antwerpen;
- Het Laatste nieuws;
- Knack;
- Humo;
- La Libre Belgique;
- La Dernière Heure,;
- Le Soir;
- Le Vif  L'express
- L'Echo;
- Nord Eclair – La nouvelle gazette;
- L'Avenir

En dit zowel in hun papieren versie, als op hun website ;

Gedaagde te horen veroordelen tot de kosten van het geding, geïndexeerde rechtsplegingsvergoeding begroot op € 1.440 inbegrepen;

Het vonnis uitvoerbaar te verklaren bij voorraad, niettegenstaande elk verhaal en zonder borgstellig of kantonnement;

Onder alle voorbehoud en zonder enige nadelige erkenning;

**WAARVAN AKTE**, en kopij gelaten overeenkomstig de bepalingen van het gerechtelijk wetboek, zo nodig onder gesloten omslag;

Kosten :vierhonderdenelf euro vierentachtig cent,
eventueel te vermeerderen met port;
Registratierechten-toepassing van art. 8bis Wb.Reg. – Registratierechten : 50,00 €

de gerechtsdeurwaarder,

