UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>APPLICATION OF PATOKH CHODIEV AND<br>INTERNATIONAL MINERAL RESOURCES, B.V.<br>FOR AN ORDER TO TAKE DISCOVERY<br>PURSUANT TO 28 U.S.C. § 1782,<br><br>                       Applicants. | 1:18-MC-00013 (EGS)<br><br>**FILED UNDER SEAL** |

**MR. AKHMETSHIN'S REPLY BRIEF IN FURTHER SUPPORT
OF HIS MOTION TO QUASH APPLICANTS' § 1782 SUBPOENA**

Respondent Rinat Akhmetshin submits this reply brief in further support of his motion to quash the subpoena dated February 6, 2018 ("2018 Subpoena") filed concurrently with the *ex parte* 28 U.S.C. § 1782 Application submitted by Applicants. Applicants' Opposition Brief dated May 29, 2018 does nothing to refute the fact that the 2018 Application itself is a replay of the 2014 Application filed by Applicant International Mineral Resources ("IMR"), which is barred by the Mutual Release.[1] Indeed, the 2018 Subpoena is little more than a mirror image of the 2014 Subpoena.

        To avoid that inconvenient truth, Applicants resort to an end-run analysis that ignores the four corners of the Application itself, and even attempts to disregard the explicit terms of the 2018 Subpoena. Rather, Applicants would have this Court ignore the insufficient bases provided in their *ex parte* Application and Subpoena, in order to assess tertiary issues such as subpoena-redefining and limiting emails between counsel and what Applicants now claim to

---

[1]   Unless otherwise indicated, capitalized terms in this brief are defined in the same manner as set forth in Mr. Akhmetshin's original Memorandum In Support of His Motion to Quash dated May 7, 2018 ("May 7 Memo at __") (Dkt. 6).

be a satisfactory response to the admittedly overbroad 2018 Subpoena.  But Applicants -- especially these Applicants -- should not be allowed to engage in such a blatant "bait and switch" in which their § 1782-qualifying documents are totally disconnected from the discovery they now seek.  Nor should their post-Subpoena rationalizations be allowed to distract from the fact that the Application and Subpoena submitted in this Proceeding, by their very terms, are: (i) directly linked to the 2014 Application, (ii) supported by *identical* Declarations, and (iii) barred by the Mutual Release that was an integral part of the 2016 settlement.  Such abuse of the § 1782 process should not be countenanced.

This motion is relatively easy.  All this Court needs to know to grant the motion to quash is that (1) the Mutual Release bars claims "in any way related " to the 2014 Actions and (2) Applicants' admission that "[t]o be sure, the Application does include a discussion of the hacking and smear campaign allegations in the Prior Actions."  (Opp. at 7).  Nothing more is required to grant Mr. Akhmetshin's motion.

## ARGUMENT

## POINT I

**THE LEGAL STANDARD THIS COURT MUST APPLY NECESSARILY FOCUSES ON THE § 1782 APPLICATION AND SUBPOENA THEMSELVES RATHER THAN ON COUNSEL'S *POST HOC* RATIONALIZATIONS.**

The first step in any § 1782 analysis starts with the statute itself.  *Intel Corporation v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 255 (2004) ("As in all statutory construction cases, we begin our examination of § 1782 with the language of the statute.").  The statute provides a three-part test as to whether the § 1782 *application* should be granted.  The *application* should be granted only if (1) the application demonstrates that the person from whom discovery is sought resides in the District in which the application is made; (2) the application

2

reveals that the discovery requested is for use in a foreign proceeding; and (3) the application carries the burden of proving that applicants are "interested persons." 28 U.S.C. § 1782. And as Justice Ginsburg's *Intel* opinion repeatedly emphasizes, "a district court is not required to grant a § 1782(a) discovery application simply because it has the power to do so." *Intel,* 542 U.S. at 264. The initial judicial enquiry therefore must focus on the justifications that Applicants set forth in their Application.

Because § 1782 ultimately concerns the nuts and bolts of discovery, the scope of the subpoena constitutes the second level of analysis after the Court has evaluated the four corners off the application. Indeed, analysis of the documents and testimony requested in the subpoena may even be necessary to assessing whether the "discovery requested" is for use in a foreign proceeding. The evaluation of the "discovery requested" necessarily hinges on the terms of the subpoena. *See Purolite Corp. v. Hitachi Am., Ltd.,* 17 Misc. 67, 2017 WL 1906905, 2017 U.S. Dist. LEXIS 71077, *9-12 (S.D.N.Y. May 9, 2017) (evaluating terms and scope of subpoena after determining application itself satisfied statutory requirements); *In re O2CNI Co.,* No. C 13-80125 CRB, 2013 WL 5826730, 2013 U.S. Dist. LEXIS 155138, *33 (N.D.Cal. Oct. 29, 2013) ("O2CNI has not shown how its broad requests would aid the Korean authorities, and their extraordinary scopes makes it appear so out of proportion to their utility in the criminal case that it gives the Court considerable pause as to O2CNI's motives.").

Only after first analyzing the application itself, and then evaluating the scope of the subpoena, does the court properly reach evaluation of the negotiations between counsel seeking to limit or define the proper scope of discovery. But one does not even get that far in the analytical methodology if the first two steps of the enquiry -- here, the Application and the 2018

3

Subpoena -- do not satisfy the statutory requirements of § 1782 and the discretionary *Intel* factors.

And that is precisely the dispositive infirmity in this case. Neither Applicants' Application nor their Subpoena satisfies the statute or *Intel*. Nor can Applicants argue with a straight face that based on an analysis of the Application and the Subpoena themselves -- the very documents the legal standard prioritizes and that bought them an *ex parte* ticket to the dance -- that this proceeding should not be barred by the Mutual Release. Once inside the dance hall, however, Mr. Chodiev and IMR perform their bait and switch, and now argue they have reduced the scope of discovery to acceptable limits -- even though there is virtually no nexus between the discovery now sought and the original Application and Subpoena. But this Court must focus its analysis -- as the Supreme Court mandated in *Intel* -- first on the Application and then on the 2018 Subpoena, not on counsel's *post hoc* rationalizations.

### POINT II

### THE RELEASE AND COVENANT BAR DISCOVERY BECAUSE THE MATTERS AT ISSUE RELATE TO THE RELEASED CLAIMS.

Application of the above legal standard to the facts of this case demonstrate that now that the Court is aware of the larger context in which this proceeding is set, it should withdraw its February 2 Order granting the Application as improvidently granted and quash the 2018 Subpoena. As outlined in Point I, the legal standard this Court should apply should focus on the Application and 2018 Subpoena, not counsel's *post hoc* efforts to justify or limit the discovery they now seek.

The 2014 Application was premised on the allegation of a "smear campaign" allegedly based on Mr. Akhmetshin's so-called "hacking and dissemination of confidential IMR documents." (2014 Application at 2). The 2018 *ex parte* Application also seeks discovery based

4

on an alleged smear campaign and allegations that Mr. Akhmetshin was involved in hacking IMR's computers.  (2018 App. at 2).  Applicants even admit as much: "To be sure, the Application does include a discussion of the hacking and smear allegations in the Prior Actions." (Opp. Br. at 7).  Moreover, the 2018 Subpoena is the mirror image of the 2015 Subpoena, both premised on "a single document request."  The latter sought "all documents and communications concerning IMR," which by definition included Mr. Chodiev.  The 2018 Subpoena demands "All Documents and Communications concerning Patokh Chodiev and his Business Interests, including but not limited to IMR."  Thus, the first two analytical steps of a proper § 1782 analysis reveals that the 2014 Application and the 2018 *ex parte* Application on their face are based on common claims and common facts, and are barred by the Mutual Release to which Applicants agreed a mere two years ago.

The fact that once the Applicants had secured the February 2 Order and were confronted with Mr. Akhmetshin's Preliminary Objections and the Mutual Release defenses they were willing to limit and redefine the Subpoena illustrates that the original bases for the 2018 Application and Subpoena were mere contrivances intended to dupe the Court.  The fact that Applicants now seek documents relating to Joseph Szlavik, Bulat Utemuratov, and Kazakhgate 2.0 rather than the universe of documents requested in the 2018 Subpoena evidence that the 2018 Application and Subpoena were mere pretexts intended to serve Mr. Chodiev's ulterior purposes.  Mr. Utemuratov's name, for example, does not appear in the 2018 Application or Subpoena, and his relation to this matter, if any, is unknown.  (*See generally* 2018 App.)  Federal courts do not hesitate to deny discovery when the subpoena in question is disconnected from the justifications presented to the court.  *See, e.g., In re China Petrochemical Dev. Corp.,* No. 3:17-cv-02138, 2018 U.S. LEXIS 42258, *13-14 (D. Conn. March 14, 2018) (quashing subpoena where

documents sought were unrelated to justifications in the application); *Lazaridis v Int'l Ctr. For Missing & Exploited Children, Inc.,* 760 F. Supp.2d 109, 115 (D.D.C. 2011) (Collyer, J.) ("This wide-ranging request suggests that Mr. Lazaridis is seeking information more for his general use than for use [in the underlying proceedings.]").

Beyond their bait and switch and focus on attorney negotiations rather than the pleadings, the next fundamental flaw in Applicants' argument that the Mutual Release and Covenant Not To Sue does not apply is that they misconstrue the "relating to" standard. Applicants claim that the Release applies only to claims that are "related to matters that are the subject of the Actions," (Opp. at 4). But the Release actually bars claims that are "in any way related to matters that are the subject of the Actions" (Mot. to Quash Ex. 2 at ¶ 3). There are numerous ways in which the 2018 Application relates to the 2014 Actions and is thus barred. (*See* May 7 Memo at 10-11, 15-17). Applicants' effort to cherry-pick their own legal history and mischaracterize the relevant record cannot alter this fundamental fact. Indeed, they seem to so admit. (Opp. at 7).

In his May 7, 2018 motion to quash, Mr. Akhmetshin explained how Applicants' allegations fail to satisfy the "for use" element of the *Intel* test. (*See* May 7 Memo at 23-27). In fact, the 2014 hacking allegations are essential to Applicants' case that the requested documents are "for use" in the Belgian Proceedings. Without the 2014 allegations, Applicants' case for obtaining discovery from Mr. Akhmetshin amounts to little more than allegations that he is (1) a "long-time friend and colleague of Mr. Szlavik", and (2) "actively attempting to sell material that Mr. Akhmetshin [allegedly] states was hacked from IMR's computer servers." (*See* 2018 App. at 9). The 2014 Application at least attempted to link Mr. Akhmetshin to contemporaneous allegations of hacking to help explain why he allegedly had documents relating to IMR. In

contrast, in this 2018 Proceeding Applicants offer no declaration describing an investigation into recent instances of hacking. On the contrary, Applicants offer testimony intended to link the "hacked" information supposedly being used to harm Mr. Chodiev in Belgium to the materials allegedly hacked by Mr. Akhmetshin in 2014: "IMR's investigators further discovered that the materials obtained by Mr. Akhmetshin through the *previous hacking* of IMR's systems contained certain files that relate to the Tractebel and other legal issues in Europe related to Kazakhstan." (2018 App. at 9) (emphasis added). Thus, the 2014 Application provided critical support for Applicants 2018 case that discovery is "for use" in the foreign proceedings.

Applicants incorporated the allegations against Mr. Akhmetshin -- including even submitting the original Declarations -- that they filed in the 2014 Actions into the 2018 Application to meet the requirements for obtaining discovery under § 1782. Having so relied upon matters raised in the 2014 Actions, Applicants cannot now claim that this Proceeding is unrelated "in any way" to the 2014 Actions. The Mutual Release bars this proceeding.

## POINT III

### THE RELEASE AND COVENANT ARE STILL VALID IN THE FACE OF GROUNDLESS ALLEGATIONS OF INTENTIONAL MISCONDUCT.

Applicants' contention that the Mutual Release is unenforceable due to Mr. Akhmetshin's alleged "future intentional misconduct" mistakes both the law and the facts. (*See* Opp. Br. at 8). It mistakes the law in that as the party seeking to set aside the Mutual Release and Covenant Not To Sue, Applicants bear the burden to establish an equitable basis to vitiate the provisions' effect. *See Hummel v. AstraZeneca LP*, 575 F. Supp. 2d 568, 570 (S.D.N.Y. 2008) ("A plaintiff seeking to set aside a release bears the burden to either demonstrate that the release does not apply to plaintiff's claim or to establish an equitable basis to vitiate its effect."). It also mistakes the facts. Applicants conclusory argument that "Hacking and trafficking in

7

stolen property constitute willful misconduct, and therefore, proceedings based on such allegations -- including the present Application -- fall into the willful misconduct exception to the enforceability of release" (Opp. at 8) is inadequate to vitiate the Mutual Release.

Conclusory, even fanciful, allegations should never be sufficient to displace negotiated settlement documents among sophisticated litigants assisted by high-powered counsel, particularly where, as here, those negotiations resolved over a dozen separate actions and proceedings among fourteen (14) separate parties regarding disputes on four different continents. (May 7 Memo at 8-9). If that were the case, mendacious litigants could always avoid the effect of a legally valid release by simply concocting a contrived story -- like Applicants' allegations here -- involving alleged willful or intentional after-the-fact misconduct. The law is neither so naïve nor so feckless.

But in addition to that conceptual dilemma, here Applicants fail to show either that the alleged misconduct occurred *after* the Mutual Release was executed on January 15, 2016, or that Mr. Akhmetshin engaged in intentional misconduct sufficient to invalidate the Release and Covenant Not To Sue. First, Applicants have not demonstrated that the alleged misconduct occurred following execution of the Mutual Release on January 15, 2016. Applicants contend that the Belgian smear campaign began as early as September 1, 2014. (*See* Opp. at 6-7: "as Applicants have explained to Mr. Akhmetshin on several occasions . . . the earliest articles regarding Kazakhgate 2.0 began appearing in the Belgian press in September 2014"). That is still more than a full year before the 2016 Mutual Release was executed.

Moreover, evidencing the contrived nature of the averments, all of the allegations concerning Mr. Akhmetshin fail to describe any dates on which Mr. Akhmetshin's supposed conduct occurred. (*See* Ehrensberger Decl. ¶ 16, Hutman Decl. ¶¶ 11-14). The Application and

Declarations intermingling of allegations from 2014 with supposedly new allegations makes pinpointing the timing of Mr. Akhmetshin's alleged misconduct impossible.[2] The lone allegation for which Applicants proffer a concrete date post-dating execution of the Mutual Release -- in Paragraph 14 of the Hutman Declaration -- provides no direct link between the allegation and Mr. Akhmetshin. (*See* May 7 Memo at 25-26). Indeed, Mr. Hutman only alleges that 2017 was the year in which his anonymous source "was shown a cache of confidential materials . . . that also appear to have been taken from IMR's servers." There is no allegation in the Hutman Declaration as to when the supposed hacking occurred or even any indication that Mr. Akhmetshin participated in the event described. (May 7 Memo at 25).

Second, other than the dateless allegations of hacking -- allegations Mr. Akhmetshin has denied under penalty of perjury -- the only alleged misconduct itemized in the Application is the actions of the Belgian Parliamentary investigators: "Such evidence will help Mr. Chodiev and IMR prove that members of the Parliamentary Commission are improperly colluding with the press or other outsiders in a fashion that has damaged Mr. Chodiev and IMR." (2018 Application at 2). Even if Mr. Akhmetshin had provided information to governmental or Parliamentary investigators -- which he did not -- there is no authority for the proposition that complying with legitimate governmental investigations constitutes "willful misconduct."[3]

---

[2] It is possible that Mr. Ehrensberger's statements that "Investigators for Mr. Chodiev have informed me that Rinat Akhmetshin has attempted to sell them material that Mr. Akhmetshin states was hacked from IMR's computer servers. Those investigators further informed me that Mr. Akhmetshin has stated that he is actively marketing the materials to others." may be describing the January 2014 Halpert meeting described in the Declaration of Akis Phanartzis supporting the 2014 Application. (*Compare* Ehrensberger Decl. ¶ 16 *with* Phanartzis Decl. at Hutman Ex. 1). It is impossible to either confirm or rule out this possibility since Mr. Ehrensberger's second- (or third-) hand recitation omits dates and descriptive context.

[3] Indeed, just last month the Belgian press reported that Belgian investigations concerning "Kazakhgate" have led to criminal indictments. *See, e.g.,* https://www.rtbf.be/info/belgique/detail_le-depute-mr-armand-de-decker-inculpe-dans-l-affaire-du-kazakhgate?id=9911463 (last visited June 15, 2018).

## POINT IV

### THIS COURT HAS JURISDICTION TO ENFORCE THE MUTUAL RELEASE BECAUSE IT WOULD BE UNREASONABLE AND UNJUST TO ENFORCE THE FORUM SELECTION CLAUSE.

Applicants cannot evade the force and effect of the Mutual Release in this Court by invoking the Mutual Release's forum selection clause because they were the ones who "selected" this forum. Applicants initiated this *ex parte* 1782 proceeding against Mr. Akhmetshin in the District of Columbia. They cannot now argue he is deprived of defenses to which he is otherwise entitled because they selected this Court. (Opp. Br. at 9). Such a position is barred by the doctrines of equitable estoppel, judicial estoppel, or both. The doctrine of equitable estoppel provides that "a party with full knowledge of the facts, which accepts the benefits of a transaction, contract, statute, regulation, or order may not subsequently take an inconsistent position to avoid the corresponding obligations or effects." *Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 55 (D.D.C. 2009). Similarly, judicial estoppel "protects the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Kopff v. World Research Grp., LLC*, 568 F. Supp. 2d 39, 43 (D.D.C. 2008). Both doctrines apply here to bar enforcement of the forum selection clause as urged by Applicants, when the very same Applicants seek this Court's imprimatur to enforce their Subpoena.

Beyond equitable and judicial estoppel, where, as here, enforcement of a forum selection clause would be unreasonable or unjust, such a clause should be disregarded by the Court. Forum selection clauses are only "prima facie valid" absent a showing that enforcement "would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Byrd v. Admiral Moving & Storage, Inc.*, 355 F. Supp. 2d 234, 237 (D.D.C. 2005)

(quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)).  The presumption in favor of a forum selection clause is overcome by a showing that "enforcement of the clause would effectively deprive plaintiff of a remedy" or that "enforcement would contravene a strong public policy of the forum in which suit is brought."  *Id.* at 238.  Application of that principle here mandates that the forum selection clause in the Mutual Release should be disregarded because its enforcement would both deprive Mr. Akhmetshin of a remedy and contravene long-established public policies of the United States.

A.Enforcement Of The Clause Will Deny Mr. Akhmetshin A Remedy.

Mr. Akhmetshin should be entitled to the benefit of his bargain in the Mutual Release; denying him the benefit of the Mutual Release's protections would deprive him of a hard-won remedy.  Under the Federal Rules of Civil Procedure, the only court generally with authority to quash a subpoena is the court for the district in which compliance is required.  *See* Fed. R. Civ. P. 45(d)(1), (d)(3)(A), (d)(3)(B) (referring to "the court for the district where compliance is required").  Thus, "when a motion to quash a subpoena is filed in a court other than the court where compliance is required, that court lacks jurisdiction to resolve the motion." *Agincourt Gaming, LLC v. Zynga, Inc.*, No. 2:14-cv-0708-RFB-NJK, 2014 U.S. Dist. LEXIS 114348, at *6 (D. Nev. Aug. 15, 2014); *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 U.S. Dist. LEXIS 165227, at *4-6 (N.D. Cal. Nov. 25, 2014).  The single exception to this rule arises under Fed. R. Civ. P. 45(f), which allows for motions under Rule 45 to be transferred to the issuing court if the person subject to the subpoena consents or if the court finds extraordinary circumstances.  Enforcing the forum selection clause would deny Mr. Akhmetshin his legal remedy to quash the Subpoena, since this is the only court with authority to do so.

B.    Enforcement Of The Clause Contravenes Well Established Public
      Policy Favoring Settlement of Disputes and Judicial Economy.

The forum selection clause should also be disregarded here because enforcement would contravene long established public policies favoring settlement of disputes and judicial economy, among others. Other policies include those to protect third parties from undue burdens of discovery and unreasonable costs, including specifically the burden of traveling to another jurisdiction. Such policies are incorporated into 28 U.S.C. § 1782 itself, which permits discovery for use in a foreign proceeding *only* in the district "in which a person resides or is found." The Federal Rules of Civil Procedure, incorporated into discovery proceedings pursuant to 28 U.S.C. § 1782, similarly manifest these policies. Fed R. Civ. P. 45(c)(1) prohibits a Subpoena from commanding a person to attend a trial, hearing, or deposition outside of "100 miles of where the person resides, is employed, or regularly transacts business in person." The Supreme Court has explained that this rule is "designed not only to protect witnesses from the harassment of long, tiresome trips but also in line with our national policy, to minimize the cost of litigation, which policy is strongly emphasized in the Federal Rules of Civil Procedure." *Farmer v. Arabian Am. Oil Co.*, 379 U.S. 227, 234-35 (1964).

Mr. Akhmetshin resides in the District of Columbia. (*See* 2018 App. at 10). New York is not within 100 miles of where Mr. Akhmetshin "resides, is employed, or regularly transacts business in person." To require Mr. Akhmetshin to travel to over 200 miles to New York to enforce the Mutual Release, as Applicants contend is required, would patently offend the public policies codified in § 1782.

Enforcement would also contravene the strong public policies encouraging judicial economy and protection of scarce judicial resources. *See, e.g., NOW v. Operation Rescue,* 37 F.3d 646, 651 (D.C. Cir. 1994) ("The policies of judicial economy, convenience, and

fairness to litigants are served by allowing the appellees to seek a single injunction based on both federal and local law claims arising out of a single set of facts and events, rather than pursuing parallel actions in both federal and District of Columbia courts."); *Andrade v. Lauer*, 234 U.S. App. D.C. 384, 729 F.2d 1475, 1489 (1984) ("Judicial economy will be served by avoiding duplicative proceedings . . . ."); *National Family Planning & Reproductive Health Ass'n v. Sullivan,* Civ. Act. No. 92-2177, 1992 WL 345629, 1992 U.S. Dist. LEXIS 15217, *5 (D.D.C. Oct. 5, 1992) ("This principle of judicial comity is derived from the policies favoring the conservation of judicial resources as well as providing for the comprehensive disposition of litigation before the federal courts."). In these circumstances, enforcing the forum selection cause would be both unreasonable and unjust.

## CONCLUSION

For all the reasons set forth above, as well as those in Mr. Akhmetshin's May 7, 2018 Motion to Quash and supporting documentation, this Court should quash the 2018 Subpoena, vacate its February 2, 2018 Order as improvidently granted, and deny with prejudice Applicants' *ex parte* Application. Mr. Akhmetshin also prays for such other and further relief as this Court deems just and proper, including an award of attorneys' fees and costs of compliance to which he is contractually or statutorily entitled.

Dated:   Washington, D.C.
         June 15, 2018

                                                          Respectfully submitted,

                                                           /s/ Kim Hoyt Sperduto
                                                          Kim Hoyt Sperduto
                                                          D.C. Bar No. 416127
                                                          Joshua S. Kauke
                                                          D.C. Bar No. 999296

SPERDUTO THOMPSON & GASSLER PLC
1747 Pennsylvania Ave., N.W.
Suite 1250
Washington, D.C.  20006
202.408.8900
202.408.8910 (f)

ksperduto@stglawdc.com
jkauke@stglawdc.com

Counsel for Rinat Akhmetshin